**LEWIS ROCA ROTHGERBER CHRISTIE LLP**
John C. Gray (Bar No. 028454)
201 East Washington Street, Suite 1200
Phoenix, AZ 85004
Telephone:  (602) 262-5311
Facsimile:  (602) 262-5747
Email:  jgray@lewisroca.com

**SHEARMAN & STERLING LLP**
Adam S. Hakki (admitted *pro hac vice*)
Daniel C. Lewis (admitted *pro hac vice*)
Joshua T. Ebersole (admitted *pro hac vice*)
599 Lexington Avenue
New York, NY 10022-6069
Telephone:  (212) 848-4000
Email:  ahakki@shearman.com
          daniel.lewis@shearman.com
          joshua.ebersole@shearman.com

*Counsel for Defendant Sea Limited*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Laborers District Council Construction Industry Pension Fund, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>Sea Limited, et al.,<br><br>    Defendants. | Case No. 2:23-CV-01455-DLR<br><br>Consolidated with:<br>Case No. CV-23-01889-PHX-DLR<br><br>**DEFENDANT SEA LIMITED'S MOTION TO DISMISS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**(Oral Argument Requested)** |

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ............................................................................... 1

FACTUAL BACKGROUND AND NATURE OF THE CASE ............................... 4

   I.    PLAINTIFF'S GARENA ALLEGATIONS ............................................... 5

       A.    Sea's Garena Business ................................................................. 5

       B.    Garena's *League Of Legends* PC Game License .............................. 5

       C.    The Launch Of *Free Fire* Transforms Garena .............................. 5

       D.    Expiration Of The License Agreement ........................................ 6

       E.    Garena's First Quarter 2023 Earnings ......................................... 6

   II.   PLAINTIFF'S SHOPEE ALLEGATIONS ............................................... 7

       A.    The Growth Of Shopee ............................................................... 7

       B.    Macro-Economic Changes And Shopee's Strategic Shift Toward
Self-Sufficiency And Profitability ............................................... 8

       C.    Sea's Fourth Quarter 2022 And First Quarter 2023 Results ............ 9

       D.    Sea's Strategic Reinvestments In Shopee's Growth ..................... 10

LEGAL STANDARD ........................................................................................ 11

ARGUMENT ...................................................................................................... 12

   I.    THE CAC FAILS TO IDENTIFY ANY FALSE STATEMENT .......................... 12

       A.    Plaintiff Does Not Identify Any False Statements About The Garena
License Agreement ................................................................... 12

       B.    Plaintiff's Allegations Establish That Sea Repeatedly And Accurately
Informed Investors About Shopee's Strategy ................................. 14

           1.    Sea did exactly what it told investors it planned to do ............ 14

           2.    Plaintiff's own allegations refute any suggestion that Sea concealed a
putative "trade off" between Shopee's growth and sustainability as a
platform ........................................................................... 15

           3.    Sea accurately informed investors that it would begin to disclose GMV
on an annual rather than quarterly basis ............................... 16

           4.    Plaintiff does not credibly allege that Sea knowingly concealed the
competitive impact of its cost-cutting initiative ..................... 16

   II.   THE ALLEGEDLY MISLEADING STATEMENTS ARE INACTIONABLE
AS A MATTER OF LAW .............................................................. 18

       A.    Sea's Accurate Statements Of Fact Are Not Actionable ................. 18

i

B.    Sea's Statements Reflecting Corporate Optimism Are Not Actionable ......... 19

C.    Sea's Forward-Looking Statements Are Not Actionable .............................. 20

III.    THE CAC FAILS TO PLEAD FRAUDULENT INTENT ................................. 22

A.    The Alleged Stock Sales (And Lack Thereof) Negate A Finding Of Fraudulent Intent ................................................................................. 23

1.    That The Alleged Stock Sales Were Pursuant To Rule 10b5-1 Trading Plans Undermines Any Inference Of Scienter ........................... 23

2.    The Alleged Sales Were *De Minimis* And Not Alleged To Be Inconsistent With Pre-Class Period Sales ................................. 24

3.    The Timing Of Sales Does Not Support An Inference Of Scienter ........ 25

B.    Plaintiff's Circumstantial Knowledge Allegations Fail To Support A "Strong Inference" Of Scienter ................................................. 26

C.    Plaintiff Ignores "Plausible, Nonculpable Explanations" That Are More Likely Than Fraud ..................................................... 29

IV.    PLAINTIFF'S "CONTROL PERSON" CLAIM SHOULD BE DISMISSED.... 30

CONCLUSION................................................................................ 30

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*In re Action Performance Cos. Inc. Sec. Litig.*,
   2007 WL 496770 (D. Ariz. Feb. 13, 2007) ................................................................... 19

*In re Bemis Co. Sec. Litig.*,
   512 F. Supp. 3d 518 (S.D.N.Y. 2021) ........................................................................ 22

*City of Pontiac Gen. Emps.' Ret. Sys. v. First Solar, Inc.*,
   2023 WL 155861 (D. Ariz. Jan. 10, 2023) ........................................................ *passim*

*City of Royal Oak Ret. Sys. v Juniper Networks, Inc.*,
   880 F. Supp. 2d 1045 (N.D. Cal. 2012) ....................................................................... 22

*In re Copper Mountain Sec. Litig.*,
   311 F. Supp. 2d 857 (N.D. Cal. 2004) ......................................................................... 21

*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010) .............................................................................. 19, 22

*In re Diebold Nixdorf, Inc., Sec. Litig.*,
   2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ............................................................ 17

*Dreiling v. Am. Online Inc.*,
   578 F.3d 995 (9th Cir. 2009) ......................................................................................... 7

*In re Eventbrite, Inc. Sec. Litig.*,
   2020 WL 2042078 (N.D. Cal. Apr. 28, 2020) ............................................................ 19

*In re Fusion-io, Inc. Sec. Litig.*,
   2015 WL 661869 (N.D. Cal. Feb. 12, 2015) .............................................................. 19

*Hoang v. ContextLogic, Inc.*,
   2023 WL 6536162 (N.D. Cal. Mar. 10, 2023) ........................................................... 26

*Irving Firemen's Relief & Ret. Fund v. Uber Tech., Inc.*,
   998 F.3d 397 (9th Cir. 2021) ....................................................................................... 11

*Lipton v. Pathogenesis Corp.*,
   284 F.3d 1027 (9th Cir. 2002) ............................................................................... 25, 26

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) ............... 24

iii

*Macomb Cnty. Emp. Ret. Sys. v. Align Tech., Inc.*,
   39 F.4th 1092 (9th Cir. 2022) ....................................................................... 20

*Marder v. Lopez*,
   450 F.3d 445 (9th Cir. 2006) .......................................................................... 4

*Metzler Inv. GMBH v. Corinthian Colleges., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ............................................................... *passim*

*Monachelli v. Hortonworks Inc.*,
   225 F. Supp. 3d 1045 (N.D. Cal. 2016). ........................................................ 18

*In re Nimble Storage, Inc. Sec. Litig.*,
   756 F. App'x 779 (9th Cir. 2019) .................................................................. 19

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
   423 F. Supp. 2d 364 (S.D.N.Y. 2006) ...................................................... 26, 27

*In re Northpoint Commc'ns Grp., Inc. Sec. Litig.*,
   184 F. Supp. 2d 991 (N.D. Cal. 2001) ........................................................... 17

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
   300 F. Supp. 3d 551 (S.D.N.Y. 2018), *aff'd sub nom.*,
   *Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 Fed. App'x 51 (2d Cir. 2019) .............. 20

*Palm Harbor Special Fire Control & Rescue Firefighters Pension Plan v.*
   *First Solar Inc.*, 2023 WL 4161355 (D. Ariz. June 23, 2023) ................................ 23, 27

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ....................................................................... 27

*In re Rigel Pharms., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ......................................................................... 12

*In re Rockwell Med., Inc. Sec. Litig.*,
   2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) .................................................. 26

*Santa Fe Indus., Inc. v. Green*,
   430 U.S. 462 (1977) ..................................................................................... 18

*In re Solarcity Corp. Sec. Litig.*,
   274 F. Supp. 3d 972 (N.D. Cal. 2017) ........................................................... 20

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
   160 F. Supp. 2d 1059 (N.D. Cal. 2001) ......................................................... 20

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
   531 F.3d 190 (2d Cir. 2008) .......................................................................... 23

iv

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ......................................................................... 29

*In re Tibco Software, Inc.*,
    2006 WL 1469654 (N.D. Cal. May 25, 2006) ....................................... 25, 26

*Turocy v. El Pollo Loco Holdings, Inc.*,
    2016 WL 4056209 (C.D. Cal. July 25, 2016) ........................................ 25

*In re Twitter, Inc. Secs. Litig.*,
    506 F. Supp. 3d 867 (N.D. Cal. 2020), *aff'd sub nom.*
    *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022) ......... 11, 13, 15

*Webb v. Solarcity Corp.*,
    884 F.3d 844 (9th Cir. 2018) ............................................................ 27

*Wenger v. Lumisys, Inc.*,
    2 F. Supp. 2d 1231 (N.D. Cal. 1998) .................................................. 18

*In re Wet Seal, Inc. Secs. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) .............................................. 20

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) ............................................................ 23

*Wozniak v. Align Techs., Inc.*,
    2011 WL 2269418 (N.D. Cal. June 8, 2011) ........................................ 24

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ............................................... 11, 27, 29, 30

**STATUTES**

15 U.S.C. § 78j ....................................................................................... 11, 30

15 U.S.C. § 78t ....................................................................................... 30

15 U.S.C. § 78u-4(b)(1)(B) ..................................................................... 11

15 U.S.C. § 78u-4(b)(2) .......................................................................... 11

15 U.S.C. § 78u-5(c) ............................................................................... 20

**REGULATIONS**

17 C.F.R. § 240.10b5-1 ........................................................................... 23, 24

**RULES**

Fed. R. Civ. P. 12(b)(6) ..................................................................................... 1

Fed. R. Civ. P. 9(b) ................................................................................ 1, 11, 26

Defendant Sea Limited ("Sea" or the "Company") respectfully moves to dismiss the Consolidated Amended Complaint (the "Complaint" or "CAC") pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).[1]  Pursuant to LRCiv 12.1(c), the parties conferred but could not agree that the CAC is curable by permissible amendment.

