# EXHIBIT 5

Case 2:23-cv-01455-DLR Document 42-5 Filed 02/20/24 Page 2 of 55

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION

|  |  |  |
|---|---|---|
| In re SEA LIMITED SECURITIES LITIGATION | : | Index No. 151344/2022 |
|  | : | |
|  | : | The Honorable Andrew Borrok, J.S.C. |
|  | : | Part 53 |
| This Document Relates To: | : | |
|  | : | |
| ALL ACTIONS. | : | |
|  | : | CLASS ACTION |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE SECURITIES ACT OF 1933**

Plaintiffs City of Taylor Police and Fire Retirement System ("City of Taylor") and General Retirement System of the City of Detroit ("City of Detroit," and together with City of Taylor, "Plaintiffs") individually, and on behalf of all others similarly situated, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on counsel's investigation, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of Sea Limited ("Sea" or the "Company") associated with: (i) Sea's secondary public offering of American Depositary Shares ("ADSs") for $318 per share, conducted on or around September 14, 2021 ("SPO") and characterized as the biggest equity deal of 2021; and (ii) Sea's public offering of 0.25% convertible senior notes due 2026 ("Notes") at a price of $1,000 per Note, also conducted on or around September 14, 2021 (the "Notes Offering," and together with the SPO, the "Offerings"). Plaintiffs believe additional evidentiary support exists for these allegations, which will be identified and developed after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons and entities who purchased ADSs and/or Notes in connection with Sea's almost $4 billion SPO, and/or $2.875 billion Notes Offering, respectively, pursuant and/or traceable to the shelf registration statement on Form F-3, together with the prospectus, prospectus supplements, and other SEC filings and materials incorporated therein (collectively, "Offering Materials"). Plaintiffs pursue remedies on behalf of these investors (the "Class," defined further below) under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("1933 Act") against Sea, certain of the Company's officers and directors, the underwriters of the Offerings ("Underwriters"), and others (together, "Defendants").

2.      Sea is a technology and gaming company founded in Singapore in 2009. It operates three core businesses across the digital entertainment, e-commerce, and digital payments/financial

Case 2:23-cv-01455-DLR    Document 42-5    Filed 02/20/24    Page 4 of 55

services segments: Garena, a global online games developer and publisher; Shopee, the largest pan-regional e-commerce platform in Southeast Asia and Taiwan; and SeaMoney, a digital payments and financial services provider in Southeast Asia. Reflecting Garena's outsized importance, Sea reported financial information for the digital entertainment segment alone but sometimes grouped Shopee and SeaMoney under "e-commerce and other services" for financial reporting purposes.

3.      By the time of the September 2021 Offerings, Sea's most recent published financial results were for the second quarter and half-year ended June 30, 2021, which were expressly incorporated into the Offering Materials. For the first six months of 2021, revenue from digital entertainment and e-commerce/other services accounted for 44.7% and 43.8%, respectively, of Sea's total revenue, while the sale of goods—relating to the sale of merchandise via the Shopee platform—accounted for the remaining 11.5%.

4.      Unbeknownst to investors, however, Sea was facing two crises of epic proportions at the time of the Offerings: *first*, the digital entertainment segment had reverted to more normalized, pre-pandemic operating dynamics during the nearly-complete third quarter—ending on September 30, 2021, two weeks after the Offerings—as the number of users of Sea's most important game, *Free Fire*, had plateaued; and *second*, *Free Fire* was substantially at risk of being banned in India due to Sea's ties to Tencent Holdings Limited ("Tencent"), a technology and entertainment conglomerate based in China, which co-developed *Free Fire* and held significant influence over Sea's operations based on its nearly 20% ownership interest in Sea and seat on Sea's board of directors.

5.      Two months after the Offerings, on November 16, 2021, Sea reported its financial results for the third quarter ended September 30, 2021. Contrary to the representations incorporated into the Offering Materials—which portrayed steep, continuing growth in digital

- 2 -

entertainment revenue and users—the segment's growth trend had abruptly stalled and ostensibly reversed. For example, Sea's quarterly active users inched up by only 4 million users, as compared to an increase of 76.4 million users in the prior quarter. And the segment's adjusted EBITDA plunged $26 million, resulting in a $166 million loss in total adjusted EBITDA compared to $120 million profit in the prior-year period. Because Sea's third quarter closed two weeks after the Offerings and Sea closely monitored its financial performance, Sea knew growth had stagnated by the Offerings and that the financial results in its Offering Materials were not indicative of its then-current or future financial condition.

6.      Three months later, on February 14, 2022, India banned *Free Fire* based on Sea's relationship with Tencent. The action took place as part of a prolonged crackdown on applications with links to China, which India believed posed a national security risk. Historically, India was a huge and important market for *Free Fire* and its offshoot, *Free Fire Max*, accounting for over 238 million downloads. In fact, in 2021 alone, India accounted for a majority of the game's installs. For these reasons, the consequences of the *Free Fire* ban were far-reaching and significant: Tencent reduced its investment in Sea, while Sea withdrew all of its business from India, including Shopee, which was gaining a foothold there. None of this was unforeseen for Defendants. In the months before the Offerings, India had banned other applications with ties to China—including a *Free Fire* competitor, PlayerUnknown's Battlegrounds ("PUBG"), that Tencent also backed. In just *two days*, India's pre-Offerings ban of PUBG wiped out $34 billion in market capitalization for Tencent, which was the second-largest shareholder in Krafton, Inc. ("Krafton")—a game developer based in South Korea responsible for developing PUBG. Defendant Yuxin Ren ("Ren")—a director of Sea—is Tencent's Chief Operating Officer ("COO") and oversees its gaming business.

- 3 -

7. The revelation of these developments caused an immediate and sustained decline in the trading price of Sea's ADSs. The ADSs—priced at $318 per share in the SPO—lost substantial value in the weeks and months following the SPO, ultimately trading as low as $54.06 per share on May 12, 2022, a 52-week low. These developments also caused an immediate and sustained decline in the price of Sea's Notes, which are currently trading below par. Accordingly, Class members suffered significant losses in acquiring the ADSs and/or Notes in connection with the Offerings. This action seeks to recover those losses.

## JURISDICTION AND VENUE

8. The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the 1933 Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.

9. This Court has jurisdiction over the subject matter of this action pursuant to the New York Constitution, Article VI, §7(a), and Section 22 of the 1933 Act, which prohibits removal of this action to federal court.

10. This Court has personal jurisdiction of Defendants under Sections 301 and 302 of the New York Civil Practice Law and Rules ("CPLR"), and venue is proper in this County pursuant to Section 503(a) of the CPLR and Section 22 of the 1933 Act.

11. The ADSs publicly trade on the New York Stock Exchange ("NYSE"). The NYSE, in turn, featured prominently in the Offering Materials—in which Defendants promoted the SPO and solicited investors to purchase the ADSs. As the Offering Materials state: "The Bank of New York Mellon, as depositary, registers and delivers" the ADSs, and "[t]he depositary's office at which the ADSs will be administered and its principal executive office are located at 240 Greenwich Street, New York, New York 10286." The Offering Materials stated that the Underwriters would deliver the ADSs against payment in New York, New York on or about

- 4 -

September 14, 2021, and indicated that "New York law governs the deposit agreement and the ADSs."

12. In this regard, the deposit agreement itself states: "This Deposit Agreement and the Receipts [*i.e.*, ADSs] shall be interpreted in accordance with and all rights hereunder and thereunder and provisions hereof and thereof shall be governed by the laws of the State of New York." Further, the deposit agreement reflects Sea's express consent to "the jurisdiction of any state or federal court" in New York, including this Court, stating, in pertinent part, as follows:

> The Company hereby (i) designates and appoints the person named in Exhibit A to this Deposit Agreement, located in the State of New York, as the Company's authorized agent upon which process may be served in any suit or proceeding (including any arbitration proceeding) arising out of or relating to the Shares or Deposited Securities, the American Depositary Shares, the Receipts or this Deposit Agreement (a "Proceeding"), (ii) consents and submits to the jurisdiction of any state or federal court in the State of New York in which any Proceeding may be instituted and (iii) agrees that service of process upon said authorized agent shall be deemed in every respect effective service of process upon the Company in any Proceeding.

13. In addition, the Underwriting Agreements for the Notes and ADSs, dated September 9, 2021, contain a similar provision. Specifically, in Section 18 ("Applicable Law and Jurisdiction"), the Underwriting Agreements state, in pertinent part, as follows:

> THIS AGREEMENT AND ANY MATTERS RELATED TO THIS TRANSACTION SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK. Each party hereby irrevocably submits to the exclusive jurisdiction of the U.S. federal and state courts in the Borough of Manhattan in The City of New York (except for proceedings instituted in regard to the enforcement of a judgment of any such court, as to which such jurisdiction is non-exclusive) in any suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby. The parties irrevocably and unconditionally waive, to the fullest extent permitted by law, any objection to the laying of venue of any suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby in any U.S. federal and state courts in the Borough of Manhattan in The City of New York and irrevocably and unconditionally waive and agree, to the fullest extent permitted by law, not to plead or claim in any such court that any such suit or proceeding in any such court has been brought in an inconvenient forum. The Company irrevocably appointed Law Debenture Corporate Services Inc., 801 2nd Avenue, Suite 403,

- 5 -

Case 2:23-cv-01455-DLR    Document 42-5    Filed 02/20/24    Page 8 of 55

New York, NY 10017, as its authorized agent in the Borough of Manhattan in the City of New York upon which process may be served in any such suit or proceeding, and agrees that service of process upon such agent, and written notice of said service to the Company by the person serving the same to the address provided in Section 11, shall be deemed in every respect effective service of process upon the Company in any such suit or proceeding. The Company further agrees to take any and all action as may be necessary to maintain such designation and appointment of such agent in full force and effect for a period of seven years from the date of this Agreement. Each party irrevocably waives, to the fullest extent permitted by law, any and all rights to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

14.     In addition to Sea's and the Underwriters' irrevocable submission to the jurisdiction of courts in this County, including this Court, the Underwriting Agreements confirm that two of the Underwriters—Defendants J.P. Morgan Securities LLC ("J.P. Morgan") and BofA Securities, Inc. ("BofA")—are based in New York at the following addresses, where they had agreed to receive all communications thereunder: (1) J.P. Morgan, 383 Madison Avenue, New York, New York 10179; and (2) BofA, One Bryant Park, New York, New York 10036.

15.     In summary, the situs of this action lies within this County, Defendants' tortious acts occurred in this County and caused injury to purchasers of Sea ADSs and/or Notes deposited with a depositary in this County, and each of Defendants and members of the Class (defined below) would foreseeably expect any case or controversy stemming from the Offerings to be adjudicated in this County.

**PARTIES**

16.     Plaintiff City of Taylor purchased Sea ADSs directly in the SPO and has been damaged thereby.  Plaintiff City of Detroit purchased Sea Notes directly in the Offering and has been damaged thereby.

17.     Defendant Sea is an online gaming and e-commerce company.  It is headquartered in Singapore and incorporated in the Cayman Islands.  Its ADSs are traded in New York on the NYSE under the ticker symbol "SE."  Notes holders may convert their Notes into cash, ADSs, or

- 6 -

INDEX NO. 151344/2022
RECEIVED NYSCEF: 08/09/2022

Case 2:23-cv-01455-DLR    Document 42-5    Filed 02/20/24    Page 9 of 55

a combination of cash and ADSs at Sea's election, on or after June 15, 2026. The initial conversion rate of the Notes is 2.0964 ADSs per $1,000 principal amount of Notes (which is equivalent to an initial conversion price of roughly $477.01 per ADS, representing a conversion premium of approximately 50.0% above the SPO price of $318 per share). Each Sea ADS represents one Class A ordinary share. The Company maintains a dual-class share structure which concentrates control over the Company in the hands of Sea insiders. Each Class A share (sold publicly) carries one vote. By contrast, until February 2022, each Class B share (owned by insiders) carried three votes; each now carries 15 votes, and all are held by Defendant Forrest Xiaodong Li ("Li"). At all relevant times, most of the Company's profits were generated in its digital entertainment segment.

