ZIMMERMAN REED, LLP
HART L. ROBINOVITCH
14648 N. Scottsdale Road, Suite 130
Scottsdale, AZ  85254
Telephone:  480/348-6400
480/348-6415 (fax)
hart.robinovitch@zimmreed.com

Local Counsel for Lead Plaintiff

ROBBINS GELLER RUDMAN
    & DOWD LLP
TOR GRONBORG (admitted *pro hac vice*)
J. MARCO JANOSKI GRAY (admitted *pro hac vice*)
T. ALEX B. FOLKERTH (admitted *pro hac vice*)
JESSICA E. ROBERTSON (admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
torg@rgrdlaw.com
mjanoski@rgrdlaw.com
afolkerth@rgrdlaw.com
jrobertson@rgrdlaw.com

Lead Counsel for Lead Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Laborers District Council Construction Industry Pension Fund, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> Sea Limited, et al., <br><br> Defendants. | No. CV-23-01455-PHX-DLR <br><br> Consolidated with <br> Case No. 23-01889-PHX-SRB <br><br> <u>CLASS ACTION</u> <br><br> PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS |

4868-2666-7446.v1

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION.................................................................................................... 1

II.     FACTUAL BACKGROUND ................................................................................. 3

III.    LEGAL STANDARD ........................................................................................... 6

IV.     SECTION 10(b) LIABILITY IS PROPERLY PLED ............................................ 7

        A.      The Complaint Alleges False and Misleading Statements........................... 8

                1.      Defendants Misled Investors About the Impact of Losing
                        *League of Legends* and *Teamfight Tactics*.......................................... 9

                2.      Defendants Misled Investors About the Effect of Its "Pivot to
                        Profitability" on Shopee's Growth...................................................... 14

        B.      The Complaint Alleges a Strong Inference of Scienter ............................. 22

                1.      Defendants' Admitted Knowledge and Intimate Involvement
                        in the Core Operations at Issue Establishes a Strong Inference
                        of Scienter ........................................................................................ 23

                2.      Defendants' Motive Buttresses the Strong Inference of
                        Scienter............................................................................................. 27

                3.      Defendants' Selective Disclosure of the Key GMV Metric
                        Further Buttresses the Strong Inference of Scienter ......................... 30

V.      SECTION 20(a) LIABILITY IS PROPERLY PLED............................................ 30

VI.     CONCLUSION ................................................................................................... 30

- i -

4868-2666-7446.v1

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................. 6

*Azar v. Yelp, Inc.*,
2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ......................................................... 28

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).................................................................................................. 6

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ......................................................... 8, 13, 14, 17

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ................................................................................ 13

*Crews v. Rivian Auto., Inc.*,
2023 WL 4361098 (C.D. Cal. July 3, 2023)......................................................... 11, 24

*Di Donato v. Insys Therapeutics Inc.*,
2017 WL 3268797 (D. Ariz. Aug. 1, 2017)......................................................... 23, 24

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)................................................................................................. 7

*ESG Cap. Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016) ................................................................................ 22

*Fecht v Price Co.*,
70 F.3d 1078 (9th Cir. 1995) ............................................................................. 8, 11

*Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*,
2021 WL 3748325 (N.D. Cal. Aug. 24, 2021) ........................................................ 25

*Gammel v. Hewlett-Packard Co.*,
2013 WL 1947525 (C.D. Cal. May 8, 2013).......................................................... 27, 29

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ................................................................................ 20, 22

*Hoang v. ContextLogic, Inc.*,
2023 WL 6536162 (N.D. Cal. Mar. 10, 2023)........................................................ 28

4868-2666-7446.v1

**Page**

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) .................................................................................. *passim*

*In re Apple Comput. Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) ...................................................................................... 27

*In re Celera Corp. Sec. Litig.*,
2013 WL 4726097 (N.D. Cal. Sept. 3, 2013) .............................................................. 21

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ...................................................................................... 27

*In re Diamond Foods, Inc. Sec. Litig.*,
2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) ............................................................ 25

*In re Equifax Inc. Sec. Litig.*,
357 F. Supp. 3d 1189 (N.D. Ga. 2019) ........................................................................ 11

*In re Facebook, Inc. Sec. Litig.*,
87 F.4th 934 (9th Cir. 2023) .................................................................................... 7, 14

*In re Galena Biopharma, Inc. Sec. Litig.*,
117 F. Supp. 3d 1145 (D. Or. 2015) ............................................................................ 30

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
554 F. Supp. 2d 1083 (C.D. Cal. 2008) ....................................................................... 20

*In re Mullen Auto Sec. Litig.*,
2023 WL 8125447 (C.D. Cal. Sept. 28, 2023) ............................................................ 24

*In re Plantronics, Inc. Sec. Litig.*,
2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ............................................................ 25

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) .................................................................... 12, 13, 20, 21

*In re Questcor Sec. Litig.*,
2013 WL 5486762 (C.D. Cal. Oct. 1, 2013)................................................................. 28

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001) ........................................................................................... 17

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
266 F. Supp. 2d 1150 (C.D. Cal. 2003) ....................................................................... 28

- iii -

4868-2666-7446.v1

**Page**

*In re Solarcity Corp. Sec. Litig.*,
274 F. Supp. 3d 972 (N.D. Cal. 2017) ......................................................................... 21

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
160 F. Supp. 2d 1059 (N.D. Cal. 2001) ....................................................................... 21

*In re Splunk Inc. Sec. Litig.*,
592 F. Supp. 3d 919 (N.D. Cal. 2022) ................................................................... 17, 25

*In re Twitter, Inc. Sec. Litig.*,
2020 WL 4187915 (N.D. Cal. Apr. 17, 2020) ............................................................. 17

*In re Upstart Holdings, Inc. Sec. Litig.*,
2023 WL 6379810 (S.D. Ohio Sept. 29, 2023) ........................................................... 28

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) ........................................................................................ 8

*In re Wet Seal, Inc. Secs. Litig.*,
518 F. Supp. 2d 1148 (C.D. Cal. 2007) ....................................................................... 21

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ........................................................................................ 26

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ............................................................................ 8, 14, 22

*Litwin v. Blackstone Grp., L.P.*,
634 F.3d 706 (2d Cir. 2011) ........................................................................................ 10

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
416 F.3d 940 (9th Cir. 2005) ....................................................................................... 13

*Longo v. OSI Sys., Inc.*,
2021 WL 1232678 (C.D. Cal. Mar. 31, 2021)............................................................. 26

*Loritz v. Exide Techs.*,
2014 WL 4058752 (N.D. Cal. Aug. 7, 2014) .............................................................. 26

*Lowthorp v. Mesa Air Grp. Inc.*,
2021 WL 3089118 (D. Ariz. July 22, 2021)................................................................ 20

*Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*
39 F.4th 1092 (9th Cir. 2022) ...................................................................................... 21

4868-2666-7446.v1

**Page**

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ................................................................................... 29

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ...................................................................................... 11, 29

*Maverick Fund, L.D.C. v. First Solar, Inc.*,
    2018 WL 6181241 (D. Ariz. Nov. 27, 2018) ...................................................... 13, 21, 24

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) .................................................................................. 7, 8

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) .................................................................................. 8, 14

*Mineworkers' Pension Scheme v. First Solar Inc.*
    881 F.3d 750 (9th Cir. 2018) ..................................................................................... 8

*Mulligan v. Impax Lab'ys, Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) .......................................................................... 20

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund
v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ................................................................................ 27, 28

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) .................................................................................. 27

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) ................................................................................... 19, 20, 22

*Orbis Glob. Equity Fund Ltd. v. NortonLifelock Inc.*,
    2023 WL 1800963 (D. Ariz. Feb. 7, 2023) ................................................................ 8, 13

*Pensions & Death Benefits v. CSK Auto Corp.*,
    525 F. Supp. 2d 1116 (D. Ariz. 2007) ...................................................................... 22, 25

*Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software*,
    2019 WL 2360942 (S.D.N.Y. Mar. 4, 2019) ................................................................ 29

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) .............................................................................. 13, 22

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ....................................................................... 22, 23, 26, 27

4868-2666-7446.v1

**Page**

*Roberti v. OSI Sys., Inc.*,
2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) ............................................................ 25

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2016) ................................................................................ 23, 26

*SEC v. Sequential Brands Grp., Inc.*,
2021 WL 4482215 (S.D.N.Y. Sept. 30, 2020) ............................................................ 30

*Shapiro v. Matrixx Initiatives, Inc.*,
2011 WL 13047298 (D. Ariz. Sept. 26, 2011) ........................................................... 24

*Sharenow v. Impac Mortg. Holdings, Inc.*,
385 F. App'x 714 (9th Cir. 2010) ............................................................................... 29

*Shenwick v. Twitter, Inc.*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017) ..................................................................... 24

*Siracusano v. Matrixx Initiatives, Inc.*,
585 F.3d 1167 (9th Cir. 2009) .................................................................................... 14

*Smilovits v. First Solar Inc.*,
119 F. Supp. 3d 978 (D. Ariz. 2015) ............................................................... 7, 8, 11

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ...................................................................................... 6

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ................................................................................... 3, 6, 22, 27

*Todd v. STAAR Surgical Co.*,
2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ........................................................... 21

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976) .............................................................................................. 8, 11

*Tsirekidze v. Syntax-Brillian Corp.*,
2009 WL 275405 (D. Ariz. Jan. 30, 2009) ................................................................ 24

*United Nurses Ass'ns of Cal. v. Nat'l Lab. Rels. Bd.*,
871 F.3d 767 (9th Cir. 2017) ........................................................................................ 7

*Va. Bankshares, Inc. v. Sandberg*,
501 U.S. 1083 (1991) ........................................................................................... 13, 22

