**LEWIS ROCA ROTHGERBER CHRISTIE LLP**
John C. Gray (Bar No. 028454)
201 East Washington Street, Suite 1200
Phoenix, AZ 85004
Telephone:  (602) 262-5311
Facsimile:  (602) 262-5747
Email:  jgray@lewisroca.com

**ALLEN OVERY SHEARMAN STERLING US LLP**
Adam S. Hakki (admitted *pro hac vice*)
Daniel C. Lewis (admitted *pro hac vice*)
Joshua T. Ebersole (admitted *pro hac vice*)
599 Lexington Avenue
New York, NY 10022-6069
Telephone:  (212) 848-4000
Email: ahakki@aoshearman.com
        daniel.lewis@aoshearman.com
        joshua.ebersole@aoshearman.com

*Counsel for Defendants Sea Limited, Forrest Li,*
*Tony Hou, Yanjun Wang, Gang Ye, and David Chen*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Laborers District Council Construction Industry Pension Fund, et al., <br><br> Plaintiffs, <br><br> v. <br><br> Sea Limited, et al., <br><br> Defendants. | Case No. 2:23-CV-01455-DLR <br><br> Consolidated with: <br> Case No. CV-23-01889-PHX-DLR <br><br> **DEFENDANTS' REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT** <br><br> **(Oral Argument Requested)** |

**TABLE OF CONTENTS**

INTRODUCTION .............................................................................................................. 1

ARGUMENT ................................................................................................................... 3

I.  The CAC Does Not Identify Any False Statement About The Expiration Of The
License Agreement............................................................................................ 3

    A.  The CAC Does Not Sufficiently Plead That The Statement That
*League of Legends*' Contribution Was Immaterial To Garena Was False ..... 3

    B.  The CAC Does Not Sufficiently Plead That The Statements Regarding
The Stabilization Of Garena's Users Were False ........................................... 5

    C.  The CAC Fails To Plead That Sea's Risk Disclosures Were False................ 6

    D.  The CAC Fails To Plead Any Corrective Disclosure Related To Garena...... 7

II.  The CAC Fails To Allege Any Actionable Statement About Shopee's Strategy...... 7

    A.  Sea Disclosed That Its Strategy Shift To Self-Sufficiency Could Result
In Negative Growth For Shopee ................................................................... 8

    B.  Plaintiff Does Not Sufficiently Allege That Sea Concealed The
Competitive Impact Of Its Turn To Self-Sufficiency ................................... 8

    C.  The Alleged Misrepresentations Are Inactionable As A Matter Of Law ....... 9

    D.  The CAC Fails To Plead Any Corrective Disclosure Related To Shopee.... 12

III.  The CAC Fails To Sufficiently Plead Scienter ...................................................... 12

    A.  The "Insider Trading" Allegations *Negate* Any Inference Of Scienter........ 12

    B.  Plaintiff's Circumstantial Knowledge Allegations Fail .............................. 13

    C.  "Plausible, Nonculpable Explanations" Are More Likely Than Fraud ........ 15

CONCLUSION .............................................................................................................. 15

**TABLE OF AUTHORITIES**

**PAGE**

**CASES**

*Acosta v. Kijakazi*,
2023 WL 3033499 (9th Cir. Apr. 21, 2023) ................................................................ 7

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ........................................................................................ 14

*Comms. Workers of Am. Plan for Empls.' Pensions & Death Benefits v.*
*CSK Auto Corp.*,
525 F. Supp. 2d 1116 (D. Ariz. 2007) ...................................................................... 14

*Crews v. Rivian Automotive, Inc.*,
2023 WL 4361098 (C.D. Cal. July 3, 2023) ............................................................. 14

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) ..................................................................................... 5

*Di Donato v. Insys Therapeutics Inc.*,
2017 WL 3268797 (D. Ariz. Aug. 1, 2017) .............................................................. 13

*In re Diamond Foods, Inc. Sec. Litig.*,
2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) .......................................................... 14

*In re Diebold Nixdorf, Inc., Sec. Litig.*,
2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) .......................................................... 15

*Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*,
2021 WL 3748325 (N.D. Cal. Aug. 24, 2021) .......................................................... 14

*Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023). .................................................................................... 11

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049, 1067 (9th Cir. 2008) ........................................................................ 12

*In re Mullen Auto Sec. Litig.*,
2023 WL 8125447 (C.D. Cal. Sept. 28, 2023) ......................................................... 14

*In re Nektar Therapeutics Sec. Litig.*,
34 F.4th 828 (9th Cir. 2022) ....................................................................................... 5

*In re Northpoint Commc'ns Grp., Inc. Sec. Litig.*,
184 F. Supp. 2d 991 (N.D. Cal. 2001) ........................................................................ 9

*Pension Fund Grp. v. Tempur-Pedic Intern., Inc.*,
   614 F. App'x 237 (6th Cir. 2015) ................................................................. 9

*In re Plantronics, Inc. Sec. Litig.*,
   2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ............................................. 14

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ................................................................... 11

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v.*
   *Hewlett-Packard Co.*,
   845 F.3d 1268 (9th Cir. 2017) ..................................................................... 5