## **PRELIMINARY STATEMENT**

The CAC is a textbook example of the sort of conclusory and deficient pleading the federal securities laws forbid.  Working backward from a decline in Sea's stock price, Plaintiff tries to construct a fraud case from nothing but after-the-fact speculation about the reasons Sea's share price moved.  Plaintiff fails utterly.  The Court should dismiss this lawsuit on multiple independent grounds.

Sea is a global consumer internet company founded and based in Singapore, which operates three core businesses: (a) Garena, a global online games developer and publisher; (b) Shopee, the largest pan-regional e-commerce platform in Southeast Asia and Taiwan, with significant presence in Brazil; and (c) SeaMoney, a leading digital payments and financial services provider in Southeast Asia.  Sea experienced several years of rapid growth following its IPO in 2017.  During the Covid-19 pandemic, like many global internet companies, Sea experienced further accelerated growth as a result of heightened demand for online consumption.  During this period, Sea invested in its organic growth and raised funds from the capital markets to support that growth.  However, post-Covid reopening trends and changes in the macro-economic environment over the ensuing period, during which the Federal Reserve rapidly raised interest rates, created significant well-documented headwinds for markets and companies.  Against this backdrop, during the third quarter of 2022, Sea informed investors of a change in strategy

---

[1] Forrest Li, Tony Hou, Yanjun Wang, Gang Ye, and David Chen (the "Individual Defendants") have not been served.  However, because these arguments apply equally to them, the Court should dismiss the CAC in its entirety.

1

to focus on self-sufficiency, efficiency, and cashflow management, and it began cutting costs. In its third quarter 2022 earnings call, Sea further explained its decision and noted that once it reached breakeven and reduced dependence on external funding, it may decide to reaccelerate growth.

In desperate search of a theory, Plaintiff has failed to identify any misstatement, let alone clear the high bar for pleading fraud. The original complaint alleged the decline in the Company's share price was attributable to alleged misstatements relating to loan provisioning in the SeaMoney business. Those allegations were rightly abandoned, but their replacements concerning Sea's two other businesses are equally baseless.

Plaintiff's first new theory is that Defendants misled investors about the expiration of a license to publish the personal computer ("PC") game *League of Legends* in six Southeast Asian markets and Taiwan and its anticipated impact on Garena's financial results for the first quarter of 2023. (*See, e.g.*, CAC ¶¶ 65, 70, 78, 81, 83.) But its expiration date had been publicly disclosed since Sea's IPO in 2017. Sea's management had explained in response to an investor question that Sea believed the expiration of the agreement would be immaterial, and fatally absent from the CAC is any non-speculative allegation that Garena's performance was impacted by the expiration of a single PC game license in a region where mobile internet access predominates. To the contrary, Garena's results in the first quarter of 2023 did not reflect any departure from the post-COVID and macro-economic trends affecting the mobile gaming industry at large for several quarters. And long before the start of the alleged Class Period, it was widely known and clearly disclosed that Garena's results were largely driven by Sea's record-breaking self-developed mobile game, *Free Fire*, which reportedly was the most-downloaded and one of the highest-grossing mobile games globally for several years running. Lead Counsel themselves claimed as much in a separate, unrelated (and unsuccessful) lawsuit.

Plaintiff's second new theory related to Sea's e-commerce business, Shopee, is even more far-fetched. Plaintiff claims that, when Sea announced a change in strategy toward self-sustainability, it must have been lying because several quarters later—when

2

facing changed competitive conditions and after Sea had undisputedly succeeded in achieving profitability—the Company began reinvesting in growing its e-commerce business.  This alleged scheme is purportedly evidenced by (i) Sea's alleged prior knowledge that its cost-cutting would require an unacceptable sacrifice of Shopee's growth and market share; (ii) Sea's transition from providing quarterly to annual disclosures of Shopee's gross merchandise value ("GMV"), a non-GAAP operating metric of e-commerce platform sales; and (iii) Sea's subsequent decision to reinvest in Shopee's growth.  (*See, e.g.*, CAC ¶¶ 66-70, 72-78, 82, 83, 85-90.)

None of Plaintiff's allegations withstands scrutiny.  *First*, Sea clearly disclosed its strategic shift toward achieving sustainability and self-sufficiency and, from the beginning, explained that it would continue to evaluate and adjust, including disclosing that, "[o]nce we achieve self-sufficiency, we will be in a position to decide to reaccelerate growth again in a much more efficient and a long-term sustainable manner" (Ex. 8, 3Q22 Call Tr., at 5), which is exactly what Sea did.  *Second*, Sea acknowledged up front that this strategic shift could negatively impact Shopee's growth in the short term, and that Sea was willing to accept that.  *Third*, Sea disclosed in advance its decision to shift from quarterly to annual disclosures of GMV, and it continued to provide investors with various GAAP metrics of Shopee's performance.  *Fourth*, Plaintiff does not dispute that Sea in fact pursued self-sustainability and achieved profitability both for Shopee and as a group and, upon doing so, began reinvesting in growth just as it disclosed it might do.

It is not fraud simply because Plaintiff may disapprove of Sea's corporate strategy, and Plaintiff's attempt to paint this fully-disclosed shift in strategy as a sinister and convoluted plot to trick investors is absurd on its face.  In any event, the above statements are also inactionable as a matter of law because they are (i) accurate statements of current or historical fact, (ii) statements of opinion or corporate optimism, and/or (iii) forward-looking statements protected by the statutory safe harbor under the PSLRA.

The CAC also should be dismissed for failing to adequately allege scienter.  The CAC offers a theory of motive supposedly supported by stock sales by two of the five

Individual Defendants pursuant to "10b5-1" trading plans, which total only 0.1% and 2.1% of their respective total beneficial ownership based upon Plaintiff's allegations and the public documents upon which Plaintiff relies.  The Ninth Circuit has uniformly held that such sales are insufficient to plead scienter.  *Second*, the CAC fails to plead that any information contradicting any public statement was known by any Defendant at the time any statement was made.  Instead, Plaintiff alleges Defendants must have known their statements were false based on their positions and because they had "day-by-day" visibility into Sea's "key metrics" for Garena and Shopee.  The Ninth Circuit has repeatedly held that these sort of circumstantial "must have known" allegations fail to state a securities fraud claim.

The CAC should be dismissed in its entirety with prejudice.

## FACTUAL BACKGROUND AND NATURE OF THE CASE[2]

Sea experienced remarkable growth across its businesses in the years after its IPO in 2017.  (CAC ¶ 34.)  Covid-19 and lockdowns during the pandemic provided further tailwinds.  (*Id.*)  As disclosed to investors, post-Covid reopening trends and changes in the macro-economic environment over the ensuing period posed significant headwinds. (*See id.* ¶ 35.)

In its earnings announcement for the second quarter of 2022, Sea informed investors of a change in strategy to focus on self-sustainability and cashflow management.  (*See id.* ¶ 38.)  Sea undertook a number of aggressive cost-cutting measures as it did not anticipate being able to rely on external capital.  (*Id.*)  During its third quarter 2022 earnings call, Sea further explained its decision and shared that once it reached breakeven and reduced its dependence on external funding, it may decide to reaccelerate growth.  (Ex. 8, 3Q22 Call Tr., at 4-5.)

---

[2] This section is based on the CAC and documents incorporated by reference or subject to judicial notice.  *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008); *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).  "Ex." refers to exhibits to the Declaration of John Gray, filed herewith.  Unless otherwise indicated, internal quotations and citations are omitted and emphasis is added.