18. Defendant Li co-founded Sea and has served as its Chairman of the Board of Directors ("Board") and Group Chief Executive Officer ("CEO") since its inception, in May 2009. Leading up to the Offerings, Li owned and controlled a combined 25% of Sea Class A and Class B shares, entitling him to 38% voting control over the Company. As described below, Li entered into an agreement with Tencent to secure majority voting control over Sea. Li reviewed, contributed to, and signed the Offering Materials. Pursuant to a Power of Attorney, Li was authorized to sign the Offering Materials as attorney-in-fact for Defendants Tony Tianyu Hou ("Hou"), Khoon Hua Kuok ("Kuok"), David Heng Chen Seng ("Seng"), Ren, and Gang Ye ("Ye"), each of whom personally signed the September 8, 2021 Form F-3.

19. Defendant Ye co-founded Sea and has served as a Board member since March 2010. Ye has served as Sea's COO since January 2017 and as its Group Chief Technology Officer, from March 2010 to December 2016. Ye reviewed, contributed to, and signed the Offering Materials.

20. Defendant Hou has served as a Board member since February 2018. Hou joined Sea in September 2010 and has served as its Group Chief Financial Officer since January 2013,

- 7 -

Case 2:23-cv-01455-DLR    Document 42-5    Filed 02/20/24    Page 10 of 55

serving as Financial Controller before then. Before joining Sea, he was an audit senior manager at Ernst & Young, where he worked from October 2000 to September 2010 in both China and the U.S. Hou reviewed, contributed to, and signed the Offering Materials.

21.    Defendant Tencent is a technology conglomerate headquartered in Shenzhen, China, and a principal shareholder of Sea. As described below, Tencent has consistently held a controlling interest in Sea and was involved in developing the Company's most valuable game, *Free Fire*:

(a)    Tencent's ownership interest in Sea resulted from a series of transactions beginning in or about 2013 and continuing until Sea's October 2017 IPO, when the Company went public and first issued ADSs for trading. Before the IPO, Tencent had received millions of ordinary shares in exchange for investing in Sea, ultimately amassing nearly 40% of Sea's ordinary shares. The IPO, which established Sea's dual-class share structure, resulted in reducing Tencent's interest in the Class A and Class B ordinary shares to about 35%, with 30% in corresponding voting control. Additionally, Defendant Ren—Tencent's COO and designee on Sea's Board— remained a director of the Company. As of March 5, 2021, Tencent beneficially owned 12.1 million Class A ordinary shares and 106 million Class B ordinary shares for a total of 22.9% of Sea's Class A and Class B ordinary shares, vesting it with 43.7% of total voting power. Its voting power as of that date did not include 46.6 million Class B ordinary shares for which Tencent granted Defendant Li an irrevocable proxy as to matters subject to the vote of shareholders.

(b)    Tencent and its affiliates own or have developed some of Sea's most popular games, including *League of Legends*, *Arena of Valor*, and *Call of Duty: Mobile*. Tencent also co-developed *Free Fire* and PUBG—popular battle royale-style games that compete for users in the same territories—and published PUBG in India. Although Tencent is a holding company that operates many lines of business through its subsidiaries, gaming is integral to Tencent. To

- 8 -

illustrate, the gaming segment generated $6.8 billion in revenues—or 40.8% of total revenues—for Tencent in the second quarter of 2020 alone, and close to $30 billion in revenues for all of 2020.

22.     Defendant Ren has served as a Board member since September 2013 and thus served in that capacity when Sea completed its 2017 initial public offering ("IPO").  Since May 2012, he has been COO of Tencent, and leads the development of Tencent's Platform & Content Group and Interactive Entertainment Group.  In those capacities, Ren oversees Tencent's entire gaming and online content business.  Ren is also a director or officer of certain Tencent subsidiaries.  He is one of the two highest paid employees of Tencent and reports to Tencent President Martin Lau.  He reviewed, contributed to, and signed the Offering Materials.

23.     Defendant Seng has served as a Board member since Sea's IPO, in October 2017. He has served as CEO of ABC World Pte. Ltd., a private equity fund, since February 2019.  He held senior positions at Temasek from 2003 to 2018 and left as a senior advisory director in January 2019.  Before then, he was an investment banker in mergers and acquisitions at Deutsche Bank AG and also specialized in advising business in Hong Kong and Singapore.  He reviewed, contributed to, and signed the Offering Materials.

24.     Defendant Kuok has served as a Board member since Sea's IPO, in October 2017. He is chairman of Kerry Holdings Limited, the main investment holding company of Kuok Group in Hong Kong, and is involved in various capacities with affiliates of those entities.  He reviewed, contributed to, and signed the Offering Materials.

25.     Defendant Donald J. Puglisi ("Puglisi") is the founder and Managing Director of Defendant Puglisi & Associates ("P&A").  He signed the Offering Materials as Sea's "authorized representative" in the U.S.

- 9 -

26. Defendant P&A is an entity that Puglisi formed. P&A acted as Sea's agent for the acceptance of service of process in the U.S. P&A is responsible and primarily liable for Puglisi's act of signing the Offering Materials, as well as any violation of the 1933 Act attributable to him, under principles of *respondeat superior* and otherwise by operation of law.

27. Defendants Goldman Sachs (Asia) L.L.C. ("GS Asia"), J.P. Morgan, and BofA underwrote the Offerings, acting as joint book-running managers. GS Asia and J.P. Morgan also acted as joint book-running managers of Sea's IPO. The Underwriters participated in preparing the Offering Materials, facilitated due diligence on Sea and the Offerings, solicited ADS and Note purchasers in the Offerings, and provided analyst coverage of Sea. With respect to the Notes Offering, the Underwriters were granted the option to purchase up to $375,000,000 worth of additional Notes to cover overallotments, less underwriting discounts and commissions, within 30 days of the September 8, 2021 prospectus supplement. The Underwriters also had the option to purchase up to 1.65 million ADSs from Sea at the SPO price, less underwriting discounts and commissions, within 30 days of the September 8, 2021 prospectus supplement. On September 14, 2021, the Underwriters exercised their options to purchase additional Notes and ADSs in full. The additional Notes and ADSs issued were valued at approximately $375 million and $500 million, respectively. The underwriting discounts and commissions for the Underwriters totaled 1.00% of the size of the Notes Offering and 1.25% of the size of the SPO, as the following charts reflect (with and without exercising the purchase options):

|  | Per note | Total | |
| --- | --- | --- | --- |
|  |  | No Exercise | Full Exercise |
| Discounts and commissions paid by us | US$10 | US$25,000,000 | US$28,750,000 |

|  | Per ADS | Total | |
| --- | --- | --- | --- |
|  |  | No Exercise | Full Exercise |
| Discounts and commissions paid by us | US$3.975 | US$43,725,000 | US$50,283,750 |

- 10 -

28.     In connection with the Offerings, GS Asia intended to offer ADSs in the U.S. through its registered broker-dealer affiliate in the U.S., Goldman Sachs & Co. LLC, which is headquartered in New York City.  Because J.P. Morgan and BofA are based in the U.S., they had no need for such an arrangement in the U.S.

## SUBSTANTIVE ALLEGATIONS

29.     In May 2009, Defendants Li and Ye co-founded the Company, which was then known as Garena Interactive Holding Limited.  On April 8, 2017, the Company changed its name to Sea Limited, as it is currently known.  From its inception, Sea focused primarily on developing its digital entertainment business (Garena), later launching its digital financial services platform (SeaMoney) in April 2014 and its e-commerce platform (Shopee) in June 2015.  Notwithstanding the continued growth of its other businesses, Sea's digital entertainment segment has remained its most important and profitable business.

30.     When Sea completed its IPO in October 2017, it concentrated its gaming business in Southeast Asia—defined to include Indonesia, Malaysia, the Philippines, Thailand, Singapore, and Vietnam—and Taiwan.  Sea has since expanded its business substantially.  It now operates in Latin America and other areas, and has continued to increase its headcount, office facilities, and infrastructure.  Before and even shortly after the Offerings, for example, Sea's most important game—a battle royale-type shooter called *Free Fire*—was available in over 130 markets, with growing user bases in Brazil, Mexico, India, North America, Russia, and the Middle East.

31.     Sea is a holding company.  It conducts business through subsidiaries, affiliates, and other entities.  As of the Offerings, the Company operated the three platforms introduced above—Garena, Shopee, and SeaMoney—described further below:

(a)     *Garena*: Garena develops, curates, and localizes mobile and PC online games for the markets in which it operates.  It also exclusively licenses and publishes third-party

- 11 -

Case 2:23-cv-01455-DLR   Document 42-5   Filed 02/20/24   Page 14 of 55

games.  Garena provides access to other entertainment content, including livestreaming of online gameplay, as well as social features, such as user chat and online forums.  In December 2017, Sea launched *Free Fire*, the first game it developed entirely in-house.  In Sea's Annual Report on Form 20-F for the fiscal year ended December 31, 2020 ("2020 Form 20-F"), filed with the SEC on April 16, 2021 (and incorporated by reference into the Offering Materials), Sea indicated that *Free Fire* allowed it to expand beyond its traditional markets in Southeast Asia and Taiwan.  In the 2020 Form 20-F, Sea also indicated that its top five games—consisting of *Free Fire* and four games licensed from third-party developers—"contributed 95.6% of [Sea's] digital entertainment revenue, among which *Free Fire* contributed a significant portion."

(b)　　*Shopee*: Shopee is an e-commerce platform with a "mobile-first" approach.  It provides a retail marketplace that connects buyers and sellers online.  Sea began monetizing Shopee in 2017 and generates revenue by offering paid advertising services, charging transaction-based fees, and charging for certain value-added services.  Sea also purchases products from manufacturers and third parties and sells them to buyers on the Shopee platform.

(c)　　*SeaMoney*: SeaMoney is a digital financial services provider.  It offers mobile wallet services, payment processing, credit-related digital financial offerings, and other financial products.  These services and products are offered in Southeast Asia under the AirPay, ShopeePay, SPayLater brands, as well as other brands.

32.　　Historically, Sea has derived substantial revenue from digital entertainment.  In 2018, 2019, and 2020, for example, that segment contributed 55.9%, 52.2%, and 46.1% of total revenue, and Sea's gross profits in those years were primarily attributable to that segment's positive impact.  Sea monetizes digital entertainment offerings using a "freemium" model, providing fully-functional games for free and generating revenue primarily by selling in-game

- 12 -

items—some of which provide special functionality, customizable options, or aesthetic gaming enhancements—to players.

33.     Notably, digital entertainment revenue increased by 77.5% from about $1.1 billion in 2019 to $2 billion in 2020, purportedly due to an increase in Sea's active user base and *Free Fire's* continued success. Sea regularly tracks users and reviews this information, along with other metrics, in evaluating growth trends, measuring performance, and making decisions.