4868-2666-7446.v1

**Page**

*Warshaw v. Xoma Corp.*,
74 F.3d 955 (9th Cir. 1996) ............................................................................ 20

*Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*,
2012 WL 3835078 (N.D. Cal. Sept. 4, 2012) ....................................... 22, 26

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ......................................................................... 26

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
§78j(b).............................................................................................................. 7
§78u-4(b).......................................................................................................... 7
§78u-4(b)(1)(B)................................................................................................ 8
§78-j(b) ........................................................................................ 1, 7, 23, 30
§78-t(a)............................................................................................................. 1

Federal Rules of Civil Procedure
Rule 9(b) .................................................................................................... 7, 11
Rule 10b-5....................................................................................................... 23
Rule 10b-5(b) ................................................................................................... 7
Rule 10b5-1 .................................................................................................... 29
Rule 12(b)(6).................................................................................................... 6

17 C.F.R.
§240.10b-5(b)................................................................................................... 7

4868-2666-7446.v1

Lead Plaintiff Laborers District Council Construction Industry Pension Fund ("Plaintiff") respectfully submits this opposition to Defendant Sea Limited's Motion to Dismiss (ECF 41) ("MTD").[1]

## I.    INTRODUCTION

This is a securities fraud class action brought on behalf of purchasers of Sea's American Depositary Shares ("ADSs") between November 15, 2022 and August 14, 2023, inclusive (the "Class Period"), for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Sea is an international consumer internet company based in Singapore, and this case arises from false and misleading public statements that Sea's top executives issued about the Company's Garena (video game) and Shopee (e-commerce) business segments.  The operative Complaint sets forth a straightforward case of §10(b) liability, and its allegations readily satisfy the challenged elements of falsity and scienter.[2]

*First*, the Complaint properly pleads falsity for Defendants' Garena-related statements concerning the loss of the wildly popular online video game *League of Legends*.  *Infra*, §IV.A.1.  Starting in November 2022, Defendants misleadingly claimed that the loss of *League of Legends* would have "no impact" and that contributions from the game were "immaterial."  Contrary to Defendants' assurances, however, the Complaint is replete with detailed allegations establishing that the game was in fact material to Garena's business:

- *League of Legends* is one of the most popular and monetized video games in the world, and reportedly generates over a billion dollars in worldwide annual revenue;

- It is especially popular in the Southeast Asia markets where Garena served as its regional publisher, and is the top-ranked video game in the entire Asia-Pacific region;

- Sea has long admitted that *League of Legends* was one of its "most popular games," and that it "substantially depend[s] on a small number of popular games"; and

---

[1]    Sea Limited's ("Sea" or the "Company") motion to dismiss has been joined by co-defendants Forrest Xiaodong Li, Tony Tianyu Hou, Yanjun Wang, Gang Ye, and David Jingye Chen (collectively, the "Individual Defendants," and together with Sea, the "Defendants"). ECF 46.  All standalone "¶__" and "¶¶__" references are to the Consolidated Complaint for Violations of the Federal Securities Laws (ECF 31) (the "Complaint"). Emphasis is added and citations are omitted unless otherwise stated.

[2]    While Defendants wrongly style it an "*Amended* Complaint" and reference a theory of liability alleged by a prior plaintiff and counsel (MTD at 1-2), the operative *Consolidated* Complaint is the first and only complaint that Plaintiff or its counsel have filed in this matter.

- 1 -

- In its first quarter without the game (1Q23), Garena experienced a significant drop in revenue and a marked "weakening in monetization," with the lowest number of paying users and the lowest paying user ratio that the Company had seen in years.

In light of these facts, Defendants' further statements in March and April 2023 touting stabilization in Garena's paying user base and discussing hypothetical risks from a negative development in a key game were also materially misleading – as they omitted that Garena had not been able to offset the loss of *League of Legends*' significant paying user base.

***Second***, the Complaint properly pleads falsity for Defendants' Shopee-related statements regarding the effect of the Company's drastic cost-cutting effort on Shopee's key growth metric, gross merchandise value ("GMV"). *Infra*, §IV.A.2. In November 2022, as Shopee's GMV had already started to stagnate and decline with ongoing cuts to sales and marketing, Defendants misleadingly spoke of the extant effect on growth as merely a hypothetical risk. Then in March 2023, after reporting the largest GMV decline in the Company's history, Defendants doubled down and falsely claimed, *inter alia*, that their cost-cutting efforts would actually allow Shopee to "capture a larger share of the [e-commerce market] pie" and that there was no "trade-off" occurring between profitability and growth. Even in May 2023, as they misleadingly concealed further declines in Shopee's GMV by discontinuing disclosure of the key metric – for the first time in the Company's history – Defendants continued to falsely maintain, *inter alia*, that any slowdown in GMV was due to mere "seasonality trends," and that they could "execute growth and managing bottom line at the same time." Contrary to the misleading impression left by these statements, however, Defendants would ultimately acknowledge that Shopee could not meaningfully grow and compete with other e-commerce platforms in Southeast Asia without operating at a loss from substantial reinvestments in sales and marketing expenses (*e.g.*, free shipping offerings).

***Finally***, the Complaint pleads a strong inference of scienter, *i.e.*, that Defendants knew or were reckless in not knowing that their Class Period statements were misleading when made. *Infra*, §IV.B. The Individual Defendants are the highest-ranking corporate officers at Sea, were directly involved in Garena's and Shopee's operations, and were kept apprised of the key performance metrics at issue in this case. Indeed, the fraud itself

- 2 -

involved Sea's core business operations, and it is implausible to the point of absurdity that the Individual Defendants would not have been aware of the: (1) material impact of the loss of one of their most popular video games (*League of Legends*); or (2) the ongoing negative trends in the key growth metric that the Company disclosed for Shopee (GMV). The Individual Defendants also routinely displayed their personal, granular knowledge of: (a) user engagement and monetization metrics and trends for specific Garena games (like *League of Legends*); and (b) the operating costs, growth rates (*i.e.*, GMV), and competitive environment in each market that Shopee operates in. These facts both independently and holistically establish a strong inference of scienter. That already strong inference is only further bolstered by the motive and opportunity allegations in the Complaint (*i.e.*, more than $27 million in insider sales and the contemporaneous crisis at Sea). And Defendants' selective disclosure of GMV – abruptly ceasing disclosure to obscure the negative effects of their cost cutting – further evidences their intent to conceal the truth from investors.

The arguments Defendants raise in their motion ignore not only the facts actually alleged, but also well-settled, applicable law. The Complaint's allegations – properly credited and judged by the correct law – are more than sufficient to state viable claims for securities fraud. Defendants' motion to dismiss should be denied in its entirety.

## II.    FACTUAL BACKGROUND[3]

Sea is an international consumer internet company organized under the laws of the Cayman Islands and headquartered in Singapore. ¶15. It provides digital entertainment, e-commerce, and digital financial services through its three respective business lines: Garena, Shopee, and SeaMoney. *Id.* This case concerns the Garena and Shopee segments.

**Garena**. Garena is Sea's digital entertainment and gaming platform. ¶24. It primarily licenses, publishes, and develops PC and mobile online video games. *Id.* In its SEC filings and earnings reports, Sea disclosed three key metrics for investors to evaluate

---

[3] For the sake of brevity, Plaintiff summarizes certain pertinent background information in this section. Defendants' motion, however, should be judged against the "complaint in its entirety." *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

- 3 -

Garena's performance and future prospects: (1) "bookings" (an estimation of cash spent by users); (2) active users (the number of unique accounts who played a Garena game); and (3) paying users (the number of unique accounts that made a payment in a Garena game). ¶¶27-28.  Garena monetizes its video games through a "freemium" business model, whereby users are permitted to download and play games for free.  ¶24.  Garena generates revenues from these games by selling virtual currency that users can then use to purchase in-game virtual items, season passes, and other pay-to-access exclusives.  *Id.*  Garena has historically been Sea's only profitable segment, and its significant cash flow allowed Sea to invest heavily in Shopee's growth in the years leading up to the Class Period.  *Id.*

**League of Legends**.  Almost all of Garena's most popular video games are licensed from third-party developers in order to be published and monetized by Garena in its Southeast Asia markets.  ¶¶24, 45.[4]  The most prominent example of this arrangement is *League of Legends* – a multiplayer online battle arena PC game developed by California-based Riot Games ("Riot"), a wholly-owned subsidiary of Chinese technology giant Tencent Holdings Limited ("Tencent").  ¶40.  In 2010, Riot granted Garena an exclusive royalty-bearing license to publish, operate, and monetize *League of Legends* in a number of Southeast Asian markets – which, by the start of the Class Period, included the Philippines, Malaysia, Singapore, Taiwan, Hong Kong, Macau, Thailand, Vietnam, and Indonesia.  *Id.*; *see also* Defs.' Ex. 2.[5]  *League of Legends* is one of the most popular and monetized video games in the world, and reportedly generates over a billion dollars of annual revenue for Riot through the use of in-game microtransactions where players can buy new champions (characters), skins (customized looks for those characters), and in-game boosts.  ¶¶41-43.  *League of Legends* is also the top-ranked video game in the entire Asia-Pacific region where Garena operates, and Sea's SEC filings consistently listed it first among Garena's "most popular [licensed] games."  ¶¶44-45. On November 9, 2022, however, six days prior to the

---

[4]  *Free Fire* is the first and only successful video game that Garena has self-developed.  ¶24.  All of its other popular games are licensed from third parties.  ¶¶24, 81.

[5]  "Defs.' Ex. ___" refers to Defendants' exhibits attached to the Declaration of John C. Gray in Support of Defendants' Motion to Dismiss the First Amended Complaint (ECF 42).