*Scheller v. Nutanix, Inc.*,
   450 F. Supp. 3d 1024 (N.D. Cal. 2020) ....................................................... 6

*Shapiro v. Matrixx Initiatives, Inc.*,
   2011 WL 13047298 (D. Ariz. Sept. 26, 2011) ........................................... 13

*Sharenow v. Impac Mortg. Holdings, Inc.*,
   385 F. App'x 714 (9th Cir. 2010) ............................................................... 13

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) ..................................................... 13

*In re Splunk Inc. Sec. Litig.*,
   592 F. Supp. 3d 919 (N.D. Cal. 2022) ....................................................... 14

*Steiner v. Hale*,
   868 F. Supp. 284 (S.D. Cal. 1994) .............................................................. 4

*In re Synchrony Fin. Sec. Litig.*,
   988 F.3d 157 (2d Cir. 2021) ........................................................................ 6

*Tsirekidze v. Syntax-Brillian Corp.*,
   2009 WL 275405 (D. Ariz. Jan. 30, 2009) ................................................. 14

*In re Turquoise Hill Resources Ltd. Sec. Litig.*,
   625 F. Supp. 3d 164 (S.D.N.Y. 2022) ....................................................... 10

*In re Twitter, Inc. Secs. Litig.*,
   506 F. Supp. 3d 867 (N.D. Cal. 2020) ..................................................... 3, 5

*United Nurses Ass'ns of Cal. v. Nat'l Lab. Rels. Bd.*,
   871 F.3d 767 (9th Cir. 2017) ...................................................................... 7

*Va. Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991) .......................................................................................... 11

**STATUTES**

15 U.S.C. § 78u-4(b) ................................................................................... 1, 11

**REGULATIONS**

17 C.F.R. § 240.10b5-1 .................................................................................... 12

**RULES**

Fed. R. Civ. P. 9(b) ............................................................................................ 1

Fed. R. Civ. P. 12(b)(2) ..................................................................................... 1

**INTRODUCTION**[1]

In adopting the PSLRA, Congress recognized that share price declines do not equate to securities fraud and enacted heightened pleading standards for the express purpose of deterring unsupported and conclusory claims of securities fraud of exactly the type presented here. The CAC's deficient and conclusory allegations—as evidenced by Plaintiff entirely abandoning the original complaint, subsequently abandoning many of the CAC's allegations, and failing to respond to several dispositive arguments in the Motion—are precisely what the PSLRA and Rule 9(b) forbid.

Plaintiff's first claim—that Sea's global, predominantly mobile gaming business Garena was materially impacted by the long-disclosed expiration of its license to publish the PC version of *League of Legends* in six Southeast Asian markets and Taiwan—is entirely speculative, supported by nothing but Plaintiff's own say-so, and contradicted by Plaintiff's own factual allegations. As the CAC confirms, Garena's results in the first quarter of 2023 were consistent with its post-pandemic trends and, rather than exposing a precipitous drop-off, showed improvement and stabilization in the decline rate following the expiration of the License Agreement for each key metric alleged in the CAC.

Plaintiff's second, unrelated theory is that Sea misled investors about its change in business strategy for Shopee, its e-commerce business, which Plaintiff calls Sea's "pivot to profitability." Changes in strategy are not actionable as securities fraud, and Plaintiff's attempt to reverse engineer a claim based on selective, out-of-context quotations does not withstand scrutiny. Sea told investors in the third quarter of 2022 that its Shopee business would focus on self-sustainability to reduce dependency on external capital. Sea subsequently (and at the start of the alleged Class Period) warned that the strategic shift

---

[1] Abbreviations and capitalized terms not defined herein have the meaning provided in Defendant's Motion to Dismiss and Memorandum of Points and Authorities in Support Thereof ("Motion" or "Mot."). References to the "Opposition" or "Opp." are to Plaintiff's Opposition to Defendants' Motion to Dismiss. The Individual Defendants continue to reserve expressly all defenses based on personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure. Unless otherwise indicated herein, internal quotations and citations are omitted and emphasis is added.

1

could negatively impact Shopee's growth in the short term and that Sea could "accept that." Sea also disclosed that it would continue to evaluate and adjust its strategy, including that "[o]nce we achieve self-sufficiency, we will be in a position to decide to reaccelerate growth again in a much more efficient and a long-term sustainable manner."

That is exactly what happened. When macro-economic and competitive conditions changed—and after Sea and Shopee achieved self-sustainability—Sea disclosed that it would reaccelerate strategic investments in Shopee. Even if such forward-looking statements of strategy were actionable (and they are not), Plaintiff has not identified anything false or misleading about Sea's accurate and transparent disclosures as the company navigated a changing landscape. And Plaintiff's unsupported allegation that Sea failed to disclose the purported "effect of [its] drastic cost-cutting measures on Shopee's growth and market share" crumbles under Plaintiff's own admission that Shopee was and remains "the largest pan-regional e-commerce platform in Southeast Asia and Taiwan." The securities laws do not permit Plaintiff to challenge reasonable changes in corporate strategy, particularly where, as here, Sea disclosed those changes in advance to the market and then executed on the disclosed strategy.