1    **I.      PLAINTIFF'S GARENA ALLEGATIONS**

2        **A.      Sea's Garena Business**

3        Garena, Sea's digital entertainment business, is a global developer and publisher

4    of online games.  (Ex. 1, 2022 20-F, at 49.)  Garena offers self-developed games such as

5    *Free Fire* and games that are licensed from third-party developers.  (*Id*. at 49, 52)  In

6    addition to GAAP metrics, Sea discloses various performance metrics for Garena,

7    including "bookings," quarterly active users ("QAUs"), and quarterly paying users

8    ("QPUs").  (CAC ¶¶ 27-30.)

9        **B.      Garena's *League Of Legends* PC Game License**

10       In connection with its licensing publishing business, Garena entered into a

11   Software License and Distribution Agreement with Riot Games, Inc. ("Riot") in January

12   2010 (the "License Agreement").  Pursuant to the License Agreement, which was

13   publicly filed with the SEC at the time of Sea's IPO in 2017, Riot granted Garena a

14   license to offer the PC game *League of Legends* in six Southeast Asian markets and

15   Taiwan for a specified term in exchange for a license fee and ongoing royalty payments

16   to Riot.  (CAC ¶ 40; *see also* Ex. 2, License Agreement.)  Since 2017, it was publicly

17   disclosed and known that the License Agreement would expire on December 31, 2022.

18   (Ex. 2, License Agreement.)[3]

19       **C.      The Launch Of *Free Fire* Transforms Garena**

20       Garena launched the mobile game *Free Fire*, the first game it developed entirely

21   in-house, in December 2017.  (CAC ¶ 24.)  In contrast to the PC game *League of*

22   *Legends*, which was offered by Garena in Southeast Asia and Taiwan, *Free Fire* is

23   available in more than 130 countries globally, including the United States and countries

24   in South America, Europe, Asia, Africa, and the Middle East.  (Ex. 1, 2022 20-F, at 47.)

25   *Free Fire* reportedly was the most downloaded mobile game globally in 2019, 2020, and

26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [3] The CAC refers to the wrong publicly filed agreement and thus identifies the wrong
28   parties and terms throughout.  The License Agreement was only between Garena and
     Riot, and Tencent was not a party.  (Ex. 2, License Agreement.)

2021.  (Ex. 4, 4Q21 Earnings, at 2.)  As early as the fourth quarter of 2018, still early in *Free Fire's* growth, the Company disclosed that more than 85% of its digital entertainment revenue on an adjusted revenue basis came from mobile games, not PC games.  (Ex. 3, 4Q18 Earnings, at 5.)[4]

As disclosed by the Company in 2022, "given the size of *Free Fire*," the results for Garena have been "largely driven by *Free Fire*."  (Ex. 6, 2Q22 Call Tr., at 10.)  This was also acknowledged by Plaintiff's own Lead Counsel in a separate and unrelated lawsuit, which has since been dismissed.  (Ex. 5, Taylor Am. Compl., ¶¶ 36, 46.)  Indeed, while *Free Fire* was discussed on every single earnings call from the first quarter of 2019 through the third quarter of 2023, the *League of Legends* PC game was only mentioned on two of those nineteen earnings calls and was not mentioned at all in any of the corresponding earnings press releases.  (Gray Decl. ¶ 2.)

**D.      Expiration Of The License Agreement**

In line with the terms of the publicly disclosed License Agreement, on November 9, 2022, Riot issued a press release announcing that Riot would begin self-publishing *League of Legends* effective January 2023, *i.e.*, 53 days before the already disclosed expiration of Garena's license.  (CAC ¶ 40.)  Six days later, when the Company released its third quarter earnings for 2022, Sea was asked whether the expiration of the License Agreement would impact Garena's publishing business going forward.  (CAC ¶ 48; Ex. 8, 3Q22 Call Tr., at 9-10.)  Sea responded that "the expiry of [the] agreement would have no impact on [its] overall publishing business as the contribution [was] immaterial."  (*Id.*)

**E.      Garena's First Quarter 2023 Earnings**

On May 16, 2023, Sea announced its first quarter results for 2023.  For Garena, Sea reported bookings of $462.3 million (compared to $543.6 million for the previous quarter), QAUs of 491.6 million (compared to 485.5 million for the previous quarter),

---

[4] Southeast Asia is a region well known for lower PC penetration and high mobile internet adoption.  (*See* Ex. 7, e-Conomy SEA 2019 at 4 ("There are 360 million Internet users in the region and 90% of them connect to the Internet primarily through their mobile phones.").)

and QPUs of 37.6 million (compared to 43.6 million for the previous quarter).  (CAC ¶¶ 28-30.)  Plaintiff claims that the decline in certain of these metrics was a result of the termination of the License Agreement.  (*See, e.g.*, CAC ¶ 49.)  However, Plaintiff does not allege any deviation from the existing trends or that the Company or any coverage analyst or industry reporter ever identified any impact from the expiration of the License Agreement.

Indeed, the first quarter 2023 results were consistent with Sea's prior disclosure that it was seeing "ongoing moderation in engagement and monetization with the reopening trends and uncertain macro environment," which was in line with trends affecting the global gaming sector more broadly following post-Covid reopenings and the emergence of various macro-economic uncertainties, such as inflation and rising interest rates in 2022.  (Ex. 8, 3Q22 Call Tr., at 8.)  As Plaintiff's own tables show (CAC ¶¶ 28-30), the first quarter results for 2023 actually demonstrated *improvement* in the quarter-on-quarter rate of decline for each of bookings, QAUs, and QPUs, indicating ongoing stabilization rather than any sharp decline:

  

## II.     PLAINTIFF'S SHOPEE ALLEGATIONS

### A.     The Growth Of Shopee

Shopee, Sea's e-commerce business, was launched in 2015.  Shopee operates an online marketplace that connects buyers and sellers offering a wide product assortment, as well as integrated payments and logistics.  (CAC ¶ 25.)  It serves users in select markets in Asia and Latin America and is the leading e-commerce platform in Southeast Asia and Taiwan.  In its quarterly results, Sea disclosed GAAP[5] and non-GAAP financial

---

[5] GAAP standards are "recognized as authoritative by the [SEC]."  *Dreiling v. Am. Online Inc.*, 578 F.3d 995, 998-99 (9th Cir. 2009).

metrics such as revenue, marketplace revenue, and adjusted EBITDA, and through the fourth quarter of 2022, it also disclosed certain non-GAAP operating metrics such as GMV and orders.  (Ex. 9, 4Q22 Earnings, at 2.)

**B.    Macro-Economic Changes And Shopee's Strategic Shift Toward Self-Sufficiency And Profitability**

During the earnings call discussing the second quarter of 2022, Sea reported that it was seeing "an environment of increased macro uncertainty with rising inflation, rising interest rates, local currency depreciation against the U.S. dollar and ongoing reopening trends[,]" and that "being agile and adaptable is even more crucial to the long-term success of [its] business."  (Ex. 6, 2Q22 Call Tr., at 4.)  Accordingly, Sea announced a strategic shift to "rapidly prioritiz[e] profitability and cash flow management," including "more tightly managing [] operating expenses, such as marketing costs."  (*Id*. at 6, 7; CAC ¶¶ 38, 53.)  As part of this shift, Sea announced that it would undertake a significant effort to manage costs to achieve profitability.  (*See* Ex. 6, 2Q22 Call Tr., at 6.)

The Company reiterated its strategic shift to focus on profitability over rapid growth during the earnings call for the third quarter of 2022:  "Given the significant uncertainties in the macro environment, we have entirely shifted our mindset and focus from growth to achieving self-sufficiency and profitability as soon as possible . . . ."  (Ex. 8, 3Q22 Call Tr., at 4-5; CAC ¶ 53.)  With respect to Shopee specifically, Sea explained that it had "meaningfully scaled back marketing expenses, especially around shipping subsidies" during the quarter.  (*Id*.)  Indeed, Shopee's sales and marketing expenses that quarter decreased 16.4% year-over-year, and Sea's overall sales and marketing expenses decreased 19.1% on a year-over-year basis.  (Ex. 10, 3Q22 Earnings, at 6.)  To help investors better understand Shopee's monetization, Sea also began disclosing additional metrics, namely its "core marketplace revenue" and "value-added services revenue," which were broken out from the Company's "marketplace revenue."  (*Id*. at 2.)  Sea also announced that maximizing GMV growth would no longer be a priority until the Company achieved self-sufficiency, at which point Sea would "assess [its] situation and

see what's the best path forward." (Ex. 8, 3Q22 Call Tr., at 11.)

### C.     Sea's Fourth Quarter 2022 And First Quarter 2023 Results

Sea reported at a group level a positive net income for the first time since its IPO in the fourth quarter of 2022. (Ex. 9, 4Q22 Earnings, at 1; CAC ¶ 58.) As to Shopee, which was profitable on an adjusted EBITDA basis, the Company identified improvement in "operating costs" as one of the "key factors driving fourth quarter profitability." (Ex. 11, 4Q22 Call Tr., at 5.) Specifically, Sea disclosed that "GAAP sales and marketing expenses improved by 34% quarter-on-quarter and 55% year-on-year driven by more targeted investments across shipping incentives and brand marketing." (*Id*.)