34.     Sea publicly reports its quarterly active users ("QAUs") and paying users ("QPUs"). A single user is counted in those metrics each time he or she plays a game or purchases an in-game item, so the same user may account for multiple QAUs or QPUs. These metrics provide visibility into expanding the user base and success in converting users into paying customers. The following chart from the 2020 Form 20-F shows QAUs and QPUs for each quarter of 2020:

|  | For the Three Months Ended | | | |
|---|---|---|---|---|
|  | March 31, 2020 | June 30, 2020 | September 30, 2020 | December 31, 2020 |
|  | (millions) | | | |
| Game QAUs | 402.1 | 499.8 | 572.4 | 610.6 |
| Game QPUs | 35.7 | 49.9 | 65.3 | 73.1 |

35.     After the Offerings, Sea updated information on its QAUs and QPUs in its Annual Report on Form 20-F for the fiscal year ended December 31, 2021, filed with the SEC on April 22, 2022 ("2021 Form 20-F"), as the following chart reflects:

|  | For the Three Months Ended | | | |
|---|---|---|---|---|
|  | March 31, 2021 | June 30, 2021 | September 30, 2021 | December 31, 2021 |
| Bookings (US$ in billions)(1) | 1.1 | 1.2 | 1.2 | 1.1 |
| Game QAUs (in millions) | 648.8 | 725.2 | 729.0 | 654.0 |
| Game QPUs (in millions) | 79.8 | 92.2 | 93.2 | 77.2 |

36.     Additionally, as disclosed in the 2020 Form 20-F, *Free Fire* was the most important factor in causing Sea's operating cash flows to turn from negative to positive in 2019:

> Operating cash flows turned from negative in 2018 to positive in 2019 principally due to changes in our working capital, primarily driven by an increase in the change in deferred revenue of US$433.0 million, mainly due to cash generated from sales

- 13 -

of in-game virtual items in our digital entertainment business, which was largely attributable to our self-developed game Free Fire . . . .

37.     For the September 2021 Offerings, Sea qualified as a foreign private issuer eligible to file a shelf registration statement on Form F-3, which entitled it to offer and sell securities to the public on an ongoing basis without filing successive registration statements or awaiting a declaration of effectiveness from the SEC.  Ultimately, when Sea filed its Form F-3, it reserved the right to issue and sell, from time to time, various securities, including Notes, Class A ordinary shares, preference shares, debt securities, guarantees, warrants, purchase contracts, and purchase units.

38.     On September 8, 2021, Sea announced the SPO, pursuant to which it intended to offer 11 million ADSs—12.65 million ADSs, if the Underwriters exercised their overallotment purchase option—for sale to the public.  Sea also announced plans to complete the separate, concurrent Notes Offering, in which it would sell up to $2.875 billion aggregate principal amount of 0.25% convertible senior notes due 2026.  The Offerings were not contingent on each other.

39.     On September 8, 2021—the same day that Sea announced the Offerings—Sea filed its Form F-3 registration statement and prospectus, as well as a preliminary prospectus supplement, to facilitate the Offerings.  The Form F-3 incorporates by reference that supplement, as well as previous and other materials, which together form the Offering Materials:

- Sea's annual report on Form 20-F for the year ended December 31, 2020 filed with the SEC on April 16, 2021;

- Sea's Report on Form 6-K, furnished with the SEC on September 8, 2021, that attaches as exhibits Sea's Management's Discussion and Analysis of Financial Condition and Results of Operations and its Unaudited Interim Condensed Consolidated Financial Statements, both for the six months ended June 30, 2020 and 2021; and

- All reports on Form 20-F, and any report on Form 6-K that so indicates it is being incorporated by reference, that Sea files with or furnishes to the SEC,

- 14 -

on or after the date on which the registration statement is first filed with the SEC and until the termination or completion of the Offerings.

40.     In the Form F-3, Sea advised that information in subsequent documents, incorporated by reference therein, controls where those documents update previously disclosed information:

> When we update the information contained in documents that have been incorporated by reference by making future filings with the SEC, the information incorporated by reference in this prospectus is considered to be automatically updated and superseded. In other words, in the case of a conflict or inconsistency between information contained in this prospectus and information incorporated by reference into this prospectus, you should rely on the information contained in the document that was filed later.

41.     However, the Form F-3 cautioned investors to rely only on the information contained therein when deciding whether to invest in the Offerings:

> You should rely only on the information that we incorporate by reference or provide in this prospectus.  We have not authorized anyone to provide you with different information.  We are not making any offer of these securities in any jurisdiction where the offer is not permitted.  You should not assume that the information in this prospectus is accurate as of any date other than the date on the front of those documents.

42.     On September 10, 2021, Sea announced that it had priced the ADSs at $318 per share.  On September 13, 2021, Sea filed its final prospectus supplement, which forms part of the Offering Materials.  The SPO closed the next day, on September 14, 2021, when Sea issued and sold 12.65 million ADSs—including 1.65 million ADSs to the Underwriters—for proceeds of nearly $4 billion.  That day, Sea also closed its Notes Offering, generating proceeds of $2.875 billion.  Together, these interrelated transactions raised total gross proceeds for the Company of almost $7 billion—the largest equity offering of 2021, reported in the media as a "mega fund raising" and the largest ever in Southeast Asia.

**A.** **The Offering Materials Misleadingly Omitted and Obscured that Before the Offerings, Sea's Users, Bookings, and Other Metrics Had Leveled Off, Reducing the Digital Entertainment Segment's Contribution to Revenue**

43.     Well before the Offerings, Defendants understood and appreciated that the continuing and sustained growth in Garena's user base—reported in the Offering Materials for earlier quarters—had stalled, leveled off, and returned to pre-pandemic levels. By the time of the Offerings, just two weeks remained in the third quarter of 2021. The data in Defendants' possession for that nearly-complete three-month period, ending September 30, 2021, depicted a company far different from the portrayal in the Offering Materials. Indeed, those third quarter results—which Sea would not publicly report until November 2021, about two months after the Offerings—diverged materially from the second quarter results incorporated in the Offering Materials. For this reason, the Company's 2021 second quarter and prior financial results were not indicative of its future—or *current*—financial condition.

44.     In 2020, Sea claimed to have experienced tremendous revenue growth because of shifts in consumer spending and behavior during the COVID-19 pandemic, resulting in an increase in the purchase of online goods and services and the continued rise in popularity of the Company's hit mobile game, *Free Fire*. Launched in late 2017, *Free Fire* became the most downloaded mobile game globally, and, by December 2019, the game had surpassed over $1 billion in lifetime revenue.

45.     Due in substantial part to *Free Fire's* success, Sea's digital entertainment revenue grew 77% year-over-year to more than $2 billion, and gross profit more than doubled year-over-year to $1.35 billion, in 2020. Digital entertainment bookings—a key measure of consumer engagement and sales—grew 111% year-over-year to $1 billion. According to the 2020 Form 20-

- 16 -

Case 2:23-cv-01455-DLR    Document 42-5    Filed 02/20/24    Page 19 of 55

F, "bookings" are GAAP revenue for digital entertainment plus change in that segment's "deferred revenue"—also an important metric, discussed below.

46.    Additionally, net cash generated from operating activities increased in 2020 by $486 million to $555.9 million, driven in large part by an increase in the change in deferred revenue of $525.2 million derived from the ongoing success of *Free Fire*. The change in deferred revenue—a metric reflecting revenue, recognized over time, from the sale of in-game items— mainly resulted from in-game item sales in the digital entertainment segment, including *Free Fire*. In fact, *Free Fire* was almost singularly responsible for the turnaround in operating cash flow from 2018 to 2019: operating cash flows turned from negative in 2018 to positive in 2019 principally due to changes in working capital driven by an increase in the change in deferred revenue of $433 million, mainly due to cash generated from in-game item sales attributable to *Free Fire*.

47.    These trends continued for the first and second quarters of 2021, running through the six-month period ended June 30, 2021—the latest information Sea publicly reported before the Offerings. For example, for the first half of 2021, digital entertainment revenue increased by 139.6% year-over-year, from $753.6 million to $1.8 billion, primarily from an increase in active and paying users based on *Free Fire's* continued success. Sea issued its first-half results on August 17, 2021, later releasing them as an exhibit to a September 8, 2021 Form 6-K, which the Offering Materials incorporated.

48.    Commenting on these results during Sea's August 17, 2021 earnings conference call (which call, unlike the results themselves, the Offering Materials did not incorporate), Defendant Li emphasized "strong year-on-year growth," comparing the results to the "standout results for the second quarter of 2020, when most of our markets were under the strictest form of lockdowns." Setting the stage for the Offerings, Li also reported that Sea had raised its financial guidance for full-year 2021 based on its first-half financial performance:

- 17 -

Considering the strong performance observed across our businesses in the first half of 2021, we are raising our full year 2021 guidance. Our digital entertainment portfolio has outperformed our expectations so far this year. As such, we now expect bookings of between $4.5 billion and $4.7 billion, representing over 44% growth from 2020 at the midpoint of the revised guidance.

E-commerce results in the first half of 2021 also exceeded our expectations, and GAAP revenue is now expected to be between $4.7 billion and $4.9 billion, representing over 121% year-on-year growth at the midpoint of the revised guidance. While strict lockdowns have mostly been lifted in our region since the end of the second quarter last year, many of our markets continue to see a high volume of COVID cases. In this dynamic environment, we continue to demonstrate our ability to adapt quickly to fast-changing circumstances and to execute well to serve the evolving needs of our users.

49.     During the call, Li also emphasized *Free Fire's* continued success in the 2021 second quarter, singling out its market-leading position in India, among other regions:

*Free Fire* continued to be the highest grossing mobile game in Southeast Asia, Latin America and India in the second quarter according to App Annie. The game has now retained its leadership in Southeast Asia and Latin America for 8 straight quarters and in India for 3 straight quarters.

50.     These representations preceded the Offerings and the issuance of the Offering Materials, which occurred the following month, in September 2021. Although statements made in the August 17, 2021 earnings conference call were not incorporated in the Offering Materials and do not form the basis of these claims, they are emblematic of the statements set forth in the Offering Materials, including statements incorporated therein. In particular, the Offering Materials portrayed increasing and sustained user growth based in large part on the continued success of *Free Fire*, notwithstanding the unique benefits to the digital entertainment business resulting from the pandemic as consumers increasingly shifted to online purchasing and entertainment.

51.     In essence, the statements set forth in the Offering Materials created the misleading impression that Sea's historical financial results were indicative of the Company's current and future financial condition, when that was not, in fact, true or accurate.