- 4 -

start of the Class Period, Riot announced that it was ending its license agreement with Garena effective January 2023, and that Riot would thereafter take over the publishing and operation of *League of Legends* (and its spinoff *Teamfight Tactics*) in Southeast Asia. ¶40.

**Shopee**. Shopee is Sea's e-commerce platform. ¶25. Its online shopping business earns revenue primarily by offering paid advertising services, charging transaction-based fees, and charging for value-added services. *Id.* Sea disclosed two key metrics in its SEC filings and earnings reports for Shopee: (1) GMV (the value of all orders of products and services on Shopee's marketplace); and (2) orders (confirmed orders from each transaction between a buyer and a seller on the platform). ¶¶32-33. In the years prior to the Class Period, Shopee leveraged significant marketing and promotional expenses to quickly grow its GMV and become the largest e-commerce platform in Southeast Asia. ¶50. For instance, Shopee worked to undercut its competitors in the region by regularly providing its customers with free delivery, zero commissions, and cashback offerings. ¶¶50, 52. These sales and marketing initiatives drove Shopee's GMV growth over the years, but they were also very expensive: Shopee posted ***billions*** of dollars in annual net losses prior to the Class Period. ¶¶50-51. However, as the Company began to slash hundreds of millions of dollars in quarterly sales and marketing expenses in 2022 as part of a widespread cost-cutting effort (discussed below), Shopee's GMV began to decelerate and then decline – prompting Defendants to abruptly stop disclosing the metric altogether in the first two quarters of 2023:



¶51.

**Sea's 2022 "Pivot to Profitability."**  By mid-2022, Sea was in the midst of a self-described "crisis."  ¶37.  As the pandemic-induced boom the Company enjoyed in 2020 and 2021 came to an end, Garena found its revenues and users in major decline, Shopee continued to incur massive losses and shuttered operations in key new markets, and the price of Sea's ADSs was essentially in free fall.  ¶¶34-37.  In or around the spring of 2022, Defendants "went into crisis mode" as they "frett[ed] about the future of [the] company," which ultimately prompted Defendants to initiate a "ruthless cost-cutting drive" across Sea.  ¶37.  In connection with this initiative, Defendants announced in August 2022 that Sea had strategically shifted its focus away from pandemic-induced growth and toward "rapidly prioritizing profitability and cash flow management" by cutting costs across the Company – *i.e.*, what the Complaint terms the "pivot to profitability."  ¶¶37-38, 52-54.  This effort would ultimately result in Sea cutting thousands of jobs, closing offices, and slashing hundreds of millions of dollars from quarterly sales and marketing expenses over the next several quarters in order "to convince investors of its profit-making ability."  ¶53.

As explained below (*infra*, §IV.A.), it is in this context that, starting on November 15, 2022, Defendants issued a series of false and misleading statements that artificially inflated the price of Sea ADSs – and ultimately, damaged investors.

### III.    LEGAL STANDARD

In assessing a motion to dismiss under Rule 12(b)(6), a court must "consider the complaint in its entirety," "accept all factual allegations in the complaint as true," and construe those allegations in the light most favorable to the plaintiff.  *Tellabs*, 551 U.S. at 322-23.  A complaint need only allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint may be dismissed only if a "defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im* plausible."  *Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011) (emphasis in original).

- 6 -

4868-2666-7446.v1

Securities fraud complaints are also subject to the requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 947 (9th Cir. 2023). Rule 9(b) requires plaintiffs to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The PSLRA similarly provides that a securities fraud complaint must: (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading"; and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b).

## IV.    SECTION 10(b) LIABILITY IS PROPERLY PLED

Section 10(b) of the Exchange Act prohibits "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. §78j(b). SEC Rule 10b-5(b) promulgated thereunder makes it unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. §240.10b-5(b). To assert a *prima facie* claim of securities fraud under §10(b) and Rule 10b-5(b), a plaintiff must allege: (1) a material misrepresentation or omission ("falsity"); (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) loss causation; and (6) economic loss/damages. *Facebook*, 87 F.4th at 947; *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Defendants' motion to dismiss challenges only the two elements of falsity and scienter, conceding that Plaintiff has adequately pled the remaining elements of its §10(b) claims. MTD at 12-30.[6] As explained below, each challenge fails.

---

[6]   Defendants do not challenge loss causation in either their "Preliminary Statement" or any of their argument headings. While Defendants include brief language on loss causation in their falsity sections for the Garena- and Shopee-related statements, each argument is limited to a single boilerplate sentence with no accompanying analysis. *See* MTD at 14, 18. Such a "perfunctory argument is inadequately briefed and therefore waived." *United Nurses Ass'ns of Cal. v. Nat'l Lab. Rels. Bd.*, 871 F.3d 767, 780 (9th Cir. 2017).

Even so, Defendants' reliance on *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049 (9th Cir. 2008), for an overly-restrictive standard of loss causation has been expressly rejected by the Ninth Circuit. As explained in *Smilovits v. First Solar Inc.*, the test for "loss causation is a form of proximate cause" and "traditional notions of proximate cause are not

- 7 -

### A.    The Complaint Alleges False and Misleading Statements

A securities fraud complaint adequately alleges falsity when it "'specifi[es] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading.'" *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012) (quoting 15 U.S.C. §78u-4(b)(1)(B)).    A statement is misleading "if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). "'"[L]iterally accurate"'" statements may still be misleading due to "'"their context and manner of presentation."'" *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). That is, even an objectively true statement "may be misleading if it **omits** material information." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir. 2018). "'[O]nce defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.'" *Id.* at 1009. Whether a statement or omission is materially misleading "is a mixed question to be decided by the trier of fact." *Fecht v Price Co.*, 70 F.3d 1078, 1080-81 (9th Cir. 1995); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). For this reason, "resolving materiality as a matter of law is generally appropriate 'only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ.'" *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 700 (9th Cir. 2021); *Orbis Glob. Equity Fund Ltd. v. NortonLifelock Inc.*, 2023 WL 1800963, at *9 (D. Ariz. Feb. 7, 2023).

Here the Complaint alleges that, starting in November 2022 – with Sea in the midst of a self-described "crisis" and its share price tanking – Defendants issued a series of materially

so narrowly circumscribed as the rule in *Metzler* and its progeny." 119 F. Supp. 3d 978, 991-92 (D. Ariz. 2015), *aff'd sub nom. Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018). The Ninth Circuit affirmed that "general proximate cause" is the test for loss causation, which can be satisfied in "an 'infinite variety' of ways," including "showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *First Solar*, 881 F.3d at 752-54. Plaintiff's loss causation allegations readily meet this standard. Complaint, §VII.

- 8 -

4868-2666-7446.v1

false and misleading statements regarding: (1) the impact of losing *League of Legends* (and its spinoff *Teamfight Tactics*) on Garena's business; and (2) the effect of Sea's drastic cost-cutting measures on Shopee's growth and market share. Complaint, §V. Defendants do not dispute that the Complaint identifies the precise statements alleged to be false and misleading, the speaker of those statements, and where and when the statements were made. *See* ¶¶65-69, 72-77, 81-82, 85-89. Nor can Defendants dispute that the Complaint alleges, with specificity, the reasons why each statement is false or misleading. *See* ¶¶70, 78, 83, 90. Instead, Defendants resort to rewriting Plaintiff's allegations and relying on fact-specific materiality arguments that would fail at any stage of this litigation – but are especially inapt at the pleading stage. As explained below, each category of misstatements is properly pled.

> **1.      Defendants Misled Investors About the Impact of Losing**
> ***League of Legends* and *Teamfight Tactics***

Beginning on November 15, 2022, Defendants made several false and misleading statements to assure investors that the loss of *League of Legends* and *Teamfight Tactics* would have "no impact" on Garena's business, and that these games were "immaterial."[7]

**November 15, 2022 Earnings Call (3Q22)**. Just a few days prior to Sea's 3Q22 earnings call, Riot issued a press release announcing that it was ending its license agreement with Garena for *League of Legends* and *Teamfight Tactics*, and that it would be taking over the publishing and management of these video games in Garena's Southeast Asia markets effective January 2023. ¶40. *League of Legends* is one of the most popular and monetized video games in the world – especially in Southeast Asia, where Garena had served as the regional publisher for the hit game since 2010. ¶¶40-44. On Sea's 3Q22 earnings call, however, when asked about the termination of the license agreement with Riot, Wang assured investors that the loss of *League of Legends* "***would have no impact on our overall***

---

[7] Defendants attempt to distort the "essence" of the Garena-related allegations as purportedly "***conceal[ing] the expiration*** of the License Agreement in accordance with its publicly-filed terms." MTD at 12. That strawman is not present anywhere in the Complaint. Rather, as set forth on the Complaint's very first page, the true crux of the Garena-related claims is that Defendants misled investors about "***the effect of losing*** the hit online video game *League of Legends*." ¶3. Defendants' argument that the expiration date of the license agreement was publicly disclosed (MTD at 12-13) is thus irrelevant to Plaintiff's allegations.

4868-2666-7446.v1

*publishing business as the contribution is immaterial from the particular game*." ¶65.

The Complaint plainly alleges how, contrary to this statement, *League of Legends* was in fact material to Garena's business and its loss had a significant impact on Garena's financial results and monetized user metrics. ¶70(a). Defendants' materiality arguments (MTD at 13-14) simply ignore the allegations that:

- *League of Legends* is one of the most popular video games in the world with more than 180 million monthly players in 2022. ¶41. It was the second most-popular video game in 2022 in terms of live streaming views on Twitch, YouTube, and Facebook. *Id.* The 2022 and 2023 League of Legends World Championships were the most watched esports events of all time, and its animated series *Arcane* became Netflix's No. 1 show in 52 countries within a week of its November 2021 release. *Id.*

- *League of Legends*' dedicated and highly-monetized user base generates over a billion dollars of annual revenue through the purchase of in-game microtransactions, with its users regularly spending hundreds or even thousands of dollars per year on new champions, skins, and in-game boosts. ¶41-42. Riot reportedly earned $1.75 billion, $1.63 billion, and $1.8 billion in annual revenue from *League of Legends* in 2020, 2021, and 2022, respectively. ¶43.