The CAC also must be dismissed for the independent reason that it fails to allege facts supporting a strong inference of scienter. Plaintiff's scienter theory is based primarily on the Individual Defendants' "core" roles at Sea and speculation that they had access to unidentified (and unsubstantiated) information that "must have" contradicted Sea's public statements. Courts in the Ninth Circuit routinely hold such speculative, conclusory allegations insufficient to meet the PSLRA's heightened pleading standards. This is particularly true here, where Sea's reported results support the far more plausible, non-culpable inference that Sea accurately described its Garena business and sincerely pursued (and achieved) its stated business strategy for Shopee. Moreover, Plaintiff's allegations regarding alleged sales of de minimis portions of the stock holdings held by two defendants do not support an inference of scienter under settled Ninth Circuit law.

For the reasons discussed herein, the CAC should be dismissed with prejudice.

2

# ARGUMENT

## I. The CAC Does Not Identify Any False Statement About The Expiration Of The License Agreement

Recognizing that the CAC identified the wrong agreement, Plaintiff has abandoned its meritless claim that Sea misled investors about the timing of the expiration of the License Agreement.  (CAC ¶¶ 40-49.)  The Opposition is thus limited to three License Agreement-related statements that Plaintiff baselessly asserts to be false:

> (i) Statement that Sea did not expect the expiration of the License Agreement to impact Garena's business going forward because *League of Legends'* contribution had been immaterial (CAC ¶ 65);
>
> (ii) Statements that Garena's paying user ratio and average revenue per user remained "relatively stable quarter-on-quarter" in Q4 2022 and that Sea was focused on "continu[ing] to stabilize" Garena's user base (CAC ¶¶ 74, 76); and
>
> (iii) The risk disclosure that "[a]ny negative developments or occurrences to any of our key revenue-earning games . . . could lead to material decline or slower growth" (CAC ¶ 81).

However, as laid out in the Motion (Mot. 12-18), the CAC does not plead "evidentiary facts" that establish that any of these statements were "untrue or misleading when made" (or ever).  *In re Twitter, Inc. Secs. Litig.*, 506 F. Supp. 3d 867, 880 (N.D. Cal. 2020), *aff'd sub nom. Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022).

### A. The CAC Does Not Sufficiently Plead That The Statement That *League of Legends'* Contribution Was Immaterial To Garena Was False

In response to an analyst question asking about the impact of the License Agreement expiration, Sea stated that it did not expect an impact because the contribution from the *League of Legends* PC game had been "immaterial."  (CAC ¶ 65.)  Plaintiff claims this is false to strategically manufacture a dispute over "materiality" (Opp. 10-12), but Plaintiff has not identified any factual basis for this assertion, which is instead contradicted by the CAC's allegations.  Indeed, Plaintiff does not point to anything—not one external analyst report, industry commentary, internal report at Sea, or witness statement—to support its speculation that the expiration of the License Agreement

3

(covering a single PC game published in six Southeast Asia markets and Taiwan) materially impacted Garena's overall results, which as Lead Counsel alleged elsewhere are primarily driven by Garena's global hit mobile game, *Free Fire*. (Mot. 12-14.)

Plaintiff tries to mask this deficiency by listing out a number of statements from different companies about the popularity of *League of Legends* and money those other companies made elsewhere under different business arrangements or from different games. (Opp. 10-11.) These allegations are irrelevant for the reasons discussed. (*See* Mot. 12-14.) The only allegations specific to Sea in the Opposition are (i) a statement that *League of Legends* was one of Sea's most popular licensed (*i.e.*, third party) games, (ii) a statement that the self-developed *Free Fire* plus other **unspecified** games accounted for 95% of Garena's revenue from 2020-2022, and (iii) a $400 million decline in "GAAP revenue" in the first quarter of 2023 that Plaintiff argues must be attributable to the expiration of the License Agreement. (Opp. 10-11 (citing CAC ¶¶ 45, 49, 81, 123).)

What is required but missing from the CAC are non-speculative allegations quantifying the PC game's contributions to Garena's key performance metrics (which *Plaintiff* identifies as bookings, QAUs, and QPUs) at the time the License Agreement expired. *Steiner v. Hale*, 868 F. Supp. 284, 288 (S.D. Cal. 1994) (dismissing securities fraud claims where "plaintiff merely makes speculative and conclusive statements in an attempt to gain discovery and perhaps discover fraud" which is the type of pleading "[t]he Ninth Circuit has prohibited"). Plaintiffs do not dispute (i) that Garena's results in the years leading up to (and following) the expiration of the License Agreement were driven by the success of its hugely popular self-developed mobile game *Free Fire*, which is available in more than 130 countries, (ii) that Sea barely discussed *League of Legends* after 2019, or (iii) that Garena's results in fact stabilized and **improved** in the quarters following the expiration of the License Agreement. (Mot. 5-7.)