Notwithstanding the significant reduction in sales and marketing expenses for Shopee, Sea disclosed that GMV "sustained and grew around 7% on the constant currency basis year-on-year," which demonstrated "the resilience of [Sea's] ecosystem and the strong leadership and execution excellence of [its] team in managing this fast transition over a few months' time to turn the platform into a positive bottom line" while sustaining the "strong leadership of the platform." (*Id.* at 9.) Sea opined that it believed "some of our measures that we are focused on such as cost structure improvement, logistics improvement, seller management, better consumer services and better buyer experience, all will improve the efficiency of any investment we make into our ecosystem and also improve the profitability as well as growth." (*Id.* at 11.) In response to a question from an analyst regarding the competitive landscape and the threat from the new social commerce player (*i.e.*, TikTok Shop), Sea explained that it believed the current focus on improved efficiency would help Shopee "defend our ecosystem against any future competition" and that Sea would "remain vigilant on competition." (*Id.* at 10.)

Sea also explained during the call that GMV would remain an "output" (*i.e.*, not be a target or key performance indicator) while Sea "continue[s] to focus on tightening [its] efficiency and profitability." (*Id.* at 12.) Sea said that it would "discontinue any quarter-on-quarter disclosure of operating metrics like GMV and orders" and would

"move to an annual disclosure in line with global peers"[6] for the time being.  (*Id.*)

In line with Sea's stated strategy of focusing on self-sufficiency and profitability, the Company was again profitable for the first quarter of 2023.  (Ex. 12, 1Q23 Earnings, at 1; CAC ¶ 85.)  Consistent with what Sea previously told investors, Sea did not report quarterly GMV but continued to provide other quarterly metrics for Shopee's revenue and monetization.  (Ex. 12, 1Q23 Earnings, at 1-2.)  In response to investor questions, Sea disclosed that it had observed seasonality trends quarter-over-quarter for GMV that were consistent with the seasonality trends it observed the prior year.  (Ex. 13, 1Q23 Call Tr., at 9; CAC ¶ 87.)

**D.     Sea's Strategic Reinvestments In Shopee's Growth**

On August 15, 2023, Sea announced that it was profitable on a net income basis again in the second quarter of 2023.  (Ex. 14, 2Q23 Earnings, at 1.)  In discussing its results for that quarter, Sea reported it had "achieved self-sufficiency" and "demonstrated the profitability of our model and our ability to manage fast and significant shifts in operational focus as we see fit."  (*Id.*)

Consistent with Sea's earlier disclosure that it would re-evaluate its strategy shift once it achieved self-sufficiency, Sea said that it believed it could again "ramp up [its] investments in growing the e-commerce business across [its] markets," that "the efficiency gains and a stronger footing we have achieved through our past efforts have further strengthened our ability to invest efficiently in growth," and that it would continue to emphasize "self-sufficiency and improving cost efficiency as a key competitive moat." (Ex. 15, 2Q23 Call Tr., at 5.)  When asked whether Sea would begin disclosing quarterly GMV "if the focus of the management is shifting towards growth again," Sea responded that it would "continue to make a decision about it quarter-on-quarter" and that it "may

---

[6] Other publicly listed companies such as Amazon (AMZN), Alibaba (BABA), and PDD Holdings (PDD), which owns Temu, do not generally disclose a quantitative breakdown of GMV metrics for their e-commerce platforms and in particular did not do so in their quarterly earnings releases for the third quarter of 2022.  (*See* Exs. 21-23.)

provide certain spot disclosure from time to time where we see relevant." (*Id*. at 13.)
Consistent with this, in the third quarter of 2023, Sea disclosed quarterly GMV along
with other quarterly metrics relating to Shopee's revenue and monetization.  (CAC ¶ 62.)

## LEGAL STANDARD

A Section 10(b) claim requires Plaintiff to plead "(1) a material misrepresentation
or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security,
(4) transaction and loss causation, and (5) economic loss." *Zucco Partners, LLC v.
Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

Securities fraud claims are subject to heightened pleading standards.  "[A]
complaint stating claims under section 10(b) and Rule 10b-5 must satisfy the dual
pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA." *Id.*
Rule 9(b) requires "particular allegations, thereby protecting a defendant's reputation
from frivolous and unfounded allegations." *Irving Firemen's Relief & Ret. Fund v. Uber
Tech., Inc.*, 998 F.3d 397, 404 (9th Cir. 2021).  In addition to alleging the "time, place[,]
and nature of the alleged fraudulent activities," Plaintiff must "plead evidentiary facts"
sufficient to establish any allegedly false statement "was untrue or misleading when
made." *In re Twitter, Inc. Secs. Litig.*, 506 F. Supp. 3d 867, 880 (N.D. Cal. 2020), *aff'd
sub nom. Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022).  "The
PSLRA has exacting requirements for pleading 'falsity,'" *Metzler Inv. GMBH v.
Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008), and requires that "the
complaint shall specify each statement alleged to have been misleading, the reason or
reasons why the statement is misleading, and, if an allegation regarding the statement or
omission is made on information and belief, the complaint shall state with particularity all
facts on which that belief is formed," 15 U.S.C. § 78u-4(b)(1)(B).

To plead scienter, *i.e.*, fraudulent intent, Plaintiff must "state with particularity
facts giving rise to a *strong inference* that the defendant acted with the required state of
mind." 15 U.S.C. § 78u-4(b)(2).  "To support a strong inference of scienter, a complaint
must allege that a defendant made false or misleading statements with an 'intent to

deceive, manipulate, or defraud,' or with deliberate recklessness." *City of Pontiac Gen. Emps.' Ret. Sys. v. First Solar, Inc.*, 2023 WL 155861, at *5 (D. Ariz. Jan. 11, 2023). "A complaint will survive a motion to dismiss 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id*. at *6. "These standards 'present no small hurdle for the securities fraud plaintiff.' . . . The Court must 'engage in a comparative evaluation [and] . . . consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged.'" *Id*.

## ARGUMENT

## I.   THE CAC FAILS TO IDENTIFY ANY FALSE STATEMENT

A securities fraud claim can survive dismissal only if it identifies a false statement. *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012) (securities fraud complaint must specifically "identify[] the statements at issue[,] . . . what is false or misleading [] about [each] statement[,] and why the statements were false or misleading at the time they were made"). The CAC fails to do so.

### A.   Plaintiff Does Not Identify Any False Statements About The Garena License Agreement

In essence, Plaintiff's Garena claim is that Sea concealed the expiration of the License Agreement in accordance with its publicly-filed terms, which allegedly had a material impact on Garena's results for the first quarter of 2023. Plaintiff insists this must be the case even though (i) the expiration date had been public since 2017, (ii) Sea told investors it would have no such impact, and (iii) Garena's results for that quarter were consistent with prior ongoing trends. (*See, e.g.*, CAC ¶¶ 48, 65.) Tellingly, the CAC does not cite a single fact—not one external analyst report, industry commentary, internal report at Sea, or witness statement—attributing any change in Sea's results to the termination of the License Agreement.

As an initial matter, Plaintiff's claim that Sea misleadingly withheld information from investors concerning the pending expiration of the License Agreement is based on

Plaintiff's demonstrably false premise that the License Agreement had a six month notice renewal provision.  (CAC ¶ 46.)  It does not, and Plaintiff cites the wrong agreement.  The *League of Legends* PC game license was scheduled to expire on December 31, 2022, pursuant to the License Agreement that was publicly filed with the SEC in 2017.  (*See supra* p. 5.)  In any event, the CAC acknowledges that there was an additional announcement of the License Agreement's expiration in November 2022, which occurred 53 days before it was set to expire according to its terms.  (CAC ¶ 40.)  Any allegation that such information was withheld is baseless.

As to the allegation that management lied when it said the impact of the expiration would be immaterial, Plaintiff offers nothing but conclusory say-so.  Plaintiff offers no "evidentiary facts" as required, *Twitter*, 506 F. Supp. 3d at 880, to support the claim that publishing license revenues for the PC game *League of Legends*— which covered only seven markets in a region dominated by mobile internet access and which Garena had to pay royalties to Riot—were material to Garena's financial results in 2022, ***let alone Sea's***.  (*See supra* pp. 5-7.)  The CAC points to years-old historical statements by Sea that identified *League of Legends* as one of Sea's "most popular games."  (CAC ¶¶ 40-49, 65, 70.)  But Plaintiff conveniently ignores that Garena's results in the years leading up to the expiration of the License Agreement were largely driven by the global success of its self-developed and self-published mobile hit, *Free Fire*, as investors were told and as Plaintiff's own lawyers alleged in an unrelated lawsuit.  (*See supra* pp. 5-6.)

Moreover, the results Sea announced in the first quarter of 2023 were *consistent* with the disclosed ongoing trend of moderation in user engagement post-Covid and the macro-economic uncertainties such as inflation and rising interest rates that emerged in 2022.  (*See supra* pp. 6-7.)  Indeed, the first quarter results for 2023 actually showed improvement in the quarter-on-quarter rate of decline for each of bookings, QAUs, and QPUs, indicating ongoing stabilization in Garena's business rather than any sharp decline as Plaintiff would have it.  (*Id.*; CAC ¶¶ 28-30.)