- 18 -

Case 2:23-cv-01455-DLR    Document 42-5    Filed 02/20/24    Page 21 of 55

52.     For example, the Offering Materials provided quarterly information for Sea's digital entertainment and other businesses from the second quarter of 2019 until the second quarter of 2021, and results for years ended December 31, 2019, 2020, and 2021.  This information portrayed steady and strong growth in digital entertainment revenue and overall gross profit in that period—ending just three months before the Offerings—largely attributable to *Free Fire's* continued success.  A chart excerpted from the Offering Materials, which shows this information (and was originally produced with other results and metrics), is below (footnotes omitted):

## Selected Annual and Quarterly Results of Operations

| | For the Three Months Ended | | | | | | | | | For the Year Ended | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | June 30, 2019 | September 30, 2019 | December 31, 2019 | March 31, 2020 | June 30, 2020 | September 30, 2020 | December 31, 2020 | March 31, 2021 | June 30, 2021 | December 31, 2018 | December 31, 2019 | December 31, 2020 |
| | (US$ in thousands) | | | | | | | | | | | |
| **Revenue:** | | | | | | | | | | | | |
| Service revenue | | | | | | | | | | | | |
| Digital entertainment | 229,478 | 329,058 | 404,082 | 369,683 | 383,946 | 568,981 | 693,362 | 781,335 | 1,024,267 | 462,464 | 1,136,017 | 2,015,972 |
| E-commerce and other services[(1)] | 165,741 | 229,740 | 296,515 | 266,545 | 364,719 | 489,500 | 656,566 | 772,382 | 999,658 | 270,049 | 822,659 | 1,777,330 |
| Sales of goods[(1)] | 40,932 | 51,339 | 76,627 | 78,692 | 133,369 | 153,679 | 216,622 | 209,927 | 256,623 | 94,455 | 216,702 | 582,362 |
| Total revenue | 436,151 | 610,137 | 777,224 | 714,920 | 882,034 | 1,212,160 | 1,566,550 | 1,763,644 | 2,280,548 | 826,968 | 2,175,378 | 4,375,664 |
| **Cost of revenue:** | | | | | | | | | | | | |
| Cost of service | | | | | | | | | | | | |
| Digital entertainment | (94,952) | (117,194) | (139,117) | (142,692) | (156,539) | (194,738) | (208,360) | (248,240) | (292,696) | (267,359) | (435,905) | (702,329) |
| E-commerce and other services | (198,431) | (240,037) | (294,685) | (285,524) | (388,291) | (458,321) | (611,637) | (674,538) | (816,748) | (446,281) | (907,518) | (1,743,773) |
| Cost of goods sold | (45,324) | (49,738) | (78,570) | (79,904) | (136,378) | (151,534) | (212,841) | (195,457) | (240,210) | (98,570) | (227,035) | (580,657) |
| Total cost of revenue | (338,707) | (406,969) | (512,372) | (508,120) | (681,208) | (804,593) | (1,032,838) | (1,118,235) | (1,349,654) | (812,210) | (1,570,458) | (3,026,759) |
| Gross profit | 97,444 | 203,168 | 264,852 | 206,800 | 200,826 | 407,567 | 533,712 | 645,409 | 930,894 | 14,758 | 604,920 | 1,348,905 |

53.     The Offering Materials also depicted a strong and accelerating trend in bookings and active and paying users in the digital entertainment segment for each quarter from 2020 through the first half of 2021, spanning from January 1, 2020 to June 30, 2021:

| | For the Three Months Ended | | | | | |
|---|---|---|---|---|---|---|
| | March 31, 2020 | June 30, 2020 | September 30, 2020 | December 31, 2020 | March 31, 2021 | June 30, 2021 |
| **Digital Entertainment** | | | | | | |
| Bookings (US$ in billions) | 0.5 | 0.7 | 0.9 | 1.0 | 1.1 | 1.2 |
| Game QAUs (in millions) | 402.1 | 499.8 | 572.4 | 610.6 | 648.8 | 725.2 |
| Game QPUs (in millions) | 35.7 | 49.9 | 65.3 | 73.1 | 79.8 | 92.2 |

- 19 -

54. The September 8, 2021 Form 6-K, which included Sea's unaudited financial results and Management's Discussion and Analysis ("MD&A") for the first half of 2021 (all of which the Offering Materials incorporated), represented that "the increase in our active user base as well as the deepened paying user penetration" primarily due to *Free Fire* was responsible for the rising, long-term trend in digital entertainment revenue:

> *Digital Entertainment*: Revenue increased by 139.6% from US$753.6 million for the six months ended June 30, 2020 to US$1.8 billion for the six months ended June 30, 2021. This increase was primarily due to the increase in our active user base as well as the deepened paying user penetration, and in particular, the continued success of our self-developed game *Free Fire*.

55. Likewise, in the 2020 Form 20-F, issued in April 2021, Sea expressly represented: "The continuous revenue growth from 2018 to 2020 was mainly attributable to the rapid growth of our e-commerce platform, as well as the increasing popularity of our games, and in particular, the continued success of our self-developed game *Free Fire*." That trend had evidently continued in the first and second quarters of 2021, as the other parts of the Offering Materials confirmed.

56. This information showed the Company's remarkable resiliency and growth both pre-and-post pandemic, even as lockdowns were lifted in key markets—which should have resulted in a *reduction* of both active and paying users, but evidently did not. Rather, these metrics demonstrated just the opposite: that Sea had weathered challenging conditions and was continuing to do so, as all of these metrics trended upward for over a year—and before, preceding 2020 (as the 2020 Form 20-F, which also discussed the Company's financial performance in 2019, indicated).

57. The overwhelming impression engendered by these statements, financial results, and operational metrics—and others like them—is that revenue, bookings, and users were continuing on an upward trajectory in the digital entertainment business as of the Offerings. These representations were materially misleading because the Company's 2021 third quarter was nearly

- 20 -

complete by the time of the Offerings, and the non-public information available to Defendants revealed that:

(a)     the user base for Sea's most important game, *Free Fire*, had leveled off and, in fact, growth in active and paying users had stagnated—signaling the beginning of a reversal in the trend of previously skyrocketing user growth;

(b)     the digital entertainment segment had reverted to normalized, pre-pandemic dynamics, which also reflected slowing growth that *Free Fire's* purported continued success could not offset;

(c)     Sea had experienced almost no growth in bookings since the end of the second quarter of 2021, gross margins had severely contracted, and the segment's historical contribution to revenue was at risk of suffering a troubling reversal, in which, for the first time, Sea's historically money-losing operations would overtake digital entertainment as the primary revenue contributor;

(d)     *Free Fire's* contribution to revenue and Sea's other operational and financial metrics had weakened, undermining descriptions in the Offering Materials of *Free Fire's* "continued success," growth, and resiliency;

(e)     *Free Fire* was exposed to the acute risk that India would ban the game shortly after the Offerings, given India's increasing crackdown on applications with ties to companies in China, including, as explained below, Tencent; and

(f)     collectively, as a result of the foregoing, the financial results reported in the Offering Materials were not indicative of the Company's then-current or future financial condition or results of operations, and the Company was vulnerable to serious risks that were materializing before the Offerings and would metastasize after them—threatening to eliminate billions in market capitalization.

- 21 -

58. Sea completed the Offerings on September 14, 2021, two weeks before the September 30, 2021 end of the third quarter. The SPO generated gross proceeds for Sea of approximately $4 billion from the sale of ADSs to the public, and the Notes Offering generated another approximately $3 billion for the Company—all based on information set forth in the Offering Materials.

59. On November 16, 2021, two months after completing the Offerings, Sea reported financial results for its 2021 third quarter. The results, overall, were negative—confirming that key metrics and operational results featured in the Offering Materials were trending *downward* as of the Offerings, representing a reversal of Sea's historical financial performance. For example, digital entertainment bookings did not increase at all from the prior quarter, but had instead remained flat, at $1.2 billion. Active and paying users for the quarter also remained flat, at 725.2 million QAUs and 92.2 million QPUs, representing almost no user growth despite the purported "continued success" of *Free Fire*. Indeed, quarterly active users only slightly increased—by 4 million users, compared to an increase of 76.4 million users in the prior quarter. On a sequential basis, digital entertainment margins had contracted by 420 basis points to 58.6% and the segment's adjusted EBITDA had plunged by $26 million, causing Sea's total adjusted EBITDA to plummet to a $166 million loss as compared to a $120 million profit in the comparable prior-year period.

60. Also on November 16, 2021, Sea held an earnings conference call to discuss its third quarter results. During the call, Yanjun Wang, Sea's Group Chief Corporate Officer, Group General Counsel, and Company Secretary, conceded that pandemic-fueled growth highlighted in the Offering Materials had ceased during the quarter, stating that *Free Fire's* growth had "normalized" and that "we are looking at more of a pre-COVID—back to more of a pre-COVID environment in terms of the game operations."

- 22 -

61. Subsequently, on March 1, 2022, Sea reported financial results for its fourth quarter and full-year ended December 31, 2021. The Company's financial and operational performance was even worse, continuing the downward trend established during the 2021 third quarter in which the Offerings closed. For the first time in Sea's history, revenue from the digital entertainment segment fell below revenue from "e-commerce and other services"—*i.e.*, combined revenue from the Shopee and SeaMoney segments. As the following chart from the 2021 Form 20-F shows, digital entertainment revenue accounted for 43.4% of the Company's total revenue in 2021 (down from 46.1% in 2020), while e-commerce and other services accounted for 45.8% (up from 40.6%):

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2019 | | 2020 | | 2021 | |
| | US$ | Percentage of Total Revenue | US$ | Percentage of Total Revenue | US$ | Percentage of Total Revenue |
| | | | (thousands, except for percentages) | | | |
| Service revenue | | | | | | |
| Digital Entertainment | 1,136,017 | 52.2 | 2,015,972 | 46.1 | 4,320,013 | 43.4 |
| E-commerce and other services | 822,659 | 37.8 | 1,777,330 | 40.6 | 4,564,617 | 45.8 |
| Sales of goods | 216,702 | 10.0 | 582,362 | 13.3 | 1,070,560 | 10.8 |
| Total revenue | 2,175,378 | 100.0 | 4,375,664 | 100.0 | 9,955,190 | 100.0 |

62. Below is a chart from the 2021 Form 20-F showing declines in digital entertainment bookings and quarterly active and paying users during the fourth quarter of 2021 (footnote omitted):

| | For the Three Months Ended | | | |
|---|---|---|---|---|
| | March 31, 2021 | June 30, 2021 | September 30, 2021 | December 31, 2021 |
| Bookings (US$ in billions)(1) | 1.1 | 1.2 | 1.2 | 1.1 |
| Game QAUs (in millions) | 648.8 | 725.2 | 729.0 | 654.0 |
| Game QPUs (in millions) | 79.8 | 92.2 | 93.2 | 77.2 |

63. The Offering Materials did not remotely warn of prevailing conditions Sea was then experiencing which could result in a dramatic departure from prior financial performance, instead engendering the impression that the Company's digital entertainment business was on a continuing and upward trajectory, as it always had been. In fact, the Offering Materials represented that Sea utilized a "proprietary" system to track and enhance user engagement in gaming:

> We have developed a proprietary technology platform with strong data analysis capabilities that integrate and track every aspect of our online game business

- 23 -

operations, including game redesign and localization, distribution, payment channel management, user research, virtual goods merchandizing, marketing, cross-promotion, game development and game services.

We use sophisticated algorithms to determine the likelihood of user engagement with specific content recommendations and we use this data to match the most relevant content to each of our users based on the user's profile and game play history. Moreover, our servers and the software development kit (SDK) modules embedded in our mobile game applications jointly support various functions within our games, including analysis of user and game data, central management of user accounts, account security, payment gateway connectivity, user communication, social, connectivity, and cross-promotion functions.

64.    In the Offering Materials, Sea also represented that it used technology to enhance its Shopee and SeaMoney businesses:

(a)    As to Shopee, the Offering Materials represented that: (1) Sea's "proprietary database management system is one of the largest database systems for mobile online transaction processing in our region"; (2) the system enables the Company to "provide data to Shopee sellers on a real-time basis to enable them to better understand key trends to target and acquire customers"; and (3) Sea uses its "data to create a better shopping experience [for buyers] by personalizing search results and shopping recommendations."

(b)    As to SeaMoney, the Offering Materials stated that Sea's "payment processing services rely on the same technological infrastructure as our online games and e-commerce services, which is scalable and customizable," explaining that its "payment processing platform consists of a database, a processing system, and interfaces for consumers, content providers, telecommunications service providers and distribution partners."

65.    In this respect, the Offering Materials conveyed the impression that Sea leveraged its unique technology to track in real-time every facet of its business—from gaming to online sales and payment processing—and that doing so protected and augmented its ongoing growth trends.