- *League of Legends* is an especially popular "favorite for players" in Garena's Southeast Asia markets, and a 2021 consumer study found it to be the top-ranked video game brand in the entire Asia-Pacific region and the number one video game in three specific markets where Garena had operated the game (Hong Kong, Taiwan, and Vietnam). ¶44. *League of Legends* was even recently included as a competitive sport between national teams at the 2022 Asian Games. *Id.*

- Sea long acknowledged that *League of Legends* was Garena's most popular licensed video game. ¶45. Sea's former Chief Strategy Officer was quoted in *Forbes* identifying "internationally-known multiplayer games like League of Legends and Dota 2 [as] the most profitable and popular across countries." *Id.* And before it lost the rights to the game, Sea's Annual Reports on Form 20-F consistently listed *League of Legends* first among its "most popular [licensed] games." *Id.*[8]

- Sea also acknowledged in its Forms 20-F that (a) Garena "substantially depend[s] on a small number of popular games"; (b) its "top five games, comprising Free Fire and games licensed to [it] by third-party game developers," accounted for more than 95% of Sea's digital entertainment revenue from 2020-2022; and (c) "[a]ny negative developments or occurrences to any of [these] key revenue-earning games . . . could lead to material decline or slower growth." ¶¶45, 81.[9]

---

[8] While Defendants' claim that their repeated admissions of *League of Legends* as one their "most popular games" are merely "years-old historical statements" (MTD at 13), this representation was included in every annual Form 20-F filed with the SEC before the Company lost the game (*i.e.*, up until **April 2022**). ¶45. Yet without any sense of irony, Defendants rely on a one-off disclosure from **4Q18** and a **2019** third-party market research report for their materiality arguments. MTD at 6, 13-14 & n.4; Defs.' Exs. 3, 7.

[9] *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 720 (2d Cir. 2011) (a misstatement's

- 10 -

4868-2666-7446.v1

- Garena experienced a significant drop in GAAP revenue (more than $400 million) and a "weakening in monetization, mainly as a result of lower paying user ratio" in 1Q23 – the first quarter that Garena no longer operated *League of Legends*. ¶¶49, 123. This negative result occurred even though: (a) Defendants had already purportedly "stabilize[d] [Garena's] user base" (¶76); (b) active users for two of Garena's other most popular games (*Free Fire* and *Arena of Valor*) hit new highs in 1Q23 (¶106); and (c) Garena's total quarterly active users turned around and increased by more than six million in 1Q23 (¶29). That is, while user metrics for the remainder of Garena's business actually trended upward in 1Q23, the loss of *League of Legends* that quarter still caused Garena's total **paying** user metrics to significantly decline – leading to the lowest number of quarterly paying users (37.6 million) and the lowest paying user ratio (7.7%) that the Company had reported in years. ¶29-31.

- Whereas Garena's revenues and paying users declined in 1Q23, Tencent (which owns Riot) reported that international gaming revenues increased significantly in 1Q23 due in part to increased performance in *League of Legends*. ¶49.[10]

These collective factual allegations "'raise a reasonable expectation that discovery will reveal evidence' satisfying the materiality requirement." *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011); *Fecht*, 70 F.3d at 1083 ("A plaintiff may also satisfy Rule 9(b) with allegations of circumstantial evidence . . . ."); *Crews v. Rivian Auto., Inc.*, 2023 WL 4361098, at *8 (C.D. Cal. July 3, 2023) (same).

In addition to ignoring the Complaint's actual allegations, Defendants' materiality arguments also disregard the law of materiality – which is an inherently fact-based inquiry that is rarely appropriate for determination at the pleading stage. *See Alphabet*, 1 F.4th at 700; *TSC Indus.*, 426 U.S. at 450; *First Solar Inc.*, 119 F. Supp. 3d at 1002-03 ("But the test for materiality is factual – whether a misrepresented or omitted fact would have been viewed by a reasonable investor as having significantly altered the total mix of information made available – and Defendants fail to provide undisputed evidence that a reasonable investor

"significance to a particularly important segment of a registrant's business tends to show its materiality"); *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1224 (N.D. Ga. 2019) ("[S]tatements relat[ing] to a core aspect of Equifax's business makes it even more likely that a reasonable investor would assign weight to them.").

[10]  In their 1Q23 earnings call transcript, Tencent management attributed the double-digit growth in international game revenue to the "extend[ed] popularity of established franchise[s]" and "strengthened performance through key titles." Defs.' Ex. 16 at 5-6. When asked by an analyst about the "number of the old franchise title [that] regained strong popularity and also achieve[d] a record growth of receipts during the quarter," Tencent management specifically identified *League of Legends* among the key titles of "evergreen games" that "performed well in the first quarter." *Id.* at 10.

- 11 -

4868-2666-7446.v1

would consider a product defect irrelevant if it constitutes, say, only 1.5% of net income."). Defendants are certainly free to argue to a jury that *League of Legends* was unimportant because it purportedly "covered only a handful of markets in a region where mobile internet access predominates" and that *Free Fire* was the only video game material to its business. MTD at 13-14.  At the merits stage, Plaintiff will readily counter with:

- Defendants' reliance on extrinsic 2019 market research on "mobile ***internet access***" for this argument (MTD at 6, 13-14, & n.4; Defs.' Ex. 7) says nothing about PC versus mobile ***gaming*** activity or monetization in the region;

- 2023 market research on gaming in the region actually shows that, *inter alia*: (i) the "vast majority (82%) of the Southeast Asia's urban online population are gamers"; (ii) "69% play games on PC" (compared to 80% on mobile); (iii) "SEA's top-played franchise on PC is League of Legends"; (iv) compared to PC gamers, "[i]t is notoriously challenging to convert mobile players to mobile ***payers***" (Pl.'s Ex. A);[11] and

- Defendants admitted in their SEC filings that *League of Legends* was one of their "most popular games," that Garena "substantially depend[s] on a small number of popular games" (not just *Free Fire*), and that "[a]ny negative developments or occurrences to any of [these] key revenue-earning games" (not just *Free Fire*) "could lead to material decline or slower growth" (¶¶45, 81).

In light of all the above, however, if any side were entitled to a pleading-stage materiality determination, it would certainly be Plaintiff – not Defendants.

Nor is the statement at ¶65 inactionable under the PSLRA's safe harbor.  MTD at 21. The Ninth Circuit has made clear that for a statement to fall under the safe harbor, it must be identified as "forward-looking" and either "'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement,'" or made "without actual knowledge that it is false or misleading." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017). The representation that *League of Legends* is "immaterial" and thus the loss of its license would have "no impact" is not forward-looking – it plainly relates to current and historical facts.  And even if, *arguendo*, a portion could be construed as forward-looking, the safe harbor does not apply when defendants "make a materially false or misleading statement

---

[11] "Pl.'s Ex. A" refers to Exhibit A to the Declaration of Marco Janoski in Support of Plaintiff's Opposition to Defendants' Request for Judicial Notice, filed herewith.

- 12 -

about current or past facts, and combine that statement with a forward-looking statement." *Id.* at 1142; *Maverick Fund, L.D.C. v. First Solar, Inc.*, 2018 WL 6181241, at \*7 (D. Ariz. Nov. 27, 2018) ("[T]he statements do not qualify for the safe harbor to the extent they are statements of current or past facts, combined with a forward-looking statement.").[12]

**March 7, 2023 Earnings Call (4Q22) and April 6, 2023 Form 20-F (FY22)**.  In the months after the operation of *League of Legends* in Southeast Asia reverted back to Riot, Defendants also misleadingly claimed that: (1) Garena's paying user base had stabilized; and (2) any risks from a negative development in a key game were merely hypothetical.

First, on the 4Q22 earnings call, Li highlighted that Garena's "***paying user ratio and average revenue per user remain[ed] relatively stable*** quarter-on-quarter" for 4Q22.  ¶74. Later in the call, Wang similarly claimed that Sea was focused on "***continuing to stabilize [Garena's] user base***."  ¶76.  These statements were materially misleading by omission, as they created "an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]."  *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  Once Defendants "chose to tout" a purportedly stabilized paying user base, "they were bound to do so in a manner that wouldn't mislead investors."  *See Berson*, 527 F.3d at 987; *NortonLifelock*, 2023 WL 1800963, at \*16 (same).  At the time of these statements, Defendants knew that they had not achieved sufficient gains in paying users in other games to offset the significant loss of the highly-monetized *League of Legends* user base in in January 2023.  ¶78(a).  Thus, these statements misleadingly omitted the "weakening in monetization, mainly as a result of lower paying user ratio" in 1Q23 that Garena was already experiencing from the loss of millions of paying users.  *Id.*

---

[12]    Further, the risk factor statement that Defendants rely on does not come close to meeting the Ninth Circuit's "stringent" standard for cautionary language.  *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005).   True cautionary language must be "'precise,'" and "'directly address'" (*Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996)) the misrepresentation such that "the risk of real deception drops to nil."  *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991).  Here, Sea's generalized warning in its Forms 20-F about "negative developments" in key games (MTD at 21 (citing ¶81)) does not address or negate the misstatement at all.  Rather, and as further explained below, that risk factor statement is alleged to be actionably misleading for describing the risk as merely hypothetical when it had already materialized.  ¶83(a).