Indeed, Plaintiff's own allegations show the implausibility of its speculation that the $400 million quarterly decline in Garena's "GAAP revenue"—which Plaintiff does *not* allege is a key metric—was attributable to *League of Legends*. As Sea disclosed,

4

GAAP revenue is generally recognized over time and (unlike bookings) does not reflect immediate changes in spending and is more reflective of performance in *prior quarters*. (*See* Ex. 1, 2022 20-F, at 108.)  In contrast, Garena's bookings—which track real-time receipts for the quarter and which Plaintiff admits *is* a key metric—held a similar trajectory from the first quarter of 2022 through the first quarter of 2023 and showed stabilization *after* the expiration of the License Agreement.  (CAC ¶ 28; Mot. 7.)

Plaintiff also mischaracterizes this argument as only concerning "materiality" and claims this is a fact question to be decided later.  (Opp. 10-12.)  But the alleged misstatement is that the contribution of *League of Legends* was "immaterial."  (CAC ¶ 65.)  Plaintiff cannot absolve itself of the requirement to plead "evidentiary facts," *Twitter*, 506 F. Supp. 3d at 880, supporting its claim that this statement was false.  *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275-77 (9th Cir. 2017) (Court "first analyz[ed] falsity . . . and then, if there was a misrepresentation, [would] determin[e] its materiality").  The CAC fails to allege plausibly that this statement was false.

Even if the Court were instead inclined to treat the argument as directed to materiality, however, the Ninth Circuit dismisses securities claims where, as here, plaintiffs fail to plead "specific facts" establishing materiality, such as how the results would have been different absent the misrepresentation.  *See In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 836-37 (9th Cir. 2022); *see also In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108-11 (9th Cir. 2010) (affirming dismissal and holding that "speculative inference approach fails both the particularity and materiality requirements").

**B.   The CAC Does Not Sufficiently Plead That The Statements Regarding The Stabilization Of Garena's Users Were False**

Plaintiff claims that Sea failed to disclose that Garena had not gained sufficient paying users to offset the alleged loss of *League of Legends* users when Sea stated (i) that Garena's paying user ratio and average revenue per user remained "relatively stable" from the third to fourth quarters of 2022, and (ii) that Sea was focused on "continuing to

stabilize" Garena's user base. (Opp. 13.) This conclusory and unsupported claim is contradicted by the CAC (*see* Mot. 6-7, 13) and fails for several additional reasons.

*First*, Plaintiff's claim is premised on an alleged decline in Garena user engagement that is unsupported by the CAC, and Plaintiff does not allege any facts suggesting that Garena's performance failed to stabilize. Moreover, nothing about these statements suggests anything about what might happen in the first quarter of 2023. Nor does Plaintiff claim that Sea did not intend to "focus" on stabilizing Garena's user base moving forward. This failure to plead falsity requires dismissal of these claims.

*Second*, Plaintiff's allegation that Defendants knew at the time of these statements that Garena experienced a material decline in user engagement that needed to be offset following the expiration of the License Agreement (Opp. 13) is contradicted by the quarterly results described in the CAC and is not based on any particularized, non-speculative allegations regarding any of the key metrics the CAC identifies. *See supra* at 4-5. Indeed, Plaintiff ignores that Garena's first quarter 2023 results were ***consistent*** with Sea's prior disclosure that it was seeing "ongoing moderation in engagement and monetization" and that Sea's first quarter 2023 results—the first quarter after the expiration of the License Agreement—showed ***improvement***, *i.e.*, stabilization, in the rate of decline for all key performance metrics that the CAC identifies. (Mot. 7.)

*Third*, courts routinely hold that statements like "relatively stable" or about what a company will "focus on" are too general to be actionable. (Mot. 19-20; *see also In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 165, 170-72 (2d Cir. 2021) ("relatively stable" actual net charge-off rates were too general to be materially misleading); *Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024, 1038 (N.D. Cal. 2020) ("relentless focus on our customers" was "non-actionable puffery").)

**C.    The CAC Fails To Plead That Sea's Risk Disclosures Were False**

Plaintiff's claims based on the expiration of the License Agreement also fail for the independent reason that Sea warned investors in its 20-F that "[a]ny negative developments or occurrences to any of [its] key revenue-earning games . . . could lead to

6

material decline or slower growth."  (CAC ¶ 81; *see also* Mot. 21.)

Plaintiff's claim that Sea misrepresented this risk "as merely a hypothetical, when [it] had already materialized" (Opp. 14) fails for two reasons.  First, Plaintiff's assertion that the risk of a material decline had "materialized" is speculative and fails for the reasons discussed above (*supra* at 3-6), and Plaintiff in any event fails to plead adequately that *League of Legends* was a "key revenue-earning game[]" at the time the License Agreement expired.  Second, Sea disclosed an ongoing moderation trend in Garena's user engagement and monetization, and its actual performance was in line with—and in certain respects an improvement to—those ongoing trends.  (Mot. 6-7, 13.)