Equally unavailing (and irrelevant) is the CAC's misleading paraphrase of a

statement by Tencent (which wholly owns Riot) that Plaintiff characterizes as identifying *League of Legends* as a driver of Tencent's growth in the first quarter of 2023.  (CAC ¶ 49.)  It is clear from the statement that Tencent was referring to its larger portfolio of games and did not attribute its growth to the performance of *League of Legends*, **let alone in the specific markets in Southeast Asia and Taiwan**.  (Ex. 16, Tencent 1Q23 Call Tr., at 9-10.)  In fact, Tencent's earnings release discussed on that call did not mention *League of Legends* or the License Agreement at all.  Rather, Tencent explicitly attributed the growth in its gaming sector to "the strong performance of recently launched GODDESS OF VICTORY: NIKKE and Triple Match 3D, as well as the robust growth of VALORANT."  (Ex. 17, Tencent 1Q23 Earnings, at 2.)  In any event, Plaintiff has not alleged how Riot's and/or Tencent's global revenues for *League of Legends* suggests anything about the extent of Garena's PC-only licensing revenues, which covered only a handful of markets in a region where mobile internet access predominates.

Plaintiff likewise fails to plead that there ever was a disclosure that Sea made a false statement about the License Agreement (CAC ¶¶ 123-24), which both demonstrates the CAC's failure to plead falsity and loss causation.  *Metzler*, 540 F.3d at 1063 (to plead loss causation a plaintiff must show that "the market learned of and reacted *to this fraud*, as opposed to merely reacting to" financial results).

**B.**     **Plaintiff's Allegations Establish That Sea Repeatedly And Accurately Informed Investors About Shopee's Strategy**

Plaintiff contends that Sea was not telling the truth when it announced a change in strategic focus toward self-sufficiency in the third quarter of 2022, because Sea must have known this would require an unacceptable trade-off against Shopee's growth.  Setting aside that such statements are not actionable for the reasons discussed below, Plaintiff has not identified a single false statement related to Shopee.

**1.**     **Sea did exactly what it told investors it planned to do**

In its third quarter 2022 earnings call, Sea announced a strategic shift to focus on self-sufficiency to reduce its dependence on external capital, which Sea acknowledged

14

may negatively impact Shopee's short term growth, and Sea rapidly pivoted to cut costs. (CAC ¶¶ 64-69.)  On the same call, Sea explained to investors that it may, upon achieving self-sufficiency, resume investment in growth.  (Ex. 8, 3Q22 Call Tr., at 5.)

Plaintiff would have the Court believe that Sea's change in strategic focus was knowingly false when announced because three quarters later, under different market conditions and after Shopee had achieved three straight profitable quarters, Sea announced that it would resume investments in efficiently pursuing e-commerce growth. Plaintiff does not allege any false statement or that Sea failed to pursue its stated objectives.  To the contrary, Plaintiff concedes that Sea and Shopee cut spending and achieved profitability by the fourth quarter of 2022.  (CAC ¶ 57.)  Plaintiff also now faults Sea for doing precisely what it communicated it may do.  There is no credible inference, let alone "*evidentiary facts*" demonstrating, that any of these statements were false when made.  *Twitter*, 506 F. Supp. 3d at 880.

### 2. Plaintiff's own allegations refute any suggestion that Sea concealed a putative "trade off" between Shopee's growth and sustainability as a platform

Plaintiff contends that Sea, in announcing its changed strategy during the third quarter of 2022 earnings call, concealed an alleged trade-off between Shopee's growth and its sustainability as a platform.  In support, Plaintiff ignores Sea's clear acknowledgment during that same earnings call that, "[t]here could be no growth or negative growth, and we can accept that" (CAC ¶ 69), and instead makes the conclusory assertion that this roadmap was false because Sea must already have been aware of a significant decline (CAC ¶ 70.)  However, Plaintiff has not alleged any facts suggesting that Sea could not or did not sustain its Shopee business without "massive investments" in sales and marketing expenses, much less that management knowingly concealed the same.  It is undisputed that Sea disclosed with its fourth quarter 2022 results a 7.7% year-over-year increase in GMV on a constant currency basis at the same time Shopee's sales and marketing costs declined by more than 50%.  (Ex. 9, 4Q22 Earnings, at 2, 8; *see also*

CAC ¶ 75.)  And as Plaintiff concedes, even though Sea did not disclose quarterly GMV

in the following quarter, Sea *disclosed* that it observed a decline quarter-over-quarter in

line with the same seasonality trends as the prior year (CAC ¶¶ 60, 87), while cutting

sales and marketing by 51.7% (Ex. 12, 1Q23 Earnings, at 6).  Indeed, far from exposing

any precipitous drop, Shopee exhibited extraordinarily resilient GMV levels against

substantial sales and marketing cuts, including more than 50% year-on-year reductions in

some quarters.  (Ex. 9, 4Q22 Earnings, at 2, 8.)  In other words, Plaintiff's entire premise

that Shopee could not operate as a sustainable business without massive sales and

marketing expenditures is unsupported.

### 3. Sea accurately informed investors that it would begin to disclose GMV on an annual rather than quarterly basis

The CAC also fails to explain how Sea's accurate statements informing investors

that it would provide only annual and not quarterly disclosure of the non-GAAP GMV

metric—in line with industry peers (*supra* n.6)—was false or misleading.  Importantly,

Plaintiff does not allege that Sea failed to provide GAAP metrics or other metrics

concerning Shopee's performance.  Rather, Plaintiff merely alleges that Sea did not

disclose quarterly GMV during the first two quarters of 2023, just as it said it would do.

Plaintiff claims that GMV is important because "Shopee's revenues are a function of the

total value of merchandise sold on the platform in a given period of time, *i.e.*, the GMV."

(CAC ¶ 25.)  But Sea continued throughout to provide quarterly disclosures relevant to

Shopee's GAAP revenue, marketplace revenue and monetization, including details of

core marketplace revenue and value-added services revenue.  (*See supra* pp. 7-10.)  And

when Sea decided to resume strategic investments in efficient growth for Shopee, Sea

told investors it would once again consider disclosing GMV and then did so.  (*Id.* at 10.)

Every step of this was communicated to investors, and nothing about this was misleading.

### 4. Plaintiff does not credibly allege that Sea knowingly concealed the competitive impact of its cost-cutting initiative

Plaintiff also claims that Sea misled investors by not disclosing the impact of

Shopee's cost cutting in combating the competitive threats Shopee faced, such as those posed by TikTok Shop, which had begun aggressively expanding and investing in Southeast Asia.  (CAC ¶¶ 66, 67, 70, 75, 78, 88, 90.)  While Plaintiff may have a different view of when and how Shopee should have confronted its new competition, Plaintiff has not identified any false statement.

The claim also defies logic.  Plaintiff alleges Defendants knew Sea's cost cutting and pursuit of self-sufficiency and improved efficiencies would not be effective despite saying they believed it would be.  (*Id.*)  To credit Plaintiff's theory, the Court would have to accept the implication that Sea undertook to cut costs and strengthen its operational efficiency, while believing this was both detrimental to Shopee's competitiveness and something it would have to quickly reverse.  Plaintiff offers no basis for such an extreme and speculative inferential leap.  *In re Northpoint Commc'ns Grp., Inc. Sec. Litig.*, 184 F. Supp. 2d 991, 998 n.2 (N.D. Cal. 2001) (allegations that "are. . . speculative in the extreme . . . do not merit extended consideration").  This is even more challenging here as Shopee undisputedly cut its expenditures, improved monetization, and achieved profitability while competing with existing and new entrants and, by Plaintiff's own admission, remaining the largest platform in Southeast Asia.  (CAC ¶¶ 2, 25.)

In any event, it is not securities fraud to face new competitors or to change business strategies in response to shifting macro-economic and competitive forces, especially where, as here, the changes were disclosed and fully known to investors.  *In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *11, 14 (S.D.N.Y. Mar. 30, 2021) ("change in business strategy does not, without more, render its past disclosures . . . misleading.  A company may shift gears for any number of reasons, most of which have nothing to do with fraud . . . a change in business strategy does not itself show that the old approach was plagued by fraud.").  Nor can there be any argument that Sea did not disclose risks related to competitive threats to its businesses, including Shopee, because it did.  (*See, e.g.*, Ex. 18, 2021 20-F, at 15-16 ("[Shopee] faces competition from regional players that operate across several markets, and from single-market players. . . .  As e-

commerce is evolving in our markets, competition for market share is particularly intense.").)  While Sea's decision to reinvest in growth in the current macro-economic environment may not have been popular, to the extent Plaintiff's claim is that it disagreed with the Company's strategy or its implementation, the Supreme Court has firmly held that cannot form the basis of a securities fraud claim.  *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977) (allegations of "corporate mismanagement" are not "within the scope of [§]10(b)").