- 24 -

Case 2:23-cv-01455-DLR    Document 42-5    Filed 02/20/24    Page 27 of 55

66.     The 2020 Form 20-F, which included these representations and a recitation of risks that could affect Sea's business, formed the foundation of the Offering Materials' disclosures. But the risk factors—which covered the year ended December 31, 2020—remained unchanged by the time of the Offerings. All of the other materials incorporated into the Offering Materials referenced the risk factors in the 2020 Form 20-F, conveying that those risks remained unchanged and, further, that nothing undermined the accuracy and completeness of the presentation of those risks. Even the risk factors set forth in the prospectus and prospectus supplements did not reflect current conditions. Because the risk factors and other cautionary language in the Offering Materials did not reflect that current operational conditions were then causing Sea's financial performance to deviate substantially from historical results, the Offering Materials were also materially misleading for this reason.

**B.      Before the Offerings, India Intensified Its Crackdown on Applications with Ties to China, Threatening *Free Fire* and—After the Offerings—Banning It**

67.     By the time of the Offerings, the government of India had undertaken extensive efforts to ban applications in India with ties to China. India's concerns arose due to widespread data collection functions built into those apps, which India believed benefitted the Chinese government and posed a national security risk. The Offering Materials did not disclose the ever-present yet intensifying risk that India would extend its ban to *Free Fire*, nor did they disclose related risks and uncertainties for the Company's business and operations as a result of India's crackdown on Chinese-connected apps. Unbeknownst to investors—told to rely solely on the Offering Materials for information about Sea when investing in ADSs and/or Notes issued in the Offerings—these risks and uncertainties were looming at the time of the Offerings and evident to Defendants, yet not adequately disclosed.

- 25 -

68. The September 8, 2021 prospectus supplement, for example, provided only limited information on Sea and its business:

(a) The supplement itself represented that it contained "only a summary" of information about Sea, directing investors to "carefully read this prospectus, any accompanying prospectus supplement, and any other offering materials, together with the information described under the heading 'Where You Can Find More Information About Us.'"

(b) Additionally, the supplement directed investors to "Item 4. Information on the Company" in Sea's Form 20-F and Sea's report on Form 6- K, furnished with the SEC on September 8, 2021, for "more information" about Sea.

(c) The supplement likewise directed investors to review the "risks described under 'Item 3. Key Information—D. Risk Factors' in [the] Form 20-F, included in any applicable prospectus supplement or in the documents incorporated by reference into this prospectus before [they] invest in [the Company's] securities."

69. In the 2020 Form 20-F, Sea stated that it "substantially depend[s] on a small number of popular games, including [its] first fully self-developed game, *Free Fire*, . . . which was launched in December 2017. In 2020, [its] top five games, comprising *Free Fire* and games licensed to [it] by third-party game developers, contributed 95.6% of [the] digital entertainment revenue, among which *Free Fire* contributed a significant portion." Despite the importance of *Free Fire* and these other gaming applications to Sea's business, the 2020 Form 20-F warned only in the most generic sense that "regulatory" or governmental actions *could* harm the Company going forward.

70. Among the issues that may adversely affect the Company, for example, Sea identified in the 2020 Form 20-F "regulatory or legal changes that affect [its] ability to monetize [its] games" and "reductions in consumer spending and engagement levels . . . ." More

- 26 -

specifically, Sea indicated that *Free Fire* is available in "several markets" including India, but warned only that expanding to "new markets" "may subject [it] to additional regulatory and compliance requirements and other new risks," as follows:

> *Free Fire* is currently available in several markets, including our region, other parts of Asia, Brazil, Mexico, India, North America and other growth markets like Russia and the Middle East. Any self-developed games we may develop in the future may also be offered in multiple jurisdictions. The expansion of our digital entertainment business into new markets where we have previously had little or no business presence, including through our self-developed games, may subject us to additional regulatory and compliance requirements and other new risks. We may have to adopt differing methods and processes to adhere to each jurisdiction's laws and regulations, which could result in undue delays in launching such self-developed games or increased costs.

71.     Although Sea mentioned that its business might be harmed if key games were banned, it portrayed the risk only as remote, hypothetical, and even theoretical, generally representing in the 2020 Form 20-F as follows:

> If any of our key games, including *Free Fire*, is banned or temporarily suspended by any government, court or distribution channels, our business, financial condition and results of operations may be materially and adversely affected.

72.     In reality, the risk of a ban in India on *Free Fire*—a gaming app directly connected to China-based Tencent—was increasing and substantially likely, if not probable, shortly after the Offerings.   The Offering Materials misrepresented and omitted the risks and uncertainties associated with a *Free Fire* ban because India's crackdown on apps with Chinese ties was intensifying before the Offerings, and by then had already affected a different non-Chinese gaming company—with a similar game to *Free Fire*—also connected to Tencent.

73.     India's ban on apps first impacted Tencent about a year before the Offerings.  It all started with a skirmish between Indian and Chinese forces.  On June 15, 2020, the Chinese military killed 20 Indian soldiers in a confrontation at the Galwan Valley, a disputed region along the Sino-Indian border.  Two weeks later, India leveled sanctions at China, identifying national security

- 27 -

Case 2:23-cv-01455-DLR Document 42-5 Filed 02/20/24 Page 30 of 55

concerns arising from surreptitious data collection activities of apps in India with ties to Chinese corporate and governmental interests.

74.     In late-June 2020, India banned 59 apps with ties to China, placing Tencent squarely in its crosshairs. The ban included WeChat, a massively popular instant messaging and social media app that Tencent developed. WeChat is widely regarded internationally as the Facebook of China—with over a billion users—and is closely associated with Tencent, which leverages WeChat to gather user information, generate revenue, and promote its business interests.

75.     India also announced the ban of an additional 47 Chinese apps, which were primarily clones of the initial 59, over similar privacy and national security concerns. By then, at least ten of Tencent's apps were blacklisted in India.

76.     Concerns swirled that India would ban other apps connected to Tencent—including apps other companies had co-developed with Tencent. One such game was PUBG Mobile—a battle royale-style mobile shooter similar in play and aesthetics to *Free Fire*. PUBG Mobile is popular internationally and has at times been the top-grossing mobile game worldwide. Although Krafton—a South Korean videogame company—developed PUBG, Tencent distributed PUBG Mobile in India. Back then, Tencent was a major shareholder in Krafton, with an approximate 15% stake in the company and a seat on its board of directors. As a result of this relationship, concerns arose as early as June 2020 that India would ban PUBG Mobile. In fact, Tencent itself reportedly expressed concern that PUBG Mobile might be next banned in India.

77.     Within weeks, on September 2, 2020, India banned another 118 apps with perceived ties to Chinese companies, including PUBG Mobile. Within two days of the ban, Tencent reportedly lost $34 billion in market capitalization. Within six days, Tencent chose to stop distributing PUBG Mobile (and its variants) in India, terminating the service and access to users there in October 2020.

- 28 -

Case 2:23-cv-01455-DLR    Document 42-5    Filed 02/20/24    Page 31 of 55

78.     India banned 43 more apps on November 24, 2020.  Snack Video, a short-video app regarded as a TikTok alternative, was included.  Snack Video was developed by Symphony Tech Pte. Ltd., a Singapore-based entity whose parent, Beijing Kuaishou Technology, is based in China and backed by Tencent.  In January 2021, India permanently banned the 59 apps it initially banned in June 2020, including Tencent's WeChat.

79.     In response to these developments, Tencent overhauled its approach to investing in companies, and developing and publishing apps, with links to the Indian market.  In February 2021, Tencent set in motion plans to exit its investment in Mumbai-based Dream Sports, which was billed as the world's largest fantasy-sports platform.  In turn, Tencent's largest stakeholder, Prosus NV, chose to reduce its position in Tencent by selling up to $14.7 billion worth of shares— at a discount to the then-current trading price—in what was regarded as the world's largest block trade.

80.     By April 2021, PUBG Mobile was no longer the world's top-grossing mobile game—a development some commentators linked to the India ban.  Also in April 2021, Krafton applied for an initial public offering in South Korea, revealing that Tencent was its second-largest shareholder.  Krafton—reportedly then valued at about $17.9 billion—had hired former employees of Tencent to assist in operating its business in India.

81.     Notably, Sea filed its 2020 Form 20-F in April 2021.  Yet the 2020 Form 20-F made no mention of the intensifying ban in India, which had already ensnared some of the largest apps in the Indian market based solely on their connection to Chinese companies, including Tencent.

82.     The following month, May 2021, the makers of PUBG Mobile announced plans to relaunch the game in India.  This new version of the app would no longer have ties to Tencent and would be hosted by Microsoft Azure servers in India.  Members of the Indian government,

- 29 -

however, viewed the relaunch with skepticism, and lobbied Prime Minister Narendra Modi to ban the new app.

83.     In a May 22, 2021 letter to the Prime Minister, for example, Ninong Ering, a member of the Legislative Assembly in India's northeastern state Arunachal Pradesh, raised concerns over PUBG's continued ties to Tencent.  The letter cautioned that "unscrupulous companies connected to PUBG. . . including Tencent . . . are trying to sidestep our laws, deceive the government and Indian citizens and relaunch the game with a new name . . . ."  The letter emphasized Tencent's substantial ownership stake in Krafton, notwithstanding Krafton's connection to Singapore (not China):

> Tencent is currently the second-largest stakeholder [with a] 15.5% stake in Krafton. Its stake was only 10% in 2018 and it may soon have a majority stake and control. While after the ban on PUBG in India, Krafton allegedly stopped its agreement with Tencent in India, however, Tencent is still the publisher and distributer of PUBG Mobile outside India.

84.     In mid-June 2021, PUBG relaunched in India as Battlegrounds Mobile India ("BMI").  Almost immediately, India's then-ruling political party, the Bharatiya Janata Party, called for India to ban BMI for the data theft and privacy concerns outlined in the May 2021 letter, described above.  These developments had a profound effect on Krafton's business.

85.     In July 2021, Krafton cut its proposed initial public offering price range by more than 10% and postponed its plans to go public for a month, as regulators in South Korea questioned its valuation.  Krafton reportedly received 87% of its revenue from Asia, and Tencent handled sales in China under the Game for Peace brand.  Krafton also provided technology services for Peacekeeper Elite, a game that Tencent distributes in China.

86.     Shortly thereafter, the hashtag #banfreefireindia started circulating on Indian social media, as citizens began tweeting at the Prime Minister that Tencent was also linked to *Free Fire*. The hashtag gained further momentum in the summer of 2021, when reports emerged that a 13-

- 30 -

year old boy committed suicide after incurring 40,000 rupees' worth of in-game charges. Neighboring country Bangladesh ultimately banned *Free Fire* in August 2021 out of concerns for child safety.

87.     Also in August 2021, Sea announced plans to launch Shopee in India.  The Company was reportedly cautiously preparing to expand its operations there, with no launch date. Notably, *Free Fire* was the highest grossing game in India, Southeast Asia, and Latin America for the first quarter of 2021.  In fact, in remarks Defendant Li gave on an August 17, 2021 earnings call covering Sea's first-half results, he confirmed that *Free Fire* had retained the status as highest grossing mobile game in India for three straight quarters—thus apparently overtaking PUBG Mobile as the world's highest-grossing mobile game app on the Google Play Store.

88.     In September 2021, Sea completed the Offerings, raising nearly $7 billion in gross proceeds from selling newly-issued ADSs at $318 per share and Notes at $1,000 each.  Sea's good fortune was short-lived, however, because *Free Fire* and Shopee would suffer the same fate as PUBG in India within only six months.