- 13 -

Second, in Sea's FY22 Form 20-F, Defendants misleadingly presented the risk that "[a]ny negative developments or occurrences to any of [its] key revenue-earning games . . . could lead to material decline or slower growth" (¶81) as merely a hypothetical, when the risk had already materialized with the loss of *League of Legends*. ¶83(a). The Ninth Circuit has long held that such "[r]isk disclosures that 'speak[] entirely of as-yet-unrealized risks and contingencies' and do not 'alert[] the reader that some of these risks may already have come to fruition' can mislead reasonable investors." *Alphabet*, 1 F.4th at 703 (quoting *Berson*, 527 F.3d at 985-87); *Facebook*, 87 F.4th at 948-50; *Khoja*, 899 F.3d at 1016; *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009).

Defendants' only argument for these statements (¶¶74, 76, 81) is the *ipse dixit* assertion that they "include accurate statements of historical fact." MTD at 18. Setting aside the fact that Defendants make no effort to identify the portion of these statements that they contend is accurate, the law is clear that even an objectively true statement may be misleading "if it omits material information." *Khoja*, 899 F.3d at 1008-09; *Miller*, 519 F.3d at 886. As explained above, that is precisely what the Complaint alleges here.

### 2. Defendants Misled Investors About the Effect of Its "Pivot to Profitability" on Shopee's Growth

Despite the tremendous growth the Company experienced during the pandemic, Sea and its e-commerce arm Shopee reported significant net losses and never turned a profit in the years prior to the Class Period. ¶¶50-51, 72. With their 2Q22 earnings in August 2022, however, Defendants announced a shift in strategy to "focus even more on self-sufficiency [and] long-term profitability" by "more tightly managing [their] operating expenses, such as marketing costs," which prompted drastic cost-cutting efforts across the Company in 2022. ¶53. While Shopee's growth had historically been driven by the use of expensive sales and marketing investments (*e.g.*, free shipping, monthly promotions, and cashback offers) (¶¶50-52), Defendants assured investors when announcing the change that, "[e]ven though we don't put as a target, naturally, we will continue to see growth." ¶54.

In this context, and beginning the following quarter when Shopee's key growth metric

- 14 -

4868-2666-7446.v1

(GMV) had already begun to stagnate (¶¶32, 51), Defendants issued a series of false and misleading statements and omissions that downplayed the effect that this "pivot to profitability" had on Shopee's growth and market share.[13]

**November 15, 2022 Earnings Call (3Q22)**.  With Sea's 3Q22 earnings, as Defendants provided further details on their cost-cutting initiatives and highlighted that they had "meaningfully scaled back marketing expenses, especially around shipping subsidies," at Shopee (¶53), Sea also disclosed that Shopee's GMV growth had stalled at $19.1 billion (compared to $19.0 billion the prior quarter). ¶55.  Nevertheless, on the 3Q22 earnings call, Defendants couched the risk of declining Shopee growth as a mere hypothetical, and stated that the Company's change in strategy to focus on profits "may" or "could" result in a decline in growth.  ¶68 (Li: "[W]e *may* see no growth or even negative growth in certain operating metrics in the near term."); ¶69 (Wang: "So there *could* be impact on the – some of the top line growth in operating metrics. . . . *But on the other hand*, as we shared, our long-term view is we want to emerge as the strongest winner in this market.").  However, Defendants misleadingly omitted that at the time of these statements – halfway through 4Q22 – Shopee *was already experiencing* decelerating and declining GMV.  *See* ¶70(c); *Alphabet*, 1 F.4th at 703 (statements that "'speak[] entirely of as-yet-unrealized risks and contingencies' and do not 'alert[] the reader that some of these risks may already have come to fruition' can mislead reasonable investors").[14]

---

[13]   Defendants again attempt to rewrite the Complaint by claiming Plaintiff alleges that the announcement of the "*change in strategic focus*" was misleading on its own accord.  MTD at 14.  Not so.  *See* ¶3 (alleging that the Shopee-related statements misled investors about "the *sustainability* of the Company's publicized 'pivot to profitability' and the *effect* that Sea's drastic cost-cutting measures would have on Shopee's growth and market share").  For this reason, Defendants' reliance on cases regarding mere disagreements with "change[d] business strategies" (MTD at 17-18) are inapposite to the allegations here.

[14]   Defendants also downplayed analyst concerns about "the competitive impact" of the cost-cutting drive and whether Sea was "building to sacrifice market share" by slashing its investment in sales and marketing costs.  ¶¶66-67.  Wang responded to these concerns by assuring analysts that Shopee's peers "behaved in a relatively rational manner" and that Shopee's "service offerings remain competitive and [its] monetization take rate is well justified" (*id.*).  Defendants misleadingly failed to disclose or acknowledge, however, that other competitors like TikTok Shop were continuing to offer discounted promotions and lower take rates that would undercut Shopee and eat into its market share.  ¶70(c).

- 15 -

**March 7, 2023 Earnings Call (4Q22)**.  Defendants took these misleading statements even further the following quarter.  While Defendants were able to temporarily appease investors and shore up the Company's share price with 4Q22 earnings by announcing Sea's first ever profitable quarter, this profit came at the expense of a significant $1.1 billion decline to Shopee's GMV.  ¶57.[15]  Even so, Li maintained in both the 4Q22 press release and earnings call that Shopee could achieve "sustainable" (*i.e.*, profitable) growth.  ¶¶72-73; *see also* ¶77 (Wang: "I think starting from '23, we'll generally see some – we'll see some natural growth hopefully.").  Along those same lines, Wang repeatedly assured investors in the Q&A session that Shopee's cost-cutting efforts would actually allow it to "capture a larger share of the pie" and that there was no "trade-off" between Shopee's profitability and growth.  ¶75 ("I think we have demonstrated clearly our ability to execute both growth and profitability.");  ¶76 ("*[I]t's not necessarily a trade-off . . . . We don't necessarily think that growth and profitability need to be a trade-off*.").  Defendants also announced that they would discontinue quarterly disclosures of Shopee's GMV and orders – for the first time in the Company's history – to purportedly come "in line with global peers."  ¶77.

These statements were all false or misleading when made.  *See* ¶78.  In reality, the unsustainable profitability that Sea had achieved in 4Q22 came at a direct "trade-off" for Shopee's sharp GMV decline in 4Q22 and further decline already occurring in 1Q23.  ¶78(b).  As Defendants would ultimately acknowledge later in the year, Shopee could not grow its GMV without major reinvestments in sales and marketing expenses that would "impact [their] bottom line" (¶61), as any focus in either growth, profitability, or market share gain necessarily "*create[s] trade-offs for another*."  ¶62.  Nor were Shopee's ongoing sales and marketing cuts allowing it to "capture a larger share of the pie."  ¶75.  Rather, "Shopee pull[ing] back more" on its discount offerings had actually allowed competitors like "TikTok [to be] able to capitalize on this and opportunistically expand[] in SE Asian

---

[15]  This $1.1 billion decline marked Shopee's first ever third-quarter-to-fourth-quarter GMV decline, and the largest GMV decline in the Company's history.  Defendants citation to a "7.7% *year-over-year* increase in GMV on [an *adjusted*] constant currency basis" (MTD at 15) has no bearing on the contemporaneous GMV declines experienced in 4Q22.

4868-2666-7446.v1

markets" over the prior six months. ¶78(d). Further, Defendants' purported reasoning for ceasing quarterly disclosures of GMV (*i.e.*, to come "in line with global peers") was revealed to be a false and misleading pretext when the Company resumed GMV disclosures as soon as the metric began increasing again in 3Q23. ¶78(c).[16] In sum, all of these statements left investors with the misleading impression that Sea could maintain its newly-achieved profitability while simultaneously growing Shopee's GMV and defending its market share from competitors – *i.e.*, "'a state of affairs that differ[ed] in a material way from the one that actually exist[ed].'" *Berson*, 527 F.3d at 985; *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 939 (N.D. Cal. 2022) ("Plaintiff's allegations raise the reasonable inference that the challenged statements misled investors into believing, incorrectly, that Defendants' investments in marketing and their sales personnel headcount were sufficient for the company to build adequate pipeline to meet its growth and revenue targets.").

**April 6, 2023 Form 20-F (FY22)**. Sea's Form 20-F for FY22 represented that Defendants were not aware of any undisclosed "trends, uncertainties, demands, commitments or events for the year ended December 31, 2022 that are reasonably likely to have a material adverse effect" on the Company. ¶82. Contrary to this representation, however, Defendants were aware of Shopee's ongoing trend of declining GMV caused by the drastic cuts in sales and marketing spend – which began no later than 3Q22 and was ongoing when Defendants filed the Form 20-F. ¶83(b); *see In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 70-74 (2d Cir. 2001) (complaint adequately alleged falsity where defendants' statements downplayed a "material downward secular trend" in their business); *In re Twitter, Inc. Sec. Litig.*, 2020 WL 4187915, at *9 (N.D. Cal. Apr. 17, 2020) (defendants' statement "that 'our MAU trend has already turned around' suggested a positive trend in MAU growth and was misleading because Defendants omitted the declining DAU/MAU trends").