**D.      The CAC Fails To Plead Any Corrective Disclosure Related To Garena**

The CAC's failure to identify any corrective disclosure tying a decline in Sea's ADS price to the License Agreement expiration necessarily means the CAC fails to sufficiently plead loss causation.  (Mot. 14.)  Plaintiff's only response is to argue in a footnote that the argument was waived.  (Opp. 7 n.6.)  But the argument was raised (*see* Mot. 14), and the loss causation argument is a simple one that did not require extended discussion.  *See Acosta v. Kijakazi*, 2023 WL 3033499, at *1 (9th Cir. Apr. 21, 2023) (no waiver where "[d]efendants promptly raised [the argument] in their motion to dismiss").[2]

**II.     The CAC Fails To Allege Any Actionable Statement About Shopee's Strategy**

Plaintiff's second theory is that Sea embarked on a strategic shift toward self-sufficiency and profitability—which it indisputably achieved—all while secretly knowing that this strategy was doomed to fail.  This hard-to-follow claim requires the Court to set aside logic and look only at out of context cherry-picked statements.  Although the CAC purports to allege approximately 10-15 misrepresentations based on this theory, the statements can be categorized as concerning (i) Shopee's growth and platform size, and

---

[2] *United Nurses Ass'ns of Cal. v. Nat'l Lab. Rels. Bd.*, 871 F.3d 767, 780 (9th Cir. 2017) is inapposite, as the Court there merely declined to consider a defendant's "fleeting[] allu[sion]" to an argument that did not identify the law or supporting facts.

(ii) Shopee's ability to maintain market share while cutting spending.[3]  (Opp. 14-19.)

**A.    Sea Disclosed That Its Strategy Shift To Self-Sufficiency Could Result In Negative Growth For Shopee**

The claim that Sea failed to disclose that its focus on profitability undermined its ability to grow flounders out of the gate.  Sea disclosed that its strategic shift could result in "no growth or negative growth" and that Sea would "accept that."  (CAC ¶ 69.)  Realizing this is fatal to its claim, Plaintiff argues Sea "couched the risk of declining Shopee growth" as a mere "hypothetical."  (Opp. 15.)  But the very same earnings release that Plaintiff claims concealed this risk disclosed, *according to Plaintiff*, "stagnating" GMV growth.  (CAC ¶ 55.)  And in the following quarters, Sea disclosed what Plaintiff calls a "significant[]" decline in GMV in the fourth quarter for 2022 (*id.* ¶ 57), and another decrease in the first quarter of 2023 (Mot. 15-16).  These disclosures, along with Sea's continued disclosure of other financial and operating metrics for Shopee, foreclose any claim that (i) Sea omitted the risk of declining or stagnating growth due to its strategy shift, and (ii) Sea's statement that it would continue to provide annual, but not quarterly GMV metrics in line with industry peers was a "pretext" to hide declining GMV.

**B.    Plaintiff Does Not Sufficiently Allege That Sea Concealed The Competitive Impact Of Its Turn To Self-Sufficiency**

Plaintiff's claim that Sea concealed the potential competitive impact of its focus on self-sufficiency fails because Sea disclosed those risks.  (Mot. 17-18 (citing Ex. 18, 2021 20-F, at 15-16 ("[Shopee] faces competition from regional players that operate across several markets, and from single-market players. . . .  As e-commerce is evolving in our markets, competition for market share is particularly intense.")).)  As the CAC confirms, Sea pointedly explained that it believed the focus on improved efficiency would help Shopee "defend [its] ecosystem against any future competition" and that it

---

[3] The precise number is difficult to determine as the CAC includes several long block quotations—at times spanning multiple pages—with certain language in bold and italics (but not always).  (*Compare* CAC ¶¶ 66, 75, 76, 87, 89.)

would "remain vigilant on competition."  (CAC ¶ 75.)  Plaintiff does not address these disclosures in the Opposition, which are dispositive of this claim.

Instead, Plaintiff relegates a central issue to a footnote, burying its (rebutted) contention that "Defendants [] downplayed analyst concerns about 'the competitive impact'" of Sea's shift in strategy to self-sufficiency.  (Opp. 15 n.14.)  To credit Plaintiff's theory, the Court would have to accept the implication that Sea undertook to cut costs and strengthen operational efficiency while believing this was both detrimental to Shopee's competitiveness and something it would have to reverse quickly.  (Mot. 16-18.)  Such an inferential leap is unwarranted because Shopee undisputedly cut its expenditures, improved monetization, and achieved profitability, all while competing with existing and new entrants and, ***by Plaintiff's own admission***, remaining the largest platform in Southeast Asia.  (*Id.* at 17 (citing *In re Northpoint Commc'ns Grp., Inc. Sec. Litig.*, 184 F. Supp. 2d 991, 998 n.2 (N.D. Cal. 2001) (allegations that "are . . . speculative in the extreme . . . do not merit extended consideration")).)

**C.      The Alleged Misrepresentations Are Inactionable As A Matter Of Law**

The alleged misrepresentations related to Shopee are inactionable as a matter of law for multiple reasons.  (Mot. 18-22).