As with Plaintiff's claim regarding Garena's License Agreement, Plaintiff's loss causation allegations related to Shopee (CAC ¶¶ 126-31) fail because they point only to supposed "disappointing" financial results without any disclosure tying those results to any alleged misstatement.  *See, e.g.*, *Metzler*, 540 F.3d at 1063.

## II.   THE ALLEGEDLY MISLEADING STATEMENTS ARE INACTIONABLE AS A MATTER OF LAW

Even if Plaintiff could surmount the lack of falsity, the alleged misrepresentations would still be inactionable as a matter of law because they are (i) accurate statements of current or historical fact, (ii) statements of opinion or corporate optimism, and/or (iii) forward-looking statements protected by the PSLRA safe harbor.

### A.   Sea's Accurate Statements Of Fact Are Not Actionable

It is well-settled that statements of current or historical fact cannot, as a matter of law, become misleading if less favorable outcomes later occur.  *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998) ("Disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future."); *see also Monachelli v. Hortonworks Inc.*, 225 F. Supp. 3d 1045, 1055 (N.D. Cal. 2016) ("'[D]isclosures of accurate historical data accompanied by general statements of optimism' . . . are not actionable.").

The statements challenged in paragraphs 66, 72, 74-76, 81 and 85-88 all include accurate statements of historical fact that are not alleged to have been misleading when made.  For example, Sea's statements that (i) "trends, *as indicated in our third quarter*

*results*, ha[ve] been that we are both improving on the top line and also on the cost

efficiency side," and (ii) "on the top line side, *as we disclosed*, we've increased our take

rate in particular, the core marketplace revenue and also on the cost side, we have

tightened our expenses related to sales and marketing especially around logistics" (CAC ¶

66 (emphasis altered)), are clear examples of Sea accurately describing its prior quarter

results and are inactionable.

### B.   Sea's Statements Reflecting Corporate Optimism Are Not Actionable

In the Ninth Circuit, "'vague statements of optimism' and opinion" are

"nonactionable." *In re Nimble Storage, Inc. Sec. Litig.*, 756 F. App'x 779, 780 (9th Cir.

2019) (quoting *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010)); *see also In

re Eventbrite, Inc. Sec. Litig.*, 2020 WL 2042078, at *14 (N.D. Cal. Apr. 28, 2020)

("'vague, generalized assertions of corporate optimism or statements of 'mere puffing'

are not actionable material misrepresentations under federal securities laws' because no

reasonable investor would rely on such statements") (quoting *In re Fusion-io, Inc. Sec.

Litig.*, 2015 WL 661869, at *14 (N.D. Cal. Feb. 12, 2015)).  That is because investors do

not rely on vague statements of optimism when valuing corporations.  *See In re Action

Performance Cos. Inc. Sec. Litig.*, 2007 WL 496770, at *8 (D. Ariz. Feb. 13, 2007).

Plaintiff improperly attempts to manufacture securities fraud claims based on the

following (and similar) statements of opinion and corporate optimism:

- We "continued to maintain our *strong market leadership*, and our peers also have behaved in a relatively rational manner."  (CAC ¶ 66 (emphasis altered); *see also id.* ¶¶ 67, 68, 86.)

- Our "long-term view is we want to emerge as the *strongest winner in this market*." (CAC ¶ 69 (emphasis altered).)

- Sea would "maintain [its] focus on sustainable growth."  (CAC ¶ 72; *see also id.* ¶ 77.)

- We will "work to *further strengthen our leading position and profitability*."  (CAC ¶ 73 (emphasis altered).)

- Our results "show[] the *resilience of our ecosystem and the strong leadership and execution excellence . . . .*"  (CAC ¶ 75 (emphasis altered); *see also id.* ¶¶ 76, 89.)

19

- "When people think about investments, sometimes people . . . overemphasized . . . shipping subsidies. *I don't think that's a fair characterization of our focus of investment.*"  (CAC ¶ 88 (emphasis altered).)

These statements are all inactionable statements of opinion and puffery.  *See, e.g.*, *Macomb Cnty. Employees' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1099 (9th Cir. 2022) (statements such as having "a great business in APAC from a growth standpoint overall," that "we're seeing tremendous growth," and describing China as "a market that's growing significantly for us" with "great economics" were all nonactionable puffery); *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 994-95 (N.D. Cal. 2017) (holding that the statements "highly optimistic about [growth in] the US" and "extremely bullish for the US markets" were nonactionable puffery); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1076-77 (N.D. Cal. 2001) (holding that statements describing "strong" demand, "better than expected" or "robust" results, a growth strategy that "was unfolding as planned," a "well positioned" company, and a "solid" company position were nonactionable puffery); *In re Wet Seal, Inc. Secs. Litig.*, 518 F. Supp. 2d 1148, 1168 (C.D. Cal. 2007) (statements such as "[w]e're the leader in a rapidly growing market," "we already have a sizable lead over our competition," and being "well-positioned" are non-actionable, vague statements of optimism) (citing cases).

**C.    Sea's Forward-Looking Statements Are Not Actionable**

A company's forward-looking statements are immunized from liability under the PSLRA's safe harbor if (a) they are accompanied by meaningful cautionary language, **_or_** (b) the plaintiff fails to show that the statements were made with actual knowledge of their falsehood.  15 U.S.C. § 78u-5(c).  *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 568 (S.D.N.Y. 2018), *aff'd sub nom., Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 Fed. App'x 51 (2d Cir. 2019) (liability for forward-looking statements requires actual knowledge).

Here, Plaintiff alleges the following forward-looking statements from Sea's earnings calls (and similar statements) were false or misleading:

- The forthcoming expiration of the *League of Legends* License Agreement with Riot "would have no impact on our overall publishing business as the contribution is immaterial from the particular game." (CAC ¶ 65.)

- "We believe our strong focus on cash flow and achieving self sufficiency as much as possible is the right strategy to pursue at this stage, even though we may see no growth or even negative growth in certain operating metrics in the near term." (CAC ¶ 68; *see also id.* ¶¶ 63, 75.)

- That "there could be [an] impact on the . . . top line growth in operating metrics," "[t]here could be no growth or negative growth, and we can accept that," "[b]ut on the other hand, as we shared, our long-term view is we want to emerge as the strongest winner in this market." (CAC ¶ 69.)

- "I think starting from '23, we'll generally see some – we'll see some natural growth hopefully. But on the other hand, this is not something that we focus on and the macro uncertainty remains. And there are too many factors affecting the underlying consumption pattern that – as a market leader that we will face. And therefore, it's not a target that we focus on. So our message stays the same: GMV remains output. And we will discontinue any quarter-on-quarter disclosure of operating metrics like GMV and orders and we'll move to an annual disclosure in line with global peers." (CAC ¶ 77; *see also id.* ¶ 73.)

- "[W]e think we will continue to invest in the long-term growth opportunities being a profitable, sustainable way that also, hopefully, we can expand the profitable TAM for our region by focusing on user experience and the cost to service. But short term, in terms of the profitability versus growth, again, we already achieved profitability. We're not focused on trying to maximize profitability in every market for every period." (CAC ¶ 89.)

These statements qualify for protection under the PSLRA safe harbor. *First*, they all are forward looking because they make "predictions" about the future of Sea's business. *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 880 (N.D. Cal. 2004).

*Second*, the statements were accompanied by meaningful cautionary warnings. For example, Sea warned that its forward-looking statements "are inherently subject to risks and uncertainties and may not be realized in the future for various reasons." (Ex. 11, 4Q22 Call Tr., at 4.) Sea also warned that it "derive[s] a significant portion of [Garena] revenue and gross profit from a limited number of online games" and that "[a]ny negative developments or occurrences to any of our key revenue-earning games, including *Free Fire* . . . could lead to material decline or slower growth." (CAC ¶ 81.) Sea further warned that Shopee "face[s] uncertainties relating to the growth and profitability of the e-commerce industry in [Sea's] markets and [Sea] may face challenges and uncertainties in implementing [its] e-commerce strategy." (Ex. 18, 2021 20-F, at 7, 25.)

21

Courts have recognized that warnings like these are sufficient to trigger protection under the PSLRA safe harbor. *See, e.g.*, *City of Royal Oak Ret. Sys. v Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1062 (N.D. Cal. 2012) (applying the PSLRA safe harbor and holding that notice at the beginning of investor calls that "opinions and statements regarding revenue guidance were forward-looking and that actual results could vary based on risks and uncertainties identified" in the company's SEC filings was "not materially different from the cautionary language held sufficient by the Ninth Circuit").