89.     In November 2021, the New Delhi High Court announced that it would seek guidance from the Indian government in response to public interest litigation ("PIL") by an Indian consumer against Shopee.  The PIL alleged that Shopee was surreptitiously operating as a Chinese-backed company in contravention of Indian rules and regulations, which prohibited foreign direct investment in Indian companies (as Taiwan similarly did for Taiwanese companies).  To substantiate this claim, the PIL alleged that Tencent owned a significant portion of Sea's Class B ordinary shares—which carry super-voting rights—and that key business decisions required Tencent's approval.

90.     Then, in December 2021, the Confederation of All India Traders submitted a letter to India's Minister of Finance and Corporate Affairs, urging a ban of Shopee.  Echoing the

- 31 -

FILED: NEW YORK COUNTY CLERK 08/09/2022 04:19 PM
NYSCEF DOC. NO. 65
Case 2:23-cv-01455-DLR    Document 42-5    Filed 02/20/24    Page 34 of 55

INDEX NO. 151344/2022
RECEIVED NYSCEF: 08/09/2022

concerns in the PIL, the letter warned that the "complex structuring of entities [that form Shopee] is nothing but an attempt to hoodwink the Indian government and infuse Chinese funds into India" in violation of Indian law.

91.     On January 4, 2022, Tencent revealed that it would reduce its stake in Sea from about 21.3% to 18.7%, representing the sale of 14.5 million ADSs.  According to a term sheet reported in the media, Tencent agreed to sell nearly $3 billion worth of ADSs for $208 to $210 per share—a material reduction from the trading price of $223.31.  The transaction imposed a six-month lockup on the further sale of its shares, but Tencent confirmed it would retain most of its stake for the long term.  The 2021 Form 20-F indicates that as of April 5, 2022, Tencent held 18.6% of all shares based on its Class A holdings and 8.7% of Sea's voting power, while Li held all Class B shares, 17.1% of all shares, and 59.9% of total voting power.

92.     On February 14, 2022, India banned *Free Fire* and 53 other apps with perceived ties to China as part of its continued crackdown.  According to reports, *Free Fire* and its related variant, *Free Fire Max*, were downloaded over 238 million times in India before the ban, and a majority of the game's installs were in India (by one account, 40 million out of 75 million active users).

93.     The ban evidently arose due to Sea's close relationship with Tencent—and the market reacted swiftly to the news, decimating the trading price of the ADSs.  The prior week, for example, the trading price closed as high as $173.95 (on February 9, 2022).  On February 14, 2022, however, the price crashed to $129.17—down from a close of $158.28 on February 11, 2022, the prior trading day—on extraordinarily high volume of 28.4 million ADSs traded.  All told, the price plummeted by nearly 20%, erasing an astounding $16 billion from Sea's market capitalization— the steepest decline on record for the Company since it went public, back in 2017.  This chart from *Bloomberg* depicts the massive price drop in response to news of India's *Free Fire* ban:

- 32 -

Case 2:23-cv-01455-DLR    Document 42-5    Filed 02/20/24    Page 35 of 55



**Stock Sinks**
Sea Ltd. sinks by most on record amid Free Fire India ban reports

Source: Bloomberg

The price of the Notes also fell, from $85.22 per Note on February 11, 2022 down to a price of $82.24 per Note on February 14, 2022.

94.     The fallout from India's decision to ban *Free Fire* continued through March 2022, when Sea revealed that, effective March 29, 2022, it would discontinue Shopee's operations in India.  Although the Company publicly denied any link between Shopee's withdrawal and India's *Free Fire* ban, one article reported on a reliable source who contradicted that portrayal:

> One person with direct knowledge of the company's thinking said Shopee's decision to exit from India was sparked in part by stricter regulatory scrutiny that saw Sea's gaming app *Free Fire* banned as part of a crackdown on companies allegedly sending data to servers in China.

95.     Subsequently, in the 2021 Form 20-F filed on April 22, 2022, Sea included a new and detailed risk disclosure designed to address India's ban of *Free Fire* and the possibility of similar actions by other governments.  That disclosure, which followed the heading "Changes in economic, political or social conditions or government policies, or government actions or restrictions, globally and in our markets could have a material adverse effect on our business and operations" (bold and italics eliminated), provides:

> In addition, governments or government agencies in any of our markets could censor, ban or block access to our services, mobile applications, platforms and/or the internet generally for various reasons, including political tensions and wars

- 33 -

between countries, content restrictions, national security, data protection or regulatory concerns, or due to some misunderstanding. For example, we announced earlier this year that due to unanticipated government actions, Free Fire was currently unavailable in the Google Play and iOS app stores in India, and it currently remains unavailable. Users generally need to access the internet and/or app stores to access, download or use our services and mobile applications. If governments either directly or indirectly block, limit or otherwise restrict us from publishing or making available our products and services to users, block, limit or restrict our users from accessing our products, services or mobile applications, prevent us from onboarding new users, prevent data transfers to or from certain markets or services, or take similar actions against us, our business could be negatively impacted, and we could experience loss or slower growth of our user base, financial loss, and our reputation may be adversely affected. Further, any government actions taken against our service providers, partners or other third-party intermediaries on which our business relies could cause our products and services to become unavailable for extended periods of time or even indefinitely.

96.     Sea has yet to recover from setbacks it experienced related to India's ban of *Free Fire* and investors have continued to suffer.  The Offering Materials did not disclose the unique risk—worsening as of the Offerings—associated with India's continued crackdown on apps with perceived ties to China, including apps that India had already banned due to Tencent's affiliation.

97.     By contrast, the risk factors in the 2020 Form 20-F contained extensive and particular language cautioning that its "businesses and operations in Taiwan may be materially and adversely impacted if [it is] deemed to be a PRC [*i.e.*, Chinese] investor."  This risk factor clearly addresses long-simmering tensions between Taiwan and China over Taiwan's sovereignty, and thus warns of actions the Taiwanese government might take against Sea if the Company is deemed to be a Chinese investor.  The following is an excerpt of this language:

Although there have been significant economic and cultural interactions and relationships established between Taiwan and the PRC, there have been and remain tensions between the governments of Taiwan and the PRC regarding the international political status of Taiwan. Such tensions may affect the economic and social activities in Taiwan, which may in turn affect our businesses and operations in Taiwan. The Taiwan government has historically imposed prohibitions and restrictions on investments, directly and indirectly, by PRC investors. "PRC investors" refer to PRC individuals, juristic persons, organizations and other institutions, and PRC invested companies from other jurisdictions. "PRC invested companies from other jurisdictions" refer to those entities incorporated outside of

- 34 -

the PRC and invested by PRC individuals, juristic persons, organizations and other institutions that: (i) directly or indirectly hold more than 30% of the shares or capital of such entities (each intermediate holding company shall be separately assessed based on this 30% test to determine whether it is deemed a PRC invested company from other jurisdictions), or (ii) have the ability to control such entities. Under the current policies on PRC investments in Taiwan, PRC investors are allowed to invest, upon prior approval, in Taiwan companies that operate business in the statutory business categories listed as permitted in the Positive Listings promulgated by the Taiwan authorities, and are prohibited or restricted from investing in all other businesses. In addition, if a PRC investor is a juristic person, organization, or other institution invested by (a) the "political party", military, administrative or political agency of PRC, or (b) PRC invested companies from other jurisdictions (defined in "Item 4. Information on the Company—B. Business Overview—Regulation—Taiwan—Regulations on Foreign Investment") invested by the agency listed in item (a) above, the Taiwan authorities may restrict or prohibit such PRC investor from investing in businesses in Taiwan.

98. The 2020 Form 20-F also articulates Sea's view, "based on advice from [its] Taiwan counsel," that it is not "a PRC investor under existing Taiwan law and court judgments." Even so, the 2020 Form 20-F recites the "range of actions" that "Taiwan authorities may take" if they believe that Sea qualifies as PRC investor, including: "imposing fines"; "ordering us to reduce any direct or indirect ownership or control by PRC investors in our company"; "requesting us to divest some or all of our ownership or control in our operating entities in Taiwan"; and "discontinuing the operations and revoking the business licenses of our Taiwan operating entities."

99. Notwithstanding the significant and persistent risk that India might deem Sea's ties to Tencent problematic—based on Tencent's stake and involvement in the Company's business—the Offering Materials did not include a similar risk factor concerning tensions between India and China, India's ongoing and increasing ban on apps with perceived China ties, and India's previous focus on PUBG given Krafton's substantially similar relationship with Tencent. Not even the prospectus and its supplements—all of which preceded the Offerings by a matter of days—warn of this impending risk, which significantly worsened as the Offerings approached and came to fruition shortly after it.

- 35 -

C.   **The Offering Materials Failed to Accurately and Completely Disclose Material Trends, Uncertainties, and Risks Pertaining to Sea's Financial and Operational Condition**

100.   Item 5 of Part I of Form 20-F, entitled "Operating and Financial Review and Prospects," requires an issuer to disclose "*management's assessment of factors and trends which are anticipated to have a material effect on the company's financial condition and results of operations in future periods*." As Item 5 explains, "*[a] discussion and analysis that meets these requirements is expected to better allow investors to view the registrant from management's perspective*." As Item 5 further instructs (all emphasis in this paragraph is contained in Item 5 itself):

> *The discussion and analysis must also focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. Provide the information specified below as well as such other information that is necessary for an investor's understanding of the company's financial condition, changes in financial condition and results of operations.*

101.   Item 5.D, entitled "Trend information," provides more specific guidance on the types of information Item 5 requires, mandating an explanation and description of "trends, uncertainties, demands, commitments or events" necessary to accurately portray an issuer's financial condition and prospects, as follows:

> The company must identify material recent trends in production, sales and inventory, the state of the order book and costs and selling prices since the latest financial year. The company also must discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

102.   The scope of the information required in Item 5.D events is coextensive with that required under Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303. According to Item 303(a), Item 303 is intended to "allow investors to view the registrant from management's perspective"

- 36 -

by requiring management to provide a detailed discussion and analysis—that is, MD&A—focused on developments of potential material concern to the company:

> The objective of the discussion and analysis [*i.e.*, MD&A] is to provide material information relevant to an assessment of the financial condition and results of operations of the registrant including an evaluation of the amounts and certainty of cash flows from operations and from outside sources. The discussion and analysis must focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This includes descriptions and amounts of matters that have had a material impact on reported operations, as well as matters that are reasonably likely based on management's assessment to have a material impact on future operations.

103.    Item 303(b)(2), in turn, requires a description of: (i) "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations"; and (ii) "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. §229.303(b)(2)(i)-(ii).

104.    For "known trends or uncertainties," Item 303(b)(2)(ii), 17 C.F.R. §229.303(b)(2)(i), also requires disclosure of relevant "events" beyond those implicated in the first subpart:

> If the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed.

105.    As relevant here, Instruction 9 to Item 303(b) also requires a foreign private issuer—such as Sea—to discuss, at a minimum, economic or political governmental policies and factors that could materially affect its operations or investments by U.S. nationals:

> If the registrant is a foreign private issuer, briefly discuss any pertinent governmental economic, fiscal, monetary, or political policies or factors that have materially affected or could materially affect, directly or indirectly, its operations or investments by United States nationals.