---

[16]    Moreover, because Defendants repeatedly portrayed Sea as still in the early stages of its growth phase, global e-commerce platforms that like Amazon and Alibaba are inapposite "peers." ¶¶58-58. Shopee's more comparable peers like Shopify continued to disclose quarterly GMV growth numbers. *Id.*

4868-2666-7446.v1

**May 16, 2023 Earnings Call (1Q23)**.  Despite the ongoing downward trend in Shopee's GMV, Defendants continued to falsely claim on their 1Q23 earnings that they could be profitable and grow the business at the same time.  For instance, even though Sea's 1Q23 earnings release misleadingly obscured Shopee's GMV growth by omitting the metric altogether for the first time in the Company's history (¶¶85, 90(b)), Li again assured investors on the earnings call that the Company's widespread cost-cutting efforts would "driv[e] profitable long-term growth."  ¶86.  When analysts repeatedly asked for insight on Shopee's GMV trend, Wang evasively acknowledged that GMV had fallen even further in in 1Q23 by stating that GMV was merely "in line" with "seasonality trends" observed the prior year between 4Q22 and 1Q23 (*i.e.*, a decline).[17]  ¶87.  And in response to several questions from analysts regarding the "strategy for e-commerce and growth versus profitability," Wang again doubled-down on the claim that there was no trade-off between profitability and growth.  ¶89 ("***I think our past track record has shown that we can execute growth and managing bottom line at the same time as well***."; "I think it's more about how we build a healthy long-term ecosystem that will ***maximize the long-term profitable growth of our business***."; and "In terms of the Shopee strategy of growth versus profitability, as I mentioned earlier, I think at this point, longer term, we think ***we will continue to invest in the long-term growth opportunities being a profitable, sustainable way***.").

Contrary to the misleading impression left by these statements, in truth Shopee had never been able to "execute growth and managing bottom line at the same time."  ¶89.  Rather, as discussed above with the 4Q22 statements, Shopee's GMV growth and share of the Southeast Asia e-commerce market relied on costly investments in sales and marketing expenses (such as free shipping offerings) – which is precisely why Shopee had ***never*** been able to post GMV growth while simultaneously turning a profit. ¶90.  Defendants essentially admitted that this was the case just several months later in August 2023, when they

---

[17]  Moreover, even though Sea was in the midst of reinstating free shipping and other promotional offerings in response to TikTok's e-commerce expansion in Southeast Asia (¶90(c)), Wang falsely claimed that such shipping subsidies were "overemphasized" by the market and were not a focus of the Company's competitive investments.  ¶88.

4868-2666-7446.v1

surprisingly announced a pivot in strategy away from profits back to "reaccelerate[ing] investments in growth" for Shopee – which they acknowledged included a "ramp up [in] investments in free shipping again to capture more of the growth opportunities" that would "impact [their] bottom line and may result in losses for Shopee and [the] group as a whole in certain periods." ¶¶61, 126-127.  And in November 2023, when Sea revealed the full impact of this reversal and reported net losses for both Shopee and Sea, Defendants acknowledged that these reinvestments in growth were necessitated by "intensified competition in [their] markets." ¶¶62, 130.  Defendants also finally admitted that – contrary to their repeated Class Period refrain – any near term focus in growth, profitability, or market share necessarily "create[s] trade-offs for another." ¶62.

Defendants' counter-narrative of events (MTD at 14-18) does not address the substance or context of any of these Shopee-related misrepresentations.  Instead, Defendants offer snippets of certain alleged misstatements to argue that they are inactionable as either: (1) accurate historical statements; (2) opinion or puffery; or (3) forward-looking statements subject to the PSLRA's safe harbor.  MTD at 18-22.  None of these arguments have merit.

**"Accurate" Statements**.  While Defendants assert *ipse dixit* that a number of statements purportedly "include accurate statements of historical fact," the only specific language Defendants identify under this defense are two snippets with altered emphasis from ¶66. MTD at 18-19.  Yet these snippets formed part of longer statements that, when viewed in their entirety and in context, served to mislead investors by omission. *See supra*, n.14.  In such instances, "literal accuracy is not enough: An issuer must as well desist from misleading investors by saying one [true] thing and holding back another." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015).

**Opinion or Puffery**.  Nor do any of the alleged misstatements constitute nonactionable opinion or puffery.  First, the Supreme Court has made clear that statements of opinion or belief are those preceded by phrases signaling the lack of certainty, such as "'I believe'" or "'I think.'" *Omnicare*, 575 U.S. at 183-88.  And even when such qualifying language is present, opinions are still actionable when: (1) the speaker does not "actually

- 19 -

hold[] the stated belief"; (2) the opinion contains a materially false "embedded statement[] of fact"; or (3) omitted information shows that the speaker "lacked the basis for making those statements that a reasonable investor would expect." *Id.* at 183-85, 196; *Lowthorp v. Mesa Air Grp. Inc.*, 2021 WL 3089118, at *10-*11 (D. Ariz. July 22, 2021). Here, only one of the statements (¶88) that Defendants claim to be opinion (MTD at 19-20) contains such qualifying language. And even there, the Complaint explains how the Defendants materially omitted that shipping subsidies and other discounted promotions were a key focus at Shopee to staying competitive in the Southeast Asia e-commerce industry. *See* ¶90(c).[18]

As to puffery, a statement only amounts to puffery if it is not "capable of objective verification" and "'so "exaggerated" or "vague" that no reasonable investor would rely on it when considering the total mix of available information.'" *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008). "[E]ven 'general statements of optimism, when taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *Quality Sys.*, 865 F.3d at 1143. This is especially true when, as here, "many of the challenged statements were made during earnings conference calls" and "in response to specific questions asked by financial analysts." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 770-71 (9th Cir. 2023). Whereas Defendants only offer out-of-context snippets of longer statements for this argument (MTD at 19-20), the "Court may not assess the statements . . . in a vacuum, 'plucking the statements out of their context to determine whether the words, taken *per se*, are sufficiently "vague" so as to constitute puffery.'" *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014); *see also Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (even a statement that "'everything [was] going fine'" was not puffery when defendants knew everything was not

---

[18] In the same vein, all of the statements where Defendants attempted to use qualifying language to claim they did not "think that growth and profitability need to be a trade-off" (¶76; *see also* ¶¶75, 89) contained materially false embedded statements of fact. *See* ¶¶78(b), 90(a). Tellingly, Defendants do not even attempt to construe them as opinion.

4868-2666-7446.v1

fine).[19]  The Complaint explains the proper context and misleading nature of these statements – all of which are capable of objective verification.  ¶¶70, 78, 83, 90.

**Safe Harbor**.  Finally, none of the Shopee-related statements that Defendants identify (MTD at 20-21) are subject to the PSLRA's safe harbor.  As an initial matter, the substance of several statements that Defendants claim are subject to this defense (¶¶75, 77, 89) clearly relate to "current or past facts," which "do not qualify for the safe harbor" even if they are "combined with a forward-looking statement."  *Maverick Fund*, 2018 WL 6181241, at \*7; *Quality Sys.*, 865 F.3d at 1142; ¶75 ("I think *we have demonstrated* clearly our ability to execute both growth and profitability."); ¶77 (decision to stop quarterly GMV disclosure is "*in line with* global peers"); ¶89 ("I think *our past track record has shown* that we can execute growth and managing bottom line at the same time as well."; "We will *continue to invest* in the long-term growth opportunities being a profitable, sustainable way.").

Further, courts have regularly held that "'to the extent Plaintiffs . . . challenge Defendants' alleged *omission of present facts* with respect to the challenged statements, the PSLRA's safe harbor does not apply.'"  *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at \*10 (C.D. Cal. Apr. 12, 2016) (emphasis in original).  For instance, the Complaint alleges Li's statement that Shopee would "see some natural growth" (¶77) starting in 2023 was materially misleading for omitting Shopee's ongoing trend of declining GMV tied to declining sales and marketing spend.  *See In re Celera Corp. Sec. Litig.*, 2013 WL 4726097, at \*2 (N.D. Cal. Sept. 3, 2013) (statement was not forward-looking because "it was an omission of a historical fact").  For this same reason, and as discussed above, the statements that Shopee "*may*" or "*could*" see an impact on growth (¶¶68-69) were materially misleading for omitting that Shopee was *already* experiencing stagnating and declining GMV.  *See*

---

[19]  Defendants string-cite inapposite cases (MTD at 20), all of which hold merely that vaguely optimistic adjectives are not actionable.  *Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1099 (9th Cir. 2022) (statements such as "'we're seeing tremendous growth'" were not concrete assurances); *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 994-95 (N.D. Cal. 2017) (statement that Solarcity was "'highly optimistic'" was not objectively verifiable); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1076-77 (N.D. Cal. 2001) (statements about "'strong'" demand puffery); *In re Wet Seal, Inc. Secs. Litig.*, 518 F. Supp. 2d 1148, 1168 (C.D. Cal. 2007) (similar).

4868-2666-7446.v1

*Alphabet*, 1 F.4th at 703 (statements that warn of future "'entirely of as-yet-unrealized risks and contingencies' and do not 'alert[] the reader that some of these risks may already have come to fruition' can mislead reasonable investors"); *Khoja*, 899 F.3d at 1008-09 (same).

Finally, the purported cautionary language that Defendants cite (MTD at 21) does not "'directly address'" (*Provenz*, 102 F.3d at 1493) the misrepresentations such that "the risk of real deception drops to nil." *Sandberg*, 501 U.S. at 1097. Indeed, the inadequacy of the boilerplate language they cite is "bolstered by the fact that Defendants did not meaningfully update the risk disclosure" from year to year. *Glazer*, 63 F.4th at 780. Even if they did, the "safe harbor cannot protect cautionary statements made with superior knowledge that some of the potential perils identified have in fact been realized." *Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*, 2012 WL 3835078, at \*4 (N.D. Cal. Sept. 4, 2012).