**Accurate Statements.**  Plaintiff does not substantively address any of the 10 or more statements identified in the Motion as accurate statements of historical fact.  (Mot. 18-19.)  For example, Plaintiff does not explain how Sea's first quarter 2023 earnings contained anything other than accurate historical information.  (CAC ¶ 85.)  The only statements that Plaintiff addresses, albeit in conclusory fashion, are inactionable opinion statements (see below) that Sea believed its peers "behaved in a relatively rational manner" and that Shopee's "service offerings remain competitive and [its] monetization take rate is well justified."  (Opp. 15 n.14 (citing CAC ¶¶ 66-67).)  Plaintiff alleges these statements were misleading because Sea did not make disclosures about the business practices of its competitors.  (*Id.*)  But Sea was not required to make disclosures about its competitors.  *See Pension Fund Grp. v. Tempur-Pedic Intern., Inc.*, 614 F. App'x 237,

9

248-49 (6th Cir. 2015).

**Opinion and/or Puffery.**  The Motion identifies 12 or more statements that are inactionable opinions and/or puffery.  (Mot. 19-20.)  Plaintiff is wrong when it argues that only statements preceded by qualifying language such as "I believe" or "I think" are inactionable opinions.  (Opp. 19-21.)  No such language is required.  *In re Turquoise Hill Resources Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 218-19 (S.D.N.Y. 2022).  Plaintiff offers no other reason that the statements should not be treated as opinions, and it ignores the cases finding the same or similar language to be inactionable.  (Mot. 19-20.)  Plaintiff also wrongly claims the Motion only identified "one" statement with qualifying language (Opp. 20 & n.18) because the Motion cites several.  (Mot. 19 (citing CAC ¶¶ 75, 76, 89).)

Plaintiff argues that certain statements of opinion are rendered actionable because Sea allegedly omitted to disclose that "shipping subsidies and other discounted promotions were a key focus at Shopee to staying competitive."  (Opp. 20.)  This is illogical and conclusory.  For example, Plaintiff fails to explain how that alleged omission renders misleading (or no longer opinions) statements in CAC ¶ 76 ("*We don't necessarily think* that growth and profitability need to be a trade-off") or ¶ 77 ("*I think* starting from '23, we'll generally see some – we'll see some natural growth *hopefully*").

As to the statements identified as puffery (Mot. 19-20), Plaintiff argues only that some statements, when read in context, might not be inactionable puffery.  (Opp. 19-21.)  Plaintiff makes no effort to explain how this principle applies here.  For example, the CAC challenges as misleading the statement that Sea's "long-term view" was that it wanted to "emerge as the strongest winner in this market."  (CAC ¶ 69.)  Elsewhere, it challenges the statement that Sea would "work to further strengthen our leading position and profitability."  (*Id.* ¶ 73.)  These are classic statements of "puffing" regardless of context, which, in any event, Plaintiff does not provide.  (Mot. 19-20.)

**Forward-Looking Statements.**  The Motion identifies seven statements regarding Sea's intended strategy for Shopee that were forward-looking and inactionable as a matter of law.  (Mot. 20-21.)  Plaintiff concedes that these statements may be protected

by the PSLRA safe harbor but argues it should not apply because (i) some statements were not forward-looking (CAC ¶¶ 75, 77, 89), (ii) omissions of present fact are not subject to safe harbor protection (CAC ¶¶ 68, 69, 77), and/or (iii) the cautionary language was insufficiently specific.  (Opp. 21-22.)  These arguments fail.

Plaintiff argues that the safe harbor does not apply to some of Sea's forward-looking statements about strategy because they omitted to disclose Shopee's allegedly declining GMV.  (Opp. 21.)  But Sea did disclose declining GMV in the context of its change in strategy, as well as the risk of no or negative growth, and it continued to provide other financial and operating metrics.  *See supra* at 8-9.  To argue that some statements were not forward-looking, Plaintiff also cherry-picks sentences from CAC paragraphs that were not identified in the Motion as forward-looking.  (Opp. 21; *see, e.g.*, CAC ¶ 89 ("I think our past track record has shown that we can execute growth and managing bottom line at the same time as well").)  These statements are inactionable statements of opinion and puffery for the reasons discussed above.

Meanwhile, Plaintiff fails to address clearly forward-looking statements such as "I think starting from '23, we'll generally see some . . . natural growth hopefully" (CAC ¶ 77) or "we think we will continue to invest in the long-term growth opportunities being a profitable, sustainable way that also, hopefully, we can expand the profitable TAM for our region by focusing on user experience and the cost to service" (*id.* ¶ 89).  Those and other statements not meaningfully addressed by Plaintiff (*id.* ¶¶ 63, 69, 73) are plainly forward-looking.  (Mot. 20-21.)  Fatally, Plaintiff does not contest that the CAC fails to allege that the speaker "had actual knowledge that any statement was false when made." (*Compare* Mot. 22 to Opp. 21-22.)  Plaintiff also fails to address the cases in the Ninth Circuit holding that cautionary language substantively indistinguishable from that provided by Sea was sufficient to trigger safe harbor protection.[4]  (Mot. 20-22.)

---

[4] Plaintiff's cases do not contain similar warnings.  *See Provenz v. Miller*, 102 F.3d 1478, 1494 (9th Cir. 1996); *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991); *Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 780 (9th Cir. 2023).