*Finally*, there are no allegations that the speaker of any statement had *actual knowledge* that any statement was false *when made*. As it relates to the statements concerning the License Agreement, there is no credible allegation that the statements were *ever* revealed to be false, much less that the speaker did not believe them to be true. (*See supra* pp. 12-14.) Similarly, there are no well pled allegations that statements that there could be no growth or even negative growth "in certain operating metrics in the near term" were known to be false when made. (CAC ¶ 68.) Indeed, Plaintiff's claim that Shopee's growth slowed during the Class Period *depends upon the aforementioned statements being truthful*. And the CAC includes no allegations that Defendants did not genuinely believe that GMV would not be a key performance indicator while the Company focused on sustainability. Nor are there any allegations of "evidentiary facts" that directly contradict the subjective belief that Sea was "not focused on trying to maximize profitability in every market for every period" when that statement was made. (*Id.* ¶ 89.) And Plaintiff's conclusory allegations that Defendants must have known that such statements were false when made because of their positions at the Company (*Id.* ¶¶ 92-104), are insufficient to plead "actual knowledge" as a matter of law. *In re Cutera*, 610 F.3d at 1112; *see also In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d 518, 535 (S.D.N.Y. 2021) (allegations that defendants "were aware" of falsity of statements "[b]y virtue of their positions with the Company" are "insufficient" to plead actual knowledge).

## III.   THE CAC FAILS TO PLEAD FRAUDULENT INTENT

Having failed to plead falsity, it is unsurprising that Plaintiff also fails to plead

facts sufficient to give rise to an inference of fraudulent intent, let alone the "strong inference" required to sufficiently state a claim.  Plaintiff's scienter allegations must be "particularized as to each Individual Defendant"; "group pleading and generalized scienter allegations are insufficient."  *Palm Harbor Special Fire Control & Rescue Dist. Firefighters Pension Plan v. First Solar Inc.*, 2023 WL 4161355, at *4 (D. Ariz. June 23, 2023).  Moreover, if a defendant is a corporation, plaintiffs generally must plead scienter as to "someone whose intent could be imputed to the corporation."  *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

### A. The Alleged Stock Sales (And Lack Thereof) Negate A Finding Of Fraudulent Intent

While "stock sales by corporate insiders may constitute circumstantial evidence of scienter," *First Solar*, 2023 WL 155861, at *8, that is not the case here because (i) the alleged sales were conducted pursuant to Rule 10b5-1 trading plans; (ii) the sales represented a *de minimis* amount of their overall holdings and were not sufficiently alleged to be inconsistent with pre-Class Period trading history; and (iii) the timing of the pre-planned sales was in no way unusual or suspicious.

#### 1. That The Alleged Stock Sales Were Pursuant To Rule 10b5-1 Trading Plans Undermines Any Inference Of Scienter

Plaintiff acknowledges that the sales by the two Individual Defendants alleged to have transacted during the Class Period were pursuant to SEC Rule 10b5-1 trading plans. (CAC ¶ 116.)  Under SEC Rule 10b5-1, a person's trading is not on the basis of material non-public information, as Plaintiff suggests here, if the person adopted and sold their securities pursuant to a written trading plan consistent with the terms of the rule.  *See* 17 C.F.R. § 240.10b5-1(c).  As the Ninth Circuit has made clear, rather than support an inference of scienter, "[s]ales according to pre-determined plans may '*rebut* [] an inference of scienter.'"  *Metzler*, 540 F.3d at 1067 n.11 (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427-28 (9th Cir. 1994)).

Plaintiff attempts to downplay the existence of the 10b5-1 trading plans by

alleging that Mr. Chen—to whom Plaintiff *does not attribute any alleged misstatement*—adopted his plan during the Class Period and *speculating* that it was possible Mr. Li did as well.  (CAC ¶¶ 116-18.)[7]  But the Form 144 that Plaintiff relies on to allege that Mr. Chen adopted his plan during the Class Period states that such plan was adopted on March 22, 2023.  (Ex. 19, Chen Form 144, at 3).  Plaintiff ignores that the SEC amended Rule 10b5-1, *effective for all plans modified or adopted after February 27, 2023*, to include a mandatory "cooling-off period" that prohibited officers (such as Mr. Chen) from conducting any trades for *at least 90 days* from the adoption or modification of the plan.  17 C.F.R. § 240.10b5-1.  Indeed, the Form 144 for Mr. Chen shows that his first sale was conducted more than 90 days after the plan adoption date.  (Ex. 19, Chen Form 144, at 2.)  These facts do not support any inference of scienter.

### 2. The Alleged Sales Were *De Minimis* And Not Alleged To Be Inconsistent With Pre-Class Period Sales

While Plaintiff focuses on the total *proceeds* of stock sales by two of the Individual Defendants, "[t]he Ninth Circuit has held that typically 'larger sales amounts' than 37% of a defendant's holdings are necessary to support scienter."  *Wozniak v. Align Techs., Inc.*, 2011 WL 2269418, at *14 (N.D. Cal. June 8, 2011) (citing *Metzler*, 540 F.3d at 1067 (allegation of sale of 37% of total holdings was insufficient to establish scienter, as the Ninth Circuit "typically require[s] larger sales amounts—and corroborative sales by other defendants—to allow insider trading to support scienter")).  Here, Mr. Li's alleged Class Period sales amounted to 0.1% of his total beneficial ownership based on the Form 13D upon which Plaintiff relies.  (Ex. 20, Li Schedule 13D Filings.)  Mr. Chen's alleged Class Period sales amounted to 2.1% of his total beneficial ownership.

---

[7] Plaintiff concedes they do not know when Mr. Li's plan was adopted and therefore have not alleged with the requisite particularity that it was adopted during the Class Period.  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 585 (S.D.N.Y. 2014) (plaintiffs must plead facts showing that the 10b5-1 plans were "entered into . . . 'strategically' so as to capitalize on insider knowledge"), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

(*See* Ex. 1, 2022 20-F, at 118-19; Ex. 19, Chen Form 144.)  Such *de minimis* percentages cannot support a strong inference of scienter as a matter of settled Ninth Circuit law. *Metzler*, 540 F.3d at 1067.

Plaintiff strategically alleges that Mr. Li did not sell any shares during an arbitrarily chosen "9-month" window preceding the alleged Class Period, relying on a single Schedule 13D disclosure of alleged sales via an entity Plaintiff alleges was solely owned and controlled by Mr. Li.  (CAC ¶ 114.)  However, Plaintiff conveniently ignores other Schedule 13D filings disclosing sales by the same entity during prior periods (including trades that occurred within a "12-month" window preceding the alleged Class Period) that are consistent with the Class Period sales alleged by Plaintiff.  (Ex. 20, Li Schedule 13D Filings); *Metzler*, 540 F.3d at 1067 ("allegations of insider trading do not raise a 'strong inference' of scienter" where, among other things, defendants "were simply trading in line with prior patterns").  Meanwhile, Plaintiff's failure to include any allegations regarding Mr. Chen's trading history undermines any inference of scienter. *City of Pontiac*, 2023 WL 155861, at *8-9 (holding "stock sale allegations fail to raise a strong inference of scienter" where the complaint "falls short of providing a 'meaningful trading history for purposes of comparison to the stock sales within the class period'").[8]

### 3. The Timing Of Sales Does Not Support An Inference Of Scienter

Plaintiff also fails to allege that the timing of the pre-planned Class Period sales by Mr. Li or Mr. Chen were unusual or suspicious.

 "Officers of publicly traded companies commonly make stock transactions following the public release of quarterly earnings and related financial disclosures," and

---

[8] Plaintiff also does not allege stock sales by all of the Individual Defendants during the Class Period.  The Ninth Circuit has held that this alone undermines any inference of scienter *as to all Defendants*.  *See Metzler*, 540 F.3d at 1067 ("allegations of insider trading do not raise a 'strong inference' of scienter" where one of three individual defendants "sold nothing at all" because it "suggest[ed] that there was no insider information from which to benefit"); *see also In re Tibco Software, Inc.*, 2006 WL 1469654, at *20 (N.D. Cal. May 25, 2006); *Turocy v. El Pollo Loco Holdings, Inc.*, 2016 WL 4056209, at *12 (C.D. Cal. July 25, 2016) (dismissing claims for failure to plead scienter where plaintiffs "[did] not explain why CFO … did not sell any shares").

there is nothing unusual or suspicious about such sales.  *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002); *Tibco Software*, 2006 WL 1469654, at *20 (Defendant's sale of "a small portion of his total holdings following the positive announcement of . . . year-end and fourth quarter earnings does not support a strong inference of scienter.").  As alleged in the CAC, 90,000 of the 180,000 shares Mr. Li allegedly sold during the Class Period were sold within the 30 days following the Company filing its 2022 Form 20-F, and another 50,000 were sold during the two weeks following the Company's filing of its first quarter 2023 earnings results.  (CAC ¶ 113.) Meanwhile, all of Mr. Chen's alleged Class Period sales occurred (i) after the 90-day "cooling-off" period pursuant to the adoption of his Rule 10b5-1 plan (which as discussed above, *negates* any inference of scienter), and (ii) after the first alleged corrective disclosure in May 2023 (CAC ¶¶ 115, 123-25).  *Hoang v. ContextLogic, Inc.*, 2023 WL 6536162, at *26 (N.D. Cal. Mar. 10, 2023) ("Sales after corrective disclosure do not support an inference of scienter.").