- 37 -

Case 2:23-cv-01455-DLR   Document 42-5   Filed 02/20/24   Page 40 of 55

106.   In May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive Release"), which provides guidance in interpreting the scope of disclosure, as follows:

> Required disclosure is based on *currently known trends, events, and uncertainties that are reasonably expected to have material effects*, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> \*   \*   \*
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

107.   The 1989 Interpretive Release set forth the following test to determine if disclosure under Item 303 is required, and this framework provides guidance for the disclosure required under Item 5.D:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1)   Is the known trend, demand, commitment, event or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2)   If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

108.   Additionally, the SEC published interpretive guidance, effective December 29, 2003, "regarding the disclosure commonly known as Management's Discussion and Analysis of Financial Condition and Results of Operations, or MD&A, which is required by Item 303 of Regulation S-K, Items 303(b) and (c) of Regulation S-B, Item 5 of Form 20-F and Paragraph 11 of General Instruction B of Form 40-F."  The SEC advised that "companies must identify and disclose known trends, events, demands, commitments and uncertainties that are reasonably likely

- 38 -

Case 2:23-cv-01455-DLR   Document 42-5   Filed 02/20/24   Page 41 of 55

to have a material effect on financial condition or operating performance," citing the 1989 Interpretive Release and quoting, in footnote 6, the following text of the 1989 Interpretive Release:

> MD&A mandates disclosure of specified forward-looking information, and specifies its own standards for disclosure—*i.e.*, reasonably likely to have a material effect. The specific standard governs the circumstances in which Item 303 requires disclosure.

109. In adopting amendments in 2003 to its rules to require disclosure of off-balance sheet arrangements for domestic and foreign issuers, the SEC also recognized that "for Form 20-F annual reports, the existing MD&A-equivalent requirements for foreign private issuers currently mirror the substantive MD&A requirements for U.S. companies."

110. Accordingly, Sea had an affirmative obligation to disclose information about known trends, uncertainties, events, and risks in the Offering Materials. The Offering Materials, however, failed to disclose such information, depriving public ADS and Note purchasers of the most basic information necessary to allow them to adequately assess the risks then confronting the Company or to make an informed investment decision.

(a) As to Sea's financial condition, the Offering Materials did not disclose that the Company's user base had normalized to pre-pandemic conditions and plateaued during the almost-complete 2021 third quarter, ending only two weeks after the Offerings. The Offering Materials also did not disclose the significant and adverse impact this suspension in user growth was then having on the digital entertainment business—an impact that would continue to adversely affect the Company long after September 2021, as the 2021 fourth quarter results later revealed. This freeze in user growth was unusual and extraordinary for Sea and dramatically out-of-line with its historical performance, reflecting a reversal of growth trends and rendering reported financial information not indicative of the Company's current and future operating or financial performance—facts known or available to Defendants, given that only two weeks remained in the

- 39 -

third quarter.  These negative operational developments presented uncertainties for the Company's business that the Offering Materials failed to disclose, including the way in which the wholesale suspension of growth in active and paying users could substantially depress the digital entertainment segment's billings, revenue, and deferred revenue—having a long-term effect on the Company in subsequent quarters.  To the extent that this stagnation in growth was realistically interpreted internally at Sea as a one-time occurrence, it was also an "event" that required disclosure.  And even if statements regarding the continued success and market-leading position of *Free Fire* were accurate and truthful, that Free Fire's market acceptance could not offset or ameliorate such adverse trends, events, and uncertainties increased the importance of disclosure in the Offering Materials.  The outsized and long-term impact of these developments—which began in the 2021 third quarter, but were entirely omitted from the Offering Materials—was reasonably likely to materially affect Sea's financial condition and results of operations, and did so.

(b)     Also posing known uncertainties and risks for Sea as of the Offerings was India's continued crackdown on apps with actual or perceived China ties, which likewise was reasonably likely to materially affect the Company's financial condition and results of operations.  When the Offering Materials were issued, India had already banned several apps with connections to Tencent, including PUBG Mobile—a game similar to *Free Fire* developed by Krafton, a South Korean entity in which Tencent held a substantial stake.  That ban severely impacted Tencent, reducing its market value by $34 billion over a matter of days.  Given the increasingly hostile climate in India toward Chinese-connected apps before the Offerings, the writing was on the wall that *Free Fire* might be next.  And it was—only months after the Offerings.  The possibility that India might ban *Free Fire* presented precisely the type of uncertainty that required disclosure, just as the Offering Materials disclosed other uncertainties (such as those pertaining to Taiwan, described above).  The sequence of events outlined below confirms that the worsening situation in

- 40 -

Case 2:23-cv-01455-DLR Document 42-5 Filed 02/20/24 Page 43 of 55

India before the Offerings increasingly presented known risks and uncertainties for Sea's business

that required disclosure in the Offering Materials:

- By June 2020, India had already banned 59 apps with ties to China, including WeChat and ten other apps tied to Tencent—which expressed concern that PUBG Mobile, a substantially similar game to *Free Fire*, would be next.

- In September 2020, India banned 118 more apps with ties to China, including PUBG Mobile, reducing Tencent's market capitalization by $34 billion and causing Tencent to pull the plug on the game in India the following month.

- In February 2021, after India had banned additional apps with ties to Tencent in the previous months, Tencent set in motion plans to exit its investment in Mumbai-based Dream Sports.

- By April 2021, PUBG Mobile was no longer the world's top-grossing mobile game; Sea issued the 2020 Form 20-F that same month, without any mention of India's crackdown on apps with perceived China ties.

- In May 2021, Krafton announced plans to relaunch PUBG Mobile and did so with BMI in June 2021, which met with swift opposition in India; Krafton later postponed its plans to go public and cut its offering price by 10%.

- Sea disclosed plans in August 2021 to launch Shopee in India and completed the SPO in September 2021, raising gross proceeds of almost $4 billion from the sale of ADSs (and another almost $3 billion from the concurrent Notes Offering).

- By January 2022, opposition in India to PUBG's re-launch had intensified, and Tencent curiously sold $3 billion worth of ADSs in Sea—reducing its stake by 14.5 million ADSs and relinquishing much of its voting control.

- In February 2022, India banned *Free Fire* and 53 other apps in its continued crackdown—erasing $16 billion in market capitalization for Sea and causing Sea to abandon plans for Shopee in India and ultimately exit India entirely.

111. Instruction 9 to Item 303(b) also required disclosure of events and uncertainties tied

to India's crackdown on applications with perceived connections to China. By the time of the

Offerings, India had adopted a national security policy intended to prohibit apps with suspected

- 41 -

Case 2:23-cv-01455-DLR    Document 42-5    Filed 02/20/24    Page 44 of 55

China ties from harvesting and leveraging information regarding Indian citizens. This policy—designed to prevent China-related apps from culling information through surreptitious or other data collection methods—emerged out of concerns that China exploited the information, threatening India's national security. India's Ministry of Electronics and Information Technology implemented the bans using emergency powers under Section 69A of India's Information Technology Act, and targeted apps by developers and publishers even with only indirect Chinese connections. The bans—also officially supported by India's Cyber Crime Coordinate Centre under the Ministry of Home Affairs—sought to prevent and prohibit the transmission to China of information on users based in India, which India proclaimed "impinges upon the sovereignty and integrity of India" and "is a matter of very deep and immediate concern which requires emergency measures." Accordingly, even before the Offerings, India's policy—which later resulted in banning *Free Fire*—was a "governmental economic . . . or political polic[y]" or factor that "could materially affect, directly or indirectly, [Sea's] operations or investments [in the ADSs or Notes] by United States nationals." The Offering Materials omitted this information, disclosing only Taiwan's "prohibitions and restrictions on investments, directly and indirectly, by PRC investors."

112. Notwithstanding the Offering Materials' non-disclosure of these known trends, events and uncertainties, the Offering Materials disclosed certain information on trends and conditions that could materially affect Sea's business, including user and consumer trends. The Offering Materials also disclosed other risks and uncertainties. Even if literally true or accurate, the Offering Materials' partial disclosure of other trends and uncertainties was materially misleading without disclosure of the adverse trends, events, and uncertainties facing Sea—and business conditions that could reverse the positive trends Sea was experiencing—when the Offering Materials were issued. Purchasers of the ADSs and Notes were thus led to believe that the Offering Materials had disclosed all relevant information before the Offerings, when the

- 42 -

contrary was true. In this vein, disclosures in the Offering Materials about trends and uncertainties represented half-truths because the disclosures omitted material information necessary to accurately and completely portray those matters before the Offerings.

113. For the same reasons, the Offering Materials failed to disclose information on some of the most material risks facing Sea at the time of the Offerings. Item 105(a) of SEC Regulation S-K, 17 C.F.R. §229.105(a)—formerly, Item 503 of Regulation S-K, 17 C.F.R. §229.503(c)— requires an issuer to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the [securities] . . . speculative or risky." Item 105(a) warns that "[t]he presentation of risks that could apply generically to any registrant . . . is discouraged," while Item 105(b) directs the issuer to "[e]xplain how each risk affects the registrant or the securities being offered." Item 105, however, does not impose a knowledge requirement.

114. In this instance, the Offering Materials failed to disclose the most precarious risks that uniquely threatened Sea as of the Offerings and rendered an investment in the ADSs or Notes speculative or risky: the flattening of active and paying users after periods of sustained and exponential growth, and the danger that India would ban *Free Fire* as part of a continued crackdown on apps connected to China, including those involving Tencent. Before the Offerings, these risks were becoming reality, with the third quarter almost complete and India progressively banning more and more apps with links to Tencent. Yet the Offering Materials made no mention of the alarming stagnation in user growth that Sea was experiencing during the 2021 third quarter, or the mounting danger that India would ban Free Fire—particularly after India had banned PUBG Mobile under similar circumstances involving Tencent.

115. Had the Offering Materials disclosed this information completely and transparently, ADS and Note purchasers could have appreciated developments then affecting the Company and factored their potential impact into valuing the Company—and the risks of

Case 2:23-cv-01455-DLR   Document 42-5   Filed 02/20/24   Page 46 of 55

investing—before purchasing ADSs or Notes. Defendants' wholesale failure to disclose this information deprived investors of the ability to make an informed investment decision, resulting in massive investor losses as material information about these issues reached the public markets.

116. Accordingly, the Offering Materials failed to inform investors of trends, uncertainties, events, and risks in violation of Item 303 of Regulation S-K, and of "the most significant factors that ma[d]e the [ADSs or Notes] speculative or risky" in violation of Item 503 of Regulation S-K.

## CLASS ACTION ALLEGATIONS

117. Plaintiffs bring this action as a class action on behalf of a class consisting of all those who purchased Sea ADSs and/or Notes pursuant and/or traceable to the Offering Materials issued in connection with the Offerings (the "Class"). Excluded from the Class are Defendants and their families; the officers, directors and affiliates of Defendants and members of their immediate families; legal representatives, heirs, successors or assigns of any of the foregoing; and any entity in which any Defendant has or had a controlling interest.

118. The members of the Class are so numerous that joinder is impracticable. The SPO involved the issuance and sale of more than 12 million ADSs, which became publicly traded on the NYSE. The Notes Offering involved the issuance and sale of $2.875 billion of Notes. While the exact number of Class members is unknown to Plaintiffs at this time and must be ascertained through discovery, Plaintiffs believe there are hundreds, if not thousands, of members. The members of the Class may be identified from records maintained by Sea, its depositary bank, or others, and Class members may receive notice of the pendency of this action using a form of notice similar to that customarily used in securities class actions.

119. Plaintiffs' claims are typical of the claims of the Class, as all Class members were and are similarly affected by Defendants' conduct.

- 44 -

Case 2:23-cv-01455-DLR   Document 42-5   Filed 02/20/24   Page 47 of 55

120.    Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in securities class action litigation.