## B. The Complaint Alleges a Strong Inference of Scienter

To plead scienter, a securities fraud complaint must "'state with particularity facts giving rise to a strong inference that the defendant'" made the "'false or misleading statements either intentionally or with deliberate recklessness.'" *Reese v. Malone*, 747 F.3d 557, 568-69 (9th Cir. 2014), *abrogated on other grounds by Omnicare*, 575 U.S. at 182-86. A "strong inference" of scienter is one that a reasonable person would deem "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The key question is "whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis in original). No "'smoking-gun'" is necessary, nor does the inference need to be the "'most plausible of competing inferences.'" *Id.* at 324. Rather, "if two possible inferences – one fraudulent and the other nonfraudulent – are equally compelling, a plaintiff has demonstrated a strong inference of scienter." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1032-33 (9th Cir. 2016); *Commc'ns Workers of Am. Plan for Emps.' Pensions & Death Benefits v. CSK Auto*

- 22 -

*Corp.*, 525 F. Supp. 2d 1116, 1120 (D. Ariz. 2007) ("[A] tie goes to the Plaintiff.").[20]

The strong inference of scienter is established here by Defendants' admitted access to and knowledge of the adverse facts and key metrics contradicting their public statements – which go to the very heart of their business. The Complaint's allegations of motive and opportunity reinforce this inference of scienter, but certainly do not stand alone. These facts independently and holistically satisfy the element of scienter, and the competing inferences that Defendants wish the Court to draw confirm that this is a dispute of fact.

**1.    Defendants' Admitted Knowledge and Intimate Involvement in the Core Operations at Issue Establishes a Strong Inference of Scienter**

A strong inference of knowledge can be independently established where a complaint contains either: (a) particular allegations that "suggest that defendants had actual access to the disputed information"; or (b) "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2016); *Di Donato v. Insys Therapeutics Inc.*, 2017 WL 3268797, at *14 (D. Ariz. Aug. 1, 2017). The Complaint's allegations readily meet either standard, and "[b]oth the absurdity and actual knowledge analysis are sufficient to create a strong inference of scienter." *Reese*, 747 F.3d at 577.

First, Defendants do not dispute that the subjects of the alleged misstatements – *i.e.*, *League of Legends* and Shopee's GMV – were of critical importance to Sea's core operations. Nor could they:

- As one of the most popular and monetized video games in the world, it is no surprise that *League of Legends* was Sea's most popular licensed game during the Class Period. ¶¶41, 44-45. Sea admitted as much. Up until it lost the rights to the game, Sea's Annual Reports on Form 20-F consistently listed *League of Legends* first among its "most popular [licensed] games," and admitted that Garena "substantially depend[s] on a small number of popular games." ¶¶45, 81.

- Both Defendants and investors considered GMV to be a "critical operating metric" to evaluating Shopee's growth. ¶¶32, 58. In fact, in the Company's entire history as a

---

[20] The "'scienter of the senior controlling officers of a corporation'" (*i.e.*, any and all of the Individual Defendants) "'may be attributed to the corporation itself to establish liability as a primary violator of §10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority.'" *Alphabet*, 1 F.4th at 705.

- 23 -

public company, the only two key operating metrics that Sea reported in its SEC filings for Shopee were GMV and orders. ¶27; *see also* Defs.' Ex. 1 at 49. These facts alone establish scienter. *See Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1145-46 (N.D. Cal. 2017) (finding scienter and holding that "it would be 'absurd' for [defendant CEO and CFO] not to have been aware of adverse . . . trends" in a metric described "as one of its five 'major growth drivers'"); *Shapiro v. Matrixx Initiatives, Inc.*, 2011 WL 13047298, at *6 (D. Ariz. Sept. 26, 2011) (scienter adequately pled based on "Zicam's importance to the company's business"); *Di Donato*, 2017 WL 3268797, at *15 (finding scienter and holding it would be "absurd" for CEO and CFO to be unaware of developments in company's top product); *Rivian*, 2023 WL 4361098, at *14 (finding scienter where allegations concerned Rivian's "flagship offering"); *In re Mullen Auto Sec. Litig.*, 2023 WL 8125447, at *8 (C.D. Cal. Sept. 28, 2023) (scienter found where partnership agreement at issue was "critical" to a "core business objective" of the company).[21]

Second, courts in this Circuit may also "consider a senior executive's role in a company to determine whether there is a cogent and compelling inference that the senior executive knew of the information at issue." *Alphabet*, 1 F.4th at 706; *see also Tsirekidze v. Syntax-Brillian Corp.*, 2009 WL 275405, at *6 (D. Ariz. Jan. 30, 2009) (defendants' scienter supported "given their positions at the company"). The Individual Defendants here are the highest-level executives at Sea, who were directly involved in or informed of the issues discussed in their misstatements:

- Li himself served as Garena's signatory to the license agreement (and all of its amendments) with Riot for *League of Legends*, which required Defendants to maintain and provide Riot with monthly and quarterly reports on the game's revenues and usage. Defs.' Ex. 2 at 23-24, §§7.10, 7.12; *see also* ¶¶102-103.

- The Company's "pivot to profitability" and drastic cost-cutting efforts at Shopee were personally directed by Li and the rest of the Individual Defendants. ¶¶37, 101. As part of this effort, starting in March 2022, the Individual Defendants "began huddling every month to discuss cashflow projections, along with their regular weekly

---

[21] Defendants' reliance on *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) and *Palm Harbor Special Fire Control & Rescue Dist. Firefighters Pension Fund Plan v. First Solar, Inc.*, 2023 WL 4161355, at *5 (D. Ariz. June 23, 2023) is misplaced. MTD at 27. There were **no** allegations in either of those cases of the defendants' involvement with company operations. That is not the case here. ¶¶99-104.

- 24 -

4868-2666-7446.v1

meetings" and "spun through 200 different versions of financial forecasts in 2022 . . . akin to rewriting the budget every two days" to address the Company's self-described "crisis."  ¶¶37, 101.

*Splunk*, 592 F. Supp. 3d at 944 (N.D. Cal. 2022) (scienter alleged where Defendants were aware of the adverse facts "by virtue of their executive roles and because of the importance of the adverse facts to the company[]"); *CSK Auto*, 525 F. Supp. 2d at 1124 ("the extensive and systematic nature of the accounting irregularities would not likely have escaped the attention of the CEO and CFO"); *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *18 (N.D. Cal. Aug. 17, 2022) (finding the "individual Defendants were aware of the undisclosed sales practice and its effects by virtue of their positions as CEO and CFO").  Nor do Defendants contest that Li wielded significant control over the Company.  *See* ¶98 (Sea's Form 20-F: Li "has control over key decision making as a result of his control of a majority of the voting power of our outstanding share capital and has substantial influence over our company."); *In re Diamond Foods, Inc. Sec. Litig.*, 2012 WL 6000923, at *11 (N.D. Cal. Nov. 30, 2012) (CEO's scienter strengthened by allegations of his "hands-on approach to management" and his own statements); *Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*, 2021 WL 3748325, at *24 (N.D. Cal. Aug. 24, 2021) (allegations that each individual defendant was "a key member of Corcept's management team and is intimately involved in the operation of the company" sufficient to establish scienter).  Li's heavy hand in so many aspects of Sea's business ventures underscores his scienter.

Moreover, Li, Hou, and Wang frequently discussed and held themselves out as knowledgeable about Garena's and Shopee's key metrics on quarterly earnings calls with analysts and investors.  ¶¶105-107.  *See Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *12 (C.D. Cal. Feb. 27, 2015) ("scienter can be established by the fact that the Defendants touched on the specific issue . . . in their public statements").  For instance, all three repeatedly issued prepared remarks and answered analyst questions that demonstrated their access to, and knowledge of, granular user engagement and monetization metrics and trends for specific Garena games (which would necessarily include one their most popular games like *League of Legends*).  ¶106 (acknowledging that, *inter alia*, Defendants "monitor closely

- 25 -

4868-2666-7446.v1

for trends" in users and monetization for specific video games). Wang also repeatedly acknowledged that Defendants closely monitored operating costs, GMV trends, market conditions, and the competitive environment in each market that Shopee operated in. ¶107 (acknowledging, *inter alia*, that "at any period of time, [Defendants] assess the market condition the natural user growth rates, the competitive landscape, our operational cost structure in that market, and then we'll assess what would be a reasonable profit margin we could achieve" for Shopee). The Individual Defendants' admitted visibility into key user and monetization metrics for individual games like *League of Legends* and key segment-level metrics for Shopee (like GMV) further establishes a strong inference of scienter. *See Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009) ("[T]he most powerful evidence of scienter is the content and context of [defendant's] statements themselves."); *Celera Corp.*, 2012 WL 3835078, at *3 ("[t]he wording of Defendants' statements on these calls [to investors] suggests they understood what was going on"); *Loritz v. Exide Techs.*, 2014 WL 4058752, at *12 (N.D. Cal. Aug. 7, 2014) (same); *Longo v. OSI Sys., Inc.*, 2021 WL 1232678, at *9 (C.D. Cal. Mar. 31, 2021) (scienter adequately pled where the individual defendants "were intimately familiar with OSI's turnkey business" and "regularly made statements touting OSI's turnkey business").[22]

Plaintiff has adequately alleged a strong inference that the Individual Defendants both had "actual access" to the disputed information, and that it would be "'absurd'" to suggest that management was without knowledge of the Company's core operations at issue. *S. Ferry*, 542 F.3d at 785-86. When considered holistically, as is required at this stage, the strong inference of the Individual Defendants' scienter becomes overwhelming. *See Reese*, 747 F.3d at 577 ("Both the absurdity and actual knowledge analysis are sufficient to create a strong inference of scienter. But looking at the totality of the circumstances under the

---

[22] Defendants' cases are inapposite. *Intuitive Surgical*, 759 F.3d at 1062-63 (no allegations detailing defendants' involvement in the company's operations or data monitoring); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1001 (9th Cir. 2009), as amended (Feb. 10, 2009) (no allegations in the complaint that suggested defendant "had access to the underlying information from which the accounting numbers were derived").