11

**D.      The CAC Fails To Plead Any Corrective Disclosure Related To Shopee**

Plaintiff's inability to identify any allegation in the CAC attributing a disclosure of what the Plaintiff claims about Shopee to a decline in Sea's ADS price means the CAC fails to sufficiently allege loss causation as to its Shopee theory.  (Mot. 18; *supra* at 7.)

**III.    The CAC Fails To Sufficiently Plead Scienter**

The CAC should also be dismissed for failing to plead facts sufficient to give rise to a strong inference of scienter, or fraudulent intent, as required.  (Mot. 22-30.)

**A.      The "Insider Trading" Allegations *Negate* Any Inference Of Scienter**

Plaintiff does not dispute any of the following: (i) only two of the five Individual Defendants are alleged to have sold any shares (Mr. Li and Mr. Chen); (ii) those alleged sales amounted to 2.1% and 0.1% of their respective holdings; (iii) the alleged sales were conducted pursuant to Rule 10b5-1 trading plans; (iv) there are no allegations regarding the prior sale history of Mr. Chen; (v) Mr. Li sold shares in consistent amounts in the years prior to the alleged Class Period; (vi) all of Mr. Chen's sales occurred after a 90-day "cooling off period" and all occurred after the first alleged corrective disclosure; and (vii) a significant portion of Mr. Li's sales occurred during normal trading periods following the public release of earnings and related financial disclosures.  (Opp. 27-29.)

As explained in the Motion, these judicially-noticeable facts cut against any inference of scienter under binding Ninth Circuit law.  (Mot. 23-26.)  For example, Defendants cited the Ninth Circuit's 2008 decision in *Metzler Inv. GMBH v. Corinthian Colleges, Inc.* holding that courts look to the percentage of a defendant's total holdings sold, rather than to the proceeds from the sales, and that sales larger than 37% generally are required.  540 F.3d 1049, 1067 (9th Cir. 2008).  In response, Plaintiff cites a 2003 decision from the Central District of California and a decision from the Southern District of Ohio, neither of which can overrule the Ninth Circuit.  (Opp. 28.)

Defendants also cited *Metzler*, 540 F.3d at 1067, for the proposition that "allegations of insider trading do not raise a 'strong inference' of scienter" where one of three individual defendants "sold nothing at all" because it "suggest[s] that there was no

12

insider information from which to benefit." (Mot. 25.) In response, Plaintiff claims that the Ninth Circuit held that it does not "'draw a negative inference from the absence of stock sales.'" (Opp. 29 (quoting *Sharenow v. Impac Mortg. Holdings, Inc.*, 385 F. App'x 714, 717 n.2 (9th Cir. 2010)).) However, the Ninth Circuit did not announce a general rule in *Sharenow*, but rather held that it would not draw a negative inference **in that case** because the plaintiff alleged that the defendant's compensation was positively impacted by the alleged fraud. 385 F. App'x at 717 n.2. No such allegations are made here.

### B.   Plaintiff's Circumstantial Knowledge Allegations Fail

Plaintiff abandoned scienter allegations based on SOX certifications (CAC ¶¶ 110-11; Mot. 29), and instead argues scienter may be inferred based on (i) the "core operations" doctrine (Opp. 23-24), (ii) the seniority and statements of the Individual Defendants (*id*. at 24-26), (iii) Sea's decision to cease quarterly disclosure of GMV (*id*. at 30), and (iv) an unpled theory that Sea was motivated by a "crisis" it allegedly faced (*id*. at 29). Plaintiff's circumstantial, kitchen-sink approach—whether considered individually or as a whole—fails to meet the PSLRA's high bar for pleading scienter.

***Core operations.*** Plaintiff contends in conclusory fashion that the "critical importance" of "*League of Legends* and Shopee's GMV . . . to Sea's core operations . . . alone establish scienter." (Opp. 23-24.) But Plaintiff does not deny that proof under the core operations doctrine "is not easy." (Mot. 27.) Here, the CAC fails to allege any specific information that was available to the Individual Defendants that *contradicted* any of the alleged misstatements at the time they were made (or ever), which is what is required to prevail under a "core operations" theory in the Ninth Circuit. (*Id.* at 27-28) The cases relied on by Plaintiff are inapposite.[5]

---

[5] *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1146-47 (N.D. Cal. 2017) (defendants emphasized the importance of the disputed metric and implied they had access to contradictory information); *Shapiro v. Matrixx Initiatives, Inc.*, 2011 WL 13047298, at *6 (D. Ariz. Sept. 26, 2011) (defendants "received and reviewed hundreds of anosmia complaints, but [] intentionally or recklessly concealed the anosmia complaints rather than disclose them to the FDA and investors"); *Di Donato v. Insys Therapeutics Inc.*, 2017 WL 3268797, at *15 (D. Ariz. Aug. 1, 2017) ("absurd" that CEO would not know

***Seniority and statements of the Individual Defendants.*** The seniority of the Individual Defendants, without more, is not indicative of scienter for the reasons discussed in the Motion (Mot. 26-27), and all of the cases cited by Plaintiff involved additional particularized allegations supporting claims of knowledge beyond the defendant's role that are entirely absent here.[6] Nor is Plaintiff's contention that Defendants "Li, Hou, and Wang frequently discussed and held themselves out as knowledgeable about Garena's and Shopee's key metrics on quarterly earnings calls with analysts and investors" (Opp. at 25) indicative of scienter because Plaintiff fails to allege facts—let alone *particularized facts*—demonstrating that these defendants had access to *contradictory information* at the time of the alleged misstatements, which is what is required. As stated in the Motion, it is not enough for Plaintiff to posit access to some theoretical, alternative facts that contradict what was publicly disclosed. (Mot. 27-28.)