**B.    Plaintiff's Circumstantial Knowledge Allegations Fail To Support A "Strong Inference" Of Scienter**

Having failed to plead any inference of scienter based on Mr. Li and Mr. Chen's stock sales, the CAC attempts to allege scienter through a hodgepodge of alternative theories of alleged circumstantial knowledge.  Whether considered individually or collectively, these theories fail to satisfy the heightened standards for pleading scienter under Rule 9(b) and the PSLRA.

*First*, Plaintiff alleges that Mr. Li must have had actual knowledge of the supposed fraud given his roles as the Company's founder, CEO, Chairman of the Board, and controlling shareholder.  (CAC ¶¶ 92-98.)  "[I]t is practically hornbook law that 'accusations' such as these, which are 'founded on nothing more than a defendant's corporate position[,] are entitled to no weight.'"  *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (collecting cases); *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 406 (S.D.N.Y. 2006) (allegations "that the

individual [d]efendants knew, or should have known, that they were misrepresenting material facts, based on their senior positions in the company," are "insufficient, as a matter of law, to establish scienter").

*Second*, Plaintiff invokes the "core operations" doctrine based on statements by Defendants Li, Hou, and Wang on investor calls concerning the Company's key operating metrics.  (CAC ¶¶ 99-108.)  But "proof under the core operations doctrine 'is not easy,' and requires 'either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations . . . or witness accounts demonstrating that executives had actual involvement in creating false reports.'"  *Webb v. Solarcity Corp.*, 884 F.3d 844, 857 (9th Cir. 2018) (quoting *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014)).  Neither exists here, as the CAC lacks particularized allegations suggesting that any Individual Defendant had "actual access" to specific information that *contradicted* any of the alleged misstatements at the time they were made or that "it would be absurd to suggest that management was without knowledge" of such contrary facts.  *Police Ret. Sys. of St. Louis*, 759 F.3d at 1062; *see also Palm Harbor*, 2023 WL 4161355, at *5 (rejecting contention that scienter could "be shown through [defendant's] misstatements regarding specific matters about which they purport to know" where the complaint "lack[ed] particularized allegations that any Individual Defendant had access to *contradictory information*").

Instead of the legally required allegations, Plaintiff points to several statements certain Defendants allegedly made about having "day-by-day" visibility into Sea's "key metrics."  (CAC ¶108.)  "At best, these facts support a 'mere inference of knowledge of all core operations,' not scienter. . . .  Missing are allegations linking specific reports and their contents to the executives."  *Police Ret. Sys. of St. Louis*, 759 F.3d at 1062-63; *see also Zucco*, 552 F.3d at 1000 (finding "allegations that senior management . . . closely reviewed the accounting numbers generated . . . each quarter . . . and that top executives had several meetings in which they discussed quarterly inventory numbers" insufficient to establish scienter).  It is not enough for Plaintiff to simply allege scienter by positing

access to some theoretical, alternative facts that contradict what was publicly disclosed. Plaintiff must allege what specific contradictory information the speaker had at the time of the alleged misstatement, and they have failed to do so here.

*Third*, Plaintiff claims that Sea's decision not to disclose quarterly GMV for the first and second quarters of 2023 supports a strong inference of scienter because it allegedly shows that "Defendants knew Shopee's growth rate would decline and stagnate over the next few quarters and wanted to conceal the deceleration from investors." (CAC ¶ 109.)  That is absurd for the reasons discussed above.  (*See supra* pp. 14-18.)  The Company informed investors that in line with industry peers it would transition from quarterly to annual disclosure of GMV while it was focused on self-sufficiency and that it would consider returning to a growth strategy and then further consider on a case-by-case basis whether to disclose quarterly GMV.  (CAC ¶¶ 69, 72-77.)  That is exactly what happened.  After Sea achieved profitability for the first time in the fourth quarter of 2022 and the first two quarters of 2023, Sea announced that it would begin reinvesting in pursuing efficient growth.  (*Id.* ¶¶ 126-27.)  Sea subsequently decided—as it told investors it may—to begin disclosing quarterly GMV again the following quarter.

Similarly unavailing is Plaintiff's suggestion that "the strongest inference from the Company's decision to stop reporting these key metrics is that Defendants knew Shopee's growth rate would decline and stagnate over the next few quarters and wanted to conceal the deceleration from investors."  (*Id.* ¶ 109.)  Sea also told investors its strategic shift might lead to further deceleration or even negative growth in operating metrics like GMV and that Sea viewed this as acceptable as part of its strategic focus on cost management and improved efficiency.  (*See supra* pp. 15-16.)  Indeed, it is undisputed that Sea disclosed with its fourth quarter 2022 results a 7.7% year-over-year increase in GMV on a constant currency basis at the same time Shopee's sales and marketing budget declined by more than 50% (*supra* p. 15), suggesting the entire premise of Plaintiff's "trade-off" theory would not have even been apparent to Defendants at the time the decision to change to annual reporting was announced.

*Finally*, the Ninth Circuit soundly rejects Plaintiff's theory that Defendants Li and Hou's Sarbanes-Oxley certifications "further evidence scienter."  (CAC ¶¶ 110-11.) *Zucco*, 552 F.3d at 1004 ("[W]e reject [plaintiff's] invitation to undermine the PSLRA's distinct requirements for pleading falsity and scienter, and hold that [SOX] certifications are not enough to create a strong inference of scienter" and do not make "otherwise insufficient allegations more compelling by their presence in the same complaint.").

### C.    Plaintiff Ignores "Plausible, Nonculpable Explanations" That Are More Likely Than Fraud

In considering whether Plaintiff sufficiently alleges a "strong inference" of scienter, the Court "must consider plausible, nonculpable explanations for the defendant's conduct" and the "inference that the defendant acted with scienter need not be irrefutable, but it must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007).  The more compelling inference in this case is that Defendants did not act with the intent to defraud Sea's investors.

As it relates to Garena and Defendant's statement that it did not expect a material impact from the expiration of the License Agreement, the more compelling inference is that Sea did not expect (and there was in fact no) material impact due to the expiration of the license.  As discussed above, Plaintiff fails to plead facts plausibly suggesting that the expiration of the License Agreement (which covered the licensing of a single PC game in only a handful of markets and which contemplated a fee split with the third-party developer) would have been material to the Company.  (*See supra* pp. 12-14.)  This is particularly true considering the growth in Garena's mobile gaming business, and as Plaintiff's lawyers argued elsewhere, the fact that Garena's results had for several years been largely driven by Sea's wildly successful self-developed and globally self-published mobile game, *Free Fire*.  Plaintiff points to no other investor questions, statements by Sea, industry media reports, confidential witness statements, or anything at all attributing any aspect of Garena's first quarter 2023 performance to the expiration of the License

Agreement.  To infer fraud on these facts requires numerous unsupported conceptual leaps.

As it relates to Shopee, the far more compelling inference is that Sea went to great lengths to keep investors informed in real time of its evolving business strategy, that Sea did exactly what it told investors it planned to do, and that when Sea began reinvesting in Shopee, it was for legitimate business reasons, including changing macro-economic and competitive circumstances.  (*See supra* pp. 14-18.)  There are no allegations—considered individually or as a whole—that call into question Sea's genuine belief in its statements or suggesting that Sea failed to pursue its disclosed strategy.  Indeed, Plaintiff does not dispute that Sea and Shopee pursued and attained profitability.  Moreover, Plaintiff's own suggestion—that Sea was under pressure due to TikTok Shop's aggressive spending and expansion into Southeast Asia in 2023—belies any contention that the decision to reinvest was secretly planned months earlier, rather than a reasonable response to changing competition.  To infer that Sea was baiting investors and secretly planned a U-turn from the outset is hardly coherent, let alone the more cogent or compelling explanation.

## IV.    PLAINTIFF'S "CONTROL PERSON" CLAIM SHOULD BE DISMISSED

Plaintiff's "control person" claims under Section 20(a) of the Exchange Act should be dismissed because Plaintiff fails to plead adequately a "primary violation."  *See Zucco*, 552 F.3d at 986-87, 990 ("Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of section 10(b).").

## <u>CONCLUSION</u>

For the foregoing reasons, the CAC should be dismissed with prejudice.

Dated:  February 20, 2024

**LEWIS ROCA ROTHGERBER CHRISTIE LLP**

/s/ *John C. Gray*

John C. Gray (Arizona Bar. No. 028454)
201 East Washington Street, Suite 1200
Phoenix, AZ 85004
Telephone:  (602) 262-5311
Facsimile:  (602) 262-5747
Email:  jgray@lewisroca.com

**SHEARMAN & STERLING LLP**
Adam S. Hakki (admitted *pro hac vice*)
Daniel C. Lewis (admitted *pro hac vice*)
Joshua T. Ebersole (admitted *pro hac vice*)
599 Lexington Avenue
New York, NY 10022-6069
Telephone:  (212) 848-4000
Email:  ahakki@shearman.com
            daniel.lewis@shearman.com
            joshua.ebersole@shearman.com

*Counsel for Defendant Sea Limited*