121.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the common questions of law and fact are:

(a)    whether Defendants violated the 1933 Act;

(b)    whether the Offering Materials misrepresented and/or omitted material facts in violation of the 1933 Act; and

(c)    whether and to what extent Class members have sustained damages and the proper measure of damages.

122.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if not impossible and impracticable, for Class members to individually redress the alleged wrongs done to them.  There will be no difficulty in managing this action as a class action.

### FIRST CAUSE OF ACTION

**For Violations of Section 11 of the 1933 Act**
**Against All Defendants**

123.    Plaintiffs repeat, reallege, and incorporate the allegations set forth above.

124.    This Cause of Action is brought under Section 11 of the 1933 Act, 15 U.S.C. §77k, against all Defendants.  This Cause of Action does not allege, and does not intend to allege, fraud, fraudulent intent or scienter, which is not a required element of Section 11, and any implication of fraud, fraudulent intent or scienter is hereby expressly disclaimed.

Case 2:23-cv-01455-DLR    Document 42-5    Filed 02/20/24    Page 48 of 55

125. Section 11 gives rise to liability to certain defendants enumerated therein if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ." 15 U.S.C. §77k(a).

126. Among others, Section 11 identifies the following categories of defendants as those who may be liable: (a) "every person who signed the registration statement"; (b) "every person who was a director of (or person performing similar functions) . . . the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted"; (c) "every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner"; and (d) "every underwriter with respect to such security." 15 U.S.C. §77k(a)(1)-(3), (5).

127. The Offering Materials, which incorporated the Form F-3 registration statement, were inaccurate, contained untrue statements of material fact, omitted to state facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

128. Sea is the registrant of the ADSs and Notes sold and otherwise distributed to Class members and is strictly liable for the Offering Materials' deficiencies. Other Defendants signed and/or authorized the signing of the Offering Materials, were identified as directors in the Offering Materials and/or were named therein with their consent, or, in the case of the Underwriters, underwrote the Offerings. All such Defendants are liable to Plaintiffs and members of the Class.

129. Additionally, P&A is liable and responsible for Puglisi's act of signing the Offering Materials under principles of agency and *respondeat superior*. Puglisi signed the Offering Materials at the direction and behest of P&A, for which P&A is liable. Without the involvement of P&A and Puglisi, Sea—as a foreign private issuer that is required to appoint an agent for service

- 46 -

of process in the U.S.—could not have issued the Offering Materials or otherwise effectuated the Offerings.

130. Tencent is liable and responsible for Ren's act of signing the Offering Materials under principles of agency and *respondeat superior*. At the time of the issuance of the Offering Materials and the Offerings, Tencent held a significant stake in Sea and possessed the ability to influence and control important aspects of the Company's operations, including by virtue of Ren's position as a director of the Company at Tencent's election.

131. Defendants did not reasonably investigate or otherwise possess reasonable grounds to believe that statements in the Offering Materials were true or complete and thus non-misleading.

132. By reason of the conduct alleged, Defendants violated and/or controlled a person who violated Section 11 of the 1933 Act, subjecting Defendants to primary liability for such violations.

133. Plaintiffs and the Class have sustained damages. Plaintiffs purchased ADSs and/or Notes registered pursuant to the Offering Materials directly in the Offerings, and other Class members either also acquired ADSs and Notes in the Offerings or otherwise traceable to the Offering Materials. The value of the ADSs and Notes have substantially declined after the Offerings and the issuance of the materially deficient Offering Materials.

134. At the time of their purchase or acquisition of the ADSs and/or Notes, Plaintiffs and other members of the Class had no knowledge of facts concerning the wrongful conduct alleged. Less than one year has elapsed between the time that Plaintiffs discovered, or reasonably could have discovered, the facts upon which this claim is based and the time that Plaintiffs filed this action. Less than three years have elapsed between the time that the ADSs and Notes upon which this claim is brought were offered to the public and the time that Plaintiffs filed this action.

## SECOND CAUSE OF ACTION

### For Violation of Section 12(a)(2) of the 1933 Act
### Against All Defendants Except Puglisi and P&A

135. Plaintiffs repeat, reallege, and incorporate the allegations set forth above.

136. This Cause of Action is brought under Section 12(a)(2) of the 1933 Act, 15 U.S.C. §77l(a)(2), against all Defendants except Puglisi and P&A. This Cause of Action does not allege, and does not intend to allege, fraud, fraudulent intent or scienter, which is not a required element of Section 12, and any implication of fraud, fraudulent intent or scienter is hereby expressly disclaimed.

137. Section 12(a)(2) imposes liability when a person "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading . . . ." 15 U.S.C. §77l(a)(2). Liability extends to those who passed title to the purchaser of the security and so-called statutory sellers who solicited the purchase for a pecuniary benefit.

138. The Offering Materials, which incorporated prospectuses, were inaccurate, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein. Defendants, other than Puglisi and P&A, participated in preparing the Offering Materials and in otherwise soliciting ADS and Notes purchasers.

139. Sea was the ultimate seller of the ADSs and Notes in the Offerings and solicited, and engaged agents to solicit, purchasers, including Plaintiffs and other Class members. The Underwriters participated in soliciting purchasers and acted as broker-dealers, or enlisted affiliates to act as broker-dealers, in connection with the Offerings. Defendants who were officers and/or

- 48 -

directors of the Company variously participated in road shows or other marketing presentations with the Underwriters on behalf of Sea, or solicited ADS and/or Note purchasers by signing and approving the issuance of the Offering Materials for the purpose of effectuating the Offerings and engaging in other conduct intended to complete the Offerings. And Tencent is liable and responsible for Ren's act of signing the Offering Materials and for otherwise soliciting ADS and Note purchasers under principles of agency and *respondeat superior*.

140. These Defendants owed Plaintiffs and other Class members a duty to reasonably and diligently investigate the statements contained in the Offering Materials to ensure they were truthful, complete, and accurate. In the exercise of reasonable care, these Defendants should have known that the Offering Materials were materially incomplete and misleading.

141. Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Offering Materials when purchasing the ADSs and Notes.

142. By reason of the conduct alleged herein, these Defendants violated Section 12(a)(2) of the 1933 Act. As a direct and proximate result of these violations, Plaintiffs and other members of the Class sustained substantial damages in connection with their ADS and Note purchases. Accordingly, Plaintiffs and other members of the Class who hold ADSs and/or Notes issued pursuant to the Offering Materials have the right to rescind those ADS and Note purchases and to recover the consideration paid for them. Class members who sold ADSs and/or Notes seek damages to the extent permitted by law.

## THIRD CAUSE OF ACTION

**For Violation of Section 15 of the 1933 Act
Against All Defendants Except the Underwriters**

143. Plaintiffs repeat, reallege, and incorporate the allegations set forth above.

- 49 -

144. This Cause of Action is brought under Section 15 of the 1933 Act, 15 U.S.C. §77o, against all Defendants except the Underwriters. This Cause of Action does not allege, and does not intend to allege, fraud, fraudulent intent or scienter, which is not a required element of Section 15, and any implication of fraud, fraudulent intent or scienter is hereby expressly disclaimed.

145. Section 15 imposes liability on "[e]very person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under [Section 11 or 12 of the 1933 Act] . . . ." 15 U.S.C. §77o(a). Control persons are "liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . ." *Id.*

146. As detailed herein, Defendants committed primary violations of the 1933 Act and are directly responsible and primarily liable for any such violations, or employed a primary violator such that liability arises under principles of agency and *respondeat superior*. Defendants, other than the Underwriters, are also liable herein as control persons under Section 15 of the 1933 Act.

147. Sea controlled its officers and employees, some of whom are named as Defendants, and directed efforts to solicit investors in connection with the Offerings. Sea also controlled P&A and Puglisi based on their employment relationship, and the Company hired the Underwriters to plan and close the Offerings and solicit investors. But for these relationships, P&A, Puglisi, and the Underwriters would not have been involved in the Offerings and Puglisi would not have signed the Offering Materials.

148. The individuals named herein as Defendants, who served as officers and/or directors of Sea at the time of the Offerings, had the power to control Sea and did so in connection with the Offerings, including by reviewing and authorizing the preparation and issuance of the Offering Materials and signing the Offering Materials. These Defendants also variously

- 50 -

participated in road shows or other presentations regarding the Offerings, directed and facilitated the Offerings, and solicited ADS and Note purchasers. These Defendants also had involvement in operating the Company and directing its activities, and did so in connection with the Offerings. Indeed, Defendant Li, in particular, held outsized influence over the Company based on his holdings and his positions as Chairman, CEO, and co-founder.

149.    Defendant Tencent, by virtue of its relationship with Sea and Ren, controlled those Defendants. Tencent was and is a significant shareholder of the Company and appointed Ren to his position as a director of the Company. In those capacities, Tencent had the ability to substantially influence the operation of Sea's business and did so with respect to the Offerings, which could not have occurred without its express consent and authorization. In this respect, the 2020 Form 20-F, which the Offering Materials incorporated by reference, represents that Tencent—by virtue of its stake in the Company—has "substantial influence over our business, including significant corporate actions such as mergers, consolidations, sales of all or substantially all of our assets, election of directors and other significant corporate actions." The 2020 Form 20-F further cautions that Tencent "may take actions that are not aligned with the interests of our other shareholders."

150.    Defendant P&A controlled Puglisi by virtue of their employment relationship, and, alternatively, Puglisi controlled P&A by virtue of his role in P&A's business and operations. Were it not for this relationship, neither P&A nor Puglisi would have been involved in the Offerings and Puglisi would not have signed the Offering Materials.

151.    By reason of the conduct alleged herein, all Defendants other than the Underwriters violated Section 15 of the 1933 Act. As a direct and proximate result of these violations, Plaintiffs and other members of the Class sustained substantial damages in connection with their purchases.

- 51 -

Case 2:23-cv-01455-DLR   Document 42-5   Filed 02/20/24   Page 54 of 55

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.        Determining that this action is properly brought as a class action and certifying the Class accordingly, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel at Robbins Geller Rudman & Dowd LLP and Abraham, Fruchter & Twersky, LLP as Class Counsel;

B.        Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with interest thereon;

C.        Awarding rescission or a rescissory measure of damages, to the extent available under the 1933 Act, together with interest thereon;

D.        Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, counsel fees and costs and fees and costs incurred for consulting and testifying expert witnesses; and

E.        Granting such other, further and/or different relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  August 9, 2022                    ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          SAMUEL H. RUDMAN
                                          JOSEPH RUSSELLO
                                          CHRISTOPHER T. GILROY


                                          _____
                                          */s/ Joseph Russello*
                                          JOSEPH RUSSELLO

- 52 -

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
jrussello@rgrdlaw.com
cgilroy@rgrdlaw.com

*Counsel for Plaintiff City of Taylor Police and Fire Retirement System and Co-Lead Counsel for Plaintiffs*

ABRAHAM, FRUCHTER
  & TWERSKY, LLP
MITCHELL M.Z. TWERSKY
JACK G. FRUCHTER
ATARA TWERSKY
SEAN M. HANDRON-O'BRIEN
450 Seventh Avenue, 38th Floor
New York, NY 10123
Telephone: 212/279-5050
mtwersky@aftlaw.com
jfruchter@aftlaw.com
atwersky@aftlaw.com
shandronobrien@aftlaw.com

*Counsel for Plaintiff General Retirement System of the City of Detroit and Co-Lead Counsel for Plaintiffs*

VANOVERBEKE, MICHAUD
  & TIMMONY, P.C.
THOMAS C. MICHAUD
MICHAEL VANOVERBEKE
79 Alfred Street Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com
mvanoverbeke@vmtlaw.com

*Additional Counsel for Plaintiffs*

- 53 -