- 26 -

4868-2666-7446.v1

*Tellabs* analysis makes the inference irresistible.").

**2.      Defendants' Motive Buttresses the Strong Inference of Scienter**

While "motive is not required to adequately plead scienter," *Gammel v. Hewlett-Packard Co.*, 2013 WL 1947525, at *21 (C.D. Cal. May 8, 2013), it "can be a relevant consideration." *Tellabs*, 551 U.S. at 325; *Reese*, 747 F.3d at 569 (facts showing a motive to commit fraud can "provide some reasonable inference of intent").  Further bolstering the already-strong inference of scienter discussed above, here the Complaint also details Defendants' motive to mislead the investing public and artificially inflate Sea's ADS price.

**Insider Trades**.  "'Unusual trading or trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter.'"  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005).  "To evaluate suspiciousness of stock sales, [the Ninth Circuit] consider[s], *inter alia*, three factors: (1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004).  Here, it is unknown precisely how many Company insiders traded Sea securities during the Class Period and in what amounts, as insiders of foreign private issuers ("FPIs") like Sea are exempt from domestic disclosure requirements regarding stock sales.  ¶112; Defs.' Ex. 1 at 46.[23]  Even so, Li's and Chen's insider sales of more than $27 million further support a finding of scienter, as they were unusual in both timing and amount.  *See* ¶114.

Stock sales are suspicious in timing when they are "dramatically out of line with prior trading practices at times calculated to maximize personal benefit from undisclosed inside information."  *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989).  Notably, Li did not sell a ***single*** share of his holdings during the nine-month period immediately preceding the nine-month Class Period. ¶114.[24]  Moreover, the majority of Li's

---

[23]  None of Defendants' stock sale cases involve FPIs where insiders are not required to disclose their trading activity, and thus, are factually distinct from the present case.

[24]  Defendants' argument that the nine-month window preceding the Class Period is "arbitrar[y]" misses the mark.  MTD at 25.  The Ninth Circuit routinely limits its review of pre-Class Period insider sales to the equivalent-length period immediately preceding the Class Period.  *Apple Comput.*, 886 F.2d at 1117; *No. 84 Emp.-Teamster Joint Council*

- 27 -

sales occurred shortly before the truth began to be revealed to the market in May 2023, and completely halted prior to the further revelations in August 2023.  ¶¶114, 123-129.  The timing of these sales were thus calculated "'to maximize the personal benefit from undisclosed inside information.'"  *Am. W. Holding Corp.*, 320 F.3d at 938.  For this same reason, Chen's June 30, 2023 sale is also suspicious because it shows that Chen (Shopee's Chief Product Officer) took advantage of the artificial inflation in Sea's stock prior to the revelation of costly reinvestments in Shopee's GMV growth in August and November 2023 that removed the inflation from Sea ADSs.  ¶¶115, 126-131.[25]  That Chen's prior trading history is not publicly available does nothing to undermine this suspicious timing.

Regarding the amount of sales, both Li and Chen were motivated to mislead investors about the true state of affairs at Sea in order to sell $13.7 million and $14.2 million of Sea ADSs, respectively, at artificially inflated prices.  ¶¶113, 115.  Defendants' assertion that they did not trade a large enough percentage of their holdings is contrary to the law.  *See In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003) ("While [the defendant] may not have sold a large percentage of his shares, as emphasized by the defendants, the amount of income he generated through his sales, $18 million, is significant."); *In re Upstart Holdings, Inc. Sec. Litig.*, 2023 WL 6379810, at *20 (S.D. Ohio Sept. 29, 2023) ("Courts have routinely rejected, however, the idea that there is a minimum percentage of stock sales that must be made before an inference of scienter can be drawn.").

Defendants also erroneously argue that their 10b-5 plans shield them from liability. Not so.  *See In re Questcor Sec. Litig.*, 2013 WL 5486762, at *16 (C.D. Cal. Oct. 1, 2013) ("[T]he fact of the 10b5-1 trading plan, without more, is insufficient to negate the effect of otherwise suspicious sales.").  A "'10b5-1 trading plan does not provide an absolute defense to a claim of insider trading.  Rather, it requires an additional factual finding of good faith,' which a court cannot make [on] . . . a motion to dismiss."  *Azar v. Yelp, Inc.*, 2018 WL

*Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 941 (9th Cir. 2003).

[25]  Both Li's and Chen's sales all took place before the final two corrective disclosures took place in this case in August and November 2023 – rendering Defendants' citation to *Hoang v. ContextLogic, Inc.*, 2023 WL 6536162 (N.D. Cal. Mar. 10, 2023) inapposite.

- 28 -

6182756, at *4 (N.D. Cal. Nov. 27, 2018).  There is also no dispute that Chen's trading plan was entered into during the Class Period, and "where 10b5-1 trading plans are entered into during the class period, they 'provide no defense to **scienter** allegations.'"  *Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software*, 2019 WL 2360942, at *6 (S.D.N.Y. Mar. 4, 2019).  Nor does Li's trading plan offer a defense when "there is nothing in the record to indicate when the plan[] w[as] entered into." *Id.* (The "'existence of a Rule 10b5-1 Trading Plan is an **affirmative defense** that must be pled and proved'" **by defendants**.).[26]

Finally, to the extent Defendants claim that a lack of stock sales for the remaining Individual Defendants negates scienter (MTD at 25 n.8), courts have repeatedly rejected such inferences. *See, e.g.*, *Matrixx*, 563 U.S. at 48; *Sharenow v. Impac Mortg. Holdings, Inc.*, 385 F. App'x 714, 717 n.2 (9th Cir. 2010) (The Ninth Circuit "do[es] not draw a negative inference from the absence of stock sales that benefitted the defendant [officers].").

**The "Crisis" at Sea**.  Defendants were additionally motivated to downplay and conceal the negative effects of (1) losing *League of Legends* and (2) their drastic cost cuts at Shopee, in order to dig the Company out of the "crisis" it found itself in circa 2022.  By the start of the Class Period, Sea had reported disappointing earnings quarter-after-quarter that took a devastating toll on the price of the Company's ADSs – which had already caused Defendants to "fret[] about the future of the company." ¶¶36-39.  Defendants were certainly motivated to misrepresent the true state of affairs at the Company to the investing public while simultaneously hoping for a miraculous turnaround. *See Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("The fact that a gamble – concealing bad news in the hope that it will be overtaken by good news – fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble."); *Gammel*, 2013 WL 1947525, at *21 ("It is far from implausible that a corporate executive who had spent months building excitement and momentum around important, new technology products might recklessly misrepresent the inability to deliver on those promises.").

---

[26]  Moreover, the fact that Li did not have **any** stock sales in 2022 leads to the inference that his 10b-5 plan must have been entered into during the Class Period.

- 29 -

4868-2666-7446.v1

### 3. Defendants' Selective Disclosure of the Key GMV Metric Further Buttresses the Strong Inference of Scienter

Defendants' abrupt decision to withhold GMV and orders as soon as the Company started reporting declines in these key metrics – only to begin disclosing them again when the metrics increased – bolsters the strong inference of scienter, and renders any "competing inference" not plausible. *See Alphabet*, 1 F.4th at 707; ¶109. Indeed, it is deceptive for a defendant to "chang[e] [their] methodology" to hide negative trends in the business. *SEC v. Sequential Brands Grp., Inc.*, 2021 WL 4482215, at *6 (S.D.N.Y. Sept. 30, 2020). And courts regularly find scienter where a defendant takes steps to "cover-up" their prior misstatements. *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1166 (D. Or. 2015) (collecting cases). Defendants' claim that this halt in disclosure was to innocuously come "in line with industry peers" (MTD at 10, 28) is simply not credible. First, Shopee's most comparable peers like Shopify continued to disclose quarterly GMV growth numbers, and Defendants repeatedly portrayed Shopee as still in the early stages of its growth phase, rendering global e-commerce platforms like Amazon and Alibaba inapposite comparators. ¶78(c). More importantly, the fact that Defendants resumed disclosing GMV and orders in 3Q23 – when the metrics began increasing again – reveals that the excuse of staying "in line with global peers" was a mere pretext to conceal a GMV metric in decline.

## V. SECTION 20(a) LIABILITY IS PROPERLY PLED

Sea does not dispute that Plaintiff sufficiently alleges each Defendants' control and participation. MTD at 30. Because the Complaint sufficiently alleges a primary violation of §10(b), it properly pleads control person liability under §20(a) as well.

## VI. CONCLUSION

For the reasons set forth above, Plaintiff has satisfied all applicable pleading standards and Defendants' motion to dismiss should be denied in its entirety.

DATED: April 19, 2024

s/ Marco Janoski
J. MARCO JANOSKI GRAY

- 30 -

4868-2666-7446.v1

ROBBINS GELLER RUDMAN
  & DOWD LLP
TOR GRONBORG
J. MARCO JANOSKI GRAY
T. ALEX B. FOLKERTH
JESSICA E. ROBERTSON
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
torg@rgrdlaw.com
mjanoski@rgrdlaw.com
afolkerth@rgrdlaw.com
irobertson@rgrdlaw.com

Lead Counsel for Lead Plaintiff

ZIMMERMAN REED, LLP
HART L. ROBINOVITCH
14648 N. Scottsdale Road, Suite 130
Scottsdale, AZ  85254
Telephone:  480/348-6400
480/348-6415 (fax)
hart.robinovitch@zimmreed.com

Local Counsel for Lead Plaintiff

- 31 -

4868-2666-7446.v1