***Sea's decision to provide annual rather than quarterly GMV disclosure.***
Plaintiff does not contest that Sea informed investors that it would provide annual, but not quarterly GMV disclosure while it was focusing on efficiency and profitability, and

that 98% of revenue came from Subsys prescriptions); *Crews v. Rivian Automotive, Inc.*, 2023 WL 4361098, at \*14 (C.D. Cal. July 3, 2023) (scienter based on confidential witness statements regarding defendants' knowledge); *In re Mullen Auto Sec. Litig.*, 2023 WL 8125447, at \*8 (C.D. Cal. Sept. 28, 2023) ("absurd" to suggest CEO did not know a major agreement had already been terminated when he was touting the agreement).

[6] *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 706 (9th Cir. 2021) (inference of knowledge of memo where defendants approved a plan to shut down Google+ on the basis of concerns revealed in memo); *Tsirekidze v. Syntax-Brillian Corp.*, 2009 WL 275405, at \*6 (D. Ariz. Jan. 30, 2009) (scienter supported by defendants' "alleged violations of GAAP"); *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 943-44 (N.D. Cal. 2022) (statement that the company had not made layoffs directly contradicted by layoffs the prior month); *Comms. Workers of Am. Plan for Empls.' Pensions & Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1124 (D. Ariz. 2007) (eight separate factors supported scienter); *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at \*18 (N.D. Cal. Aug. 17, 2022) (confidential witness allegations that defendants were aware of contradictory information); *In re Diamond Foods, Inc. Sec. Litig.*, 2012 WL 6000923, at \*11 (N.D. Cal. Nov. 30, 2012) (same); *Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*, 2021 WL 3748325, at \*23 (N.D. Cal. Aug. 24, 2021) (product accounted for 100% of company revenue).

Sea continued to disclose other financial and operating metrics.  (Mot. 9-10, 16, 28.)  Once Sea achieved three straight quarters of profitability, it informed investors that it was in a position of strength to reaccelerate investment in growth, and it once again disclosed GMV on a quarterly basis, as it had told investors it may do.  (*Id.* at 28.)  These disclosures do not support an inference of scienter.

***The unpled "crisis" motivation theory.***  Plaintiff's unpled contention that Sea was "motivated to misrepresent the true state of affairs at the Company to the investing public while simultaneously hoping for a miraculous turnaround" (Opp. 29) is nonsensical and unsupported by particularized facts.  As discussed in the Motion, the undisputed facts support the more compelling inferences that Sea made strategic business decisions based on evolving market and competitive conditions, sincerely pursued its stated objectives (as borne out by its results), and kept its investors informed every step of the way.  *See In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at \*11, 14 (S.D.N.Y. Mar. 30, 2021) ("change in business strategy does not, without more, render its past disclosures . . . misleading.  A company may shift gears for any number of reasons, most of which have nothing to do with fraud . . . a change in business strategy does not itself show that the old approach was plagued by fraud.").  Plaintiff cannot credibly claim otherwise.

**C.    "Plausible, Nonculpable Explanations" Are More Likely Than Fraud**

The far more likely inferences in this case are (i) that Sea did not expect (and there was in fact no) material impact on Garena's performance from the License Agreement expiration, and (ii) that Sea was focused on cost-cutting and self-sustainability as evidenced by its performance and then, under changed market conditions, decided to reinvest in growth.  (Mot. 30.)  Plaintiff fails to address these arguments.

**CONCLUSION**

For the foregoing reasons, the CAC should be dismissed with prejudice.[7]

---

[7] Plaintiff does not dispute that failure to plead a viable primary claim requires dismissal of its control person claims.  (Mot. 30; Opp. 30.)

15

Dated:  May 20, 2024

LEWIS ROCA ROTHGERBER CHRISTIE LLP


/s/ *John C. Gray*

John C. Gray (Arizona Bar. No. 028454)
201 East Washington Street, Suite 1200
Phoenix, AZ 85004
Telephone:  (602) 262-5311
Facsimile:  (602) 262-5747
Email:  jgray@lewisroca.com

ALLEN OVERY SHEARMAN STERLING US LLP
Adam S. Hakki (admitted *pro hac vice*)
Daniel C. Lewis (admitted *pro hac vice*)
Joshua T. Ebersole (admitted *pro hac vice*)
599 Lexington Avenue
New York, NY 10022-6069
Telephone:  (212) 848-4000
Email:  ahakki@aoshearman.com
        daniel.lewis@aoshearman.com
        joshua.ebersole@aoshearman.com

*Counsel for Defendants Sea Limited, Forrest Li, Tony Hou, Yanjun Wang, Gang Ye, and David Chen